1  Ivaylo Tsvetanov Dodev,

**FILE ON DEMAND
FOR THE RECORD**

2  c/o  6312 South 161st Way
      Gilbert, Arizona

3     (480) 457-8888 Phone

4     (480) 457-8887 Facsimile
      dodev@hotmail.com



5

6  *Pro Se*

7

8

9          **IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF ARIZONA**

10

11

12

13  **Ivaylo Tsvetanov Dodev,**          **Case No.  CV-13-02155-PHX-DLR**

14          **Plaintiff,**          **VERIFIED ACTION-AT-LAW FOR**
                                      **(1) Standing to Enforce Security**
15          **vs.**                  **(2) Tort and Deceptive Consumer**
                                          **Practices with Respect to Foreclosure**
16  **RECONTRUST COMPANY, N.A.,**     **(3) FDCPA & FCRA Violations**
    **SELECT PORTFOLIO SERVICING,**   **(4) Security Violations**
17  **INC., THE BANK OF NEW YORK**    **(5) Anticipatory Repudiation**
    **MELLON,  CORPORATION, FKA THE** **(6) Contractual Fraud**
18  **BANK OF NEW YORK, BANK OF**     **(7) Usury**
    **AMERICA, N.A. successor of**    **(8) TILA Violations**
19  **COUNTRYWIDE HOME LOANS, INC.,** **(9) RICO**
20  **REAL TIME RESOLUTIONS, INC.,**  **(10)   Quiet Title**
    **DOES 1-100,** *in his/her individual and*  **(11)   Declaratory and Injunctive Relief**
21  *official capacity*
22                                    **SECOND AMENDED COMPLAINT**
                                          **AS ORDERED (DOC. 93)**
23          **Defendants.**          **(Contemporaneously Filed With Doc.**
                                      **53 As Judicial Cognizance)**
24

25                                    **A TRIAL BY JURY DEMANDED**
26
27                                    **(HON. DOUGLAS L. RAYES)**
28

Here comes, Ivaylo Tsvetanov Dodev, *pro se[1]*, ("Plaintiff"), consumer, as defined in 15 U.S.C § 1692a(3): *"'consumer' means any <u>natural person</u> obligated or allegedly obligated to pay any debt"*, Citizen of Arizona[2], with his Second Amended Complaint.

# I
## INTRODUCTION

1. This Second Amended Complaint is filed pursuant to Judge's Order, Doc. 93. In lieu of striking and amending specific passages, Plaintiff hereby strikes the entire First Amended Complaint and brings the following, with more clearly pled legal arguments and allegations which tie specific defendants to causes of action, in the name of judicial efficiency.

2. Plaintiff lack of formal training in law is apparent from his First Amended

---

[1] *"Allegations such as those asserted by petitioner, however inartfully pleaded, are sufficient... which we hold to less stringent standards than formal pleadings drafted by lawyers."* <u>Fortney v. U.S.</u>, C.A.9 (Nev.) 1995, 59 F.3d 117. *"The United States Supreme Court, in <u>Haines v Kerner</u> 404 U.S. 519 (1972) stated that all litigants defending themselves must be afforded the opportunity to present their evidence and that the Court should look to the substance of the complaint rather than the form, and that a minimal amount of evidence is necessary to support contention of lack of good faith."*

[2] "There are two classes of citizens, citizens of the United States and of the State. And one may be a citizen of the former without being a citizen of the latter" <u>Gardina v. Board of Registers</u> 48 So. 788, 169 Ala. 155 (1909);"Citizenship of the United States does not entitle citizens to privileges and immunities of Citizens of the State, since privileges of one are not the same as the other" <u>Tashiro v. Jordan</u>, 255 P. 545 California;"The right of trial by jury in civil cases, guaranteed by the 7th Amendment (<u>Walker v. Sauvinet</u>, 92 U. S. 90); "...the privileges and immunities of citizens of the United States do not necessarily include all the rights protected by the first eight amendments to the Federal constitution against the powers of the Federal government." <u>Maxwell v Dow</u>, 20 S.C.R. 448, at pg 455

Complaint as it appears to be wholly misconstrued by the Defendants and the Court (Doc. 93 at 2), who presume that his primary cause of action is based on disputing nonjudicial foreclosure sale attempt by Defendants on his property, even though his obligation on the underlying loans was discharged in bankruptcy.

3. Some of Plaintiff main arguments are that debt collectors[1] cannot substitute Trustee or conduct nonjudicial foreclosure under Arizona law and the Deed of Trust ("DOT") and that there is no Holder in Due Course ("HDC") seeking to enforce the purported secured instruments to <u>whom payment is due</u> as defined under Arizona Revised Statutes, ("ARS"), **ARS §47-3305(C).**

4. On his own cognizance and in the name of a just speedy and inexpensive trial Plaintiff hereby dismiss his claims against all individuals, as alleged in the First Amended Complaint: Gerald Hassell, Karla Richards, Dani Todd, and KaJay Williams and Brian T. Moynihan.

5. On his own cognizance Plaintiff hereby dismiss the formerly alleged RESPA claims as none of the Defendants appear to have any servicing or mortgagee rights as they are all debt collectors under the Fair Debt Collection Practices Act ("FDCPA").

6. Plaintiff, brings this verified action against defendants ReconTrust Company, N.A. ("Recontrust"), Select Portfolio Servicing, Inc. ("SPS"), The Bank of New York Mellon FKA The Bank of New York as Trustee for the Certificateholders of CWALT, Inc., Alternative Loan Trust 2007-OA7, Mortgage Pass-Through Certificates, Series 2007-OA7 ("BNYM"), Bank Of America, N.A. ("BANA"), successor of Countrywide

---

[1] <u>Carmen O'Quin v Bank of America</u>, CV-12-00744-PHX-ROS, Doc. 33

Home Loans, Inc., Real Time Resolutions, Inc. (Real Time), Doe 1 through Doe 100, and alleges the following:

## II
## JURISDICTION AND VENUE

7. The jurisdiction of this Court is pursuant to 28 U.S.C. 1331 (Federal Question), 15 U.S.C. 1692 (d) (Fair Debt Collection Practices Act), 28 USC 1367 (Pendent State Claims), 18 USC § 1341, 31 USC § 3729(a), and ARS § 12-1101, ARS § 33-420(a), ARS § 33-420(c), and Bill of Rights in particular Amendment I, V, VII and XIV. This is a VERIFIED ACTION-AT-LAW TO QUIET TITLE AND MONEY DAMAGES.

8. Venue is pursuant to 28 U.S.C. 1391(b)(2), (c) and (d). Venue lies in the District of Arizona as the claims arose from acts of the Defendants perpetrated therein.

## III
## SEVENTH-AMENDMENT TRIAL BY JURY IS DEMANDED
### Seventh-Amendment Judicial Notice if Hereby Given

9. It is the lawful intent of the Plaintiff herein to invoke the American Law of the Land and its Common-Law Jurisdiction - Court of Record (on the record), where a Seventh-Amendment, constitutionally valid, Common-Law Trial BY Jury of Peers will Judge BOTH the Law and the Fact, as established in the historic American System of Checks and Balances as originally provided by the American Founding Fathers to judge against bad laws. An Administrative-Law advisory Jury Trial, is thus hereby rejected. If this Honorable Court is not able to provide such a Seventh-Amendment constitutionally valid Common-Law Trial BY Jury, the Plaintiff herein respectfully

demands that the instant ACTION-AT-LAW be transferred to such a Seventh Amendment, Common-Law, constitutionally valid Court of Record.

**V**
**PARTIES**

10.    Ivaylo Tsvetanov Dodev is the Plaintiffs at this **VERIFIED ACTION-AT-LAW.** The Plaintiff is the legal titleholder and has beneficiary and possessory interest of the subject private property located at 6312 South 161st Way, Gilbert, Arizona, Maricopa County. Recorded in the Office of the Maricopa County Recorder on June 26, 2004 is his Warranty Deed, under recording No.: 20040852027 (See EXHIBIT "A"); The Plaintiff has a secured and valid interest in the subject private property for over $1,000,000 (one million dollars) (See EXHIBIT "B"); The plaintiff is paying his taxes on the subject land (See EXHIBIT "C"); The Plaintiff is paying his property insurance (See EXHIBIT "D").

11.    Defendant BANA, a national bank with primary place of business: 100 North Tryon Street Charlotte, North Carolina, was former serviced to Plaintiff's loan and has sold his discharged debt to SPS without proper recordation and transfer.

12.    Defendant BNY Mellon, with primary place of business: The Bank of New York Mellon, One Wall Street, New York, New York, is a purported beneficiary of Plaintiff's Note and trustee to a security instrument they claim is associated with Plaintiff's property: CWALT, INC., ALTERNATIVE LOAN TRUST 2007-OA7, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-OA7. Plaintiff's mortgage was allegedly transferred to the ALTERNATIVE LOAN TRUST 2007-

OA7, with the only recordation of assignment being after the closing date in violation of the POOLING AND SERVICING AGREEMENT ("PSA") rendering it VOID (see Glaski v. Bank of America, N.A.: Case No. F064556).

13.    Defendants SPS, with primary place of business: 3815 South West Temple, Salt Lake City, Utah, claims to be a note holder or servicer for investment trusts of a Note secured by Plaintiff's real property.

14.    Defendant ReconTrust, with primary place of business: 7105 Corporate Drive, Plano, Texas, claim to be a Trustee under Plaintiff's Deed of Trust and has recorded multiple Notices of Trustee Sale on Plaintiff's property for BNY Mellon and SPS without standing, in violation of ARS § 33-420(A), his VII and XIV Amendment Rights from the Bill of Rights.

15.    Defendant Real Time, with primary place of business:1349 Empire Central Drive, Suite #150, Dallas, Texas 75247, claims to be a note holder or servicer for investment trusts of a Note secured by Plaintiff's real property (HELOC; second lien).

16.    DOE 1 –DOE 100 are unknown type of entities. The defendants herein named as "all persons unknown, claiming any legal or equitable right, title, estate, lien, or interest in the private land described in this Action adverse to plaintiff's title, or any cloud on plaintiff's title thereto" (hereinafter sometimes referred to as "the unknown defendants") are unknown to plaintiff.

17.   Plaintiff is ignorant to the true names and capacities of defendants sued herein as DOES 1 – 100, and therefore sues these defendants by such fictitious names. Plaintiff will amend this ACTION-AT-LAW to allege their true names and capacities when ascertained in manner similar to Real Time, who were not a part of the First Amended Complaint. Plaintiff  believes, and thereon alleges that each of these fictitiously named defendants, may claim some right, title, estate, lien, or interest in the hereinafter described private land adverse to plaintiff's title; and their claims, and each of them, constitute a cloud on plaintiff's title to the subject private land.

## VI
## GENERAL FACTUAL ALLEGATIONS

18.   Plaintiff is the sole owner of the private landed estate, commonly known as 6312 S 161st Way, Gilbert, AZ 82598 (the "estate").

19.   The basis of Plaintiff's title is a Deed from Justin C. Franks and Daidria (Howe) Franks, who were Successors of All Original Land Patent Rights, Title, and Interest held by the Santa Fe Pacific Railroad Company granting the above-described interest in the subject private land in Allodium to Ivaylo T. Dodev and Nikolina T. Dodev, dated July 16, 2004, by Warranty Deed recorded as Document No. 20040852027 in the Official Records of Maricopa County Recorder, state of Arizona and a Land Patent[1] No. 505230 as recorded in the Official Record of the United States

---

[1] State v. Crawford, 475 P.2d 515 (Ariz. App. 1970) *"A patent is prima facie valid, and if its validity can be attacked at all, the burden of proof is upon the defendant"*; State v. Crawford, 441 P.2d 586, 590 (Ariz. App. 1968) *"A patent to land is the highest evidence of title and may not be collaterally attacked"*; Dredge v. Husite

Department of the Interior, Bureau of Land Management.

20.    Plaintiff has possessed the above-described private land for nine years and four months as of the commencement of this ACTION-AT-LAW.

21.    On December 12, 2006, Plaintiff signed an Adjustable Rate Note (The Promissory Note or "Note") and a Deed of Trust ("DOT") purported to be a mortgage with First Magnus Financial Corporation ("First Magnus"), recorded under instrument No.: 20061646998 in Maricopa County Recorder (See EXHIBIT "E"). The Trust Deed lacks proper assignment of Trustee ("Trustee" is "BLANK" in the document) and lists MERS as beneficiary and nominee for lender and First Magnus as "lender".

22.    No lawful money was ever given to Plaintiff and only commercial credit was extended. There is no evidence of consideration from the purported lender.

23.    On January 2nd, 2007, Plaintiff signed a Home Equity Credit Line Agreement ("HELOC") and Deed of Trust with Assignment of Rents with First Magnus as "Beneficiary", Instrument No 20070033621 as recorded in the Official Records of Maricopa County Recorder, state of Arizona (See EXHIBIT "F").

24.    On January 5, 2009, Plaintiff received bankruptcy discharged of his obligation to the aforementioned Notes under Section 727, of Title 11 of U.S.C. in Chapter 7 bankruptcy proceeding Case No. 2-09-bk-00043-CGC.

Company, 369 P.2d 676,682 (1962) *"A patent is the act of legally instituted tribunal, done within its jurisdiction, and passes the title. Such a patent is a final judgment as well as a conveyance and is conclusive upon a collateral attack"*. Absent some facial invalidity, the patents are presumed valid. Murray v. State, 596 P.2d 805, 816 (1979). The government retains no power to nullify a patent except through a direct court proceeding. United States v. Reimann, 504 F.2d 135 (1974); See also: *Green v. Barker*, 66 N.W. 1032, 1034 (1896)

25.     Seeing as Defendants BNY Mellon and SPS are claiming Plaintiff's Note and DOT are part of an investment trust titled "Cwalt, Inc., Alternative Loan Trust 2007-OA7, Mortgage Pass-Through Certificates, Series 2007-OA7," the two instruments should have been transferred to the trust once securitized in a manner pursuant to the terms of the Pooling and Servicing Agreement PSA (See EXHIBIT "G") that governs the Trust, relevant securities laws, and the Uniform Commercial Code (UCC).

26.     The PSA which governs the Trust cited a closing date of March 30, 2007 or 90 days thereafter. All Notes and DOT's (undivided) that were to become part of the Trust had to be physically delivered in by that closing date (See PSA 2:02 and ARS § 47-3202 et. seq.) with proper recordation of assignment.

27.     On August 24th, 2011, 5 years after the closing date of the PSA, a Corporation Assignment of Deed of Trust (the "Assignment") was recorded as instrument No. 20110706279 in Maricopa County Recorder (See EXHIBIT "H") in which Mortgage Electronic Registrations Systems, Inc. ("MERS") purported to transfer beneficial interest (which it did not hold) of Plaintiff's DOT to BNY Mellon as Trustee for Cwalt, Inc., Alternative Loan Trust 2007-OA7, Mortgage Pass-Through Certificates, Series 2007-OA7. Carmelia Boone signed this document as the purported Assistant Secretary to MERS.

28.     The purported assignment was executed by MERS though it was never part of or in possession of the Note or gave any consideration for it, in violation of covenant 20 of the DOT Plaintiff signed. A DOT does not pass the debt [obligation],

-9-|Page of Second Amended Complaint

and passing the security interest only passes no interest to the grantee. <u>Smith v. J.R. Newberry Co.</u>, 21 Cal. App. 432, 131 P. 1055 (2d Dist. 1913), <u>Rodney v Arizona Bank</u> (assignee who obtained mortgage assignment but not the promissory note could not foreclose on a mortgage). Confirmed in <u>Re: Weisband</u> (Bankr. D. Airz. 2010).

29.     Under Arizona Law, ARS §47-3203(B), ***"...Public filing or recording of a document [purported assignmen] does not of itself constitute notice of a defense, claim in recoupment or claim to the instrument."***

30.     Arizona Law, while not warranting any defense or claim of recoupment after a recordation of a document  protects the land record from fraudulent recordation under ARS §33-420(A), the purpose of which is to *"[p]rotect property owners from actions clouding title to their property."* <u>Stauffer v. U.S. Bank National Ass'n</u>, 308 P.3d 1173, 1175 (Ariz. Ct. App. 2013), where Arizona Court of Appeals held that a § 33-420(A) damages claim is available in a case in which plaintiffs alleged as false documents *"[a] Notice of Trustee Sale, a Notice of Substitution of Trustee, and an Assignment of a Deed of Trust."* Claim for damages under ARS was duly upheld by the U. S. Court of Appeals for the 9th Circuit, No. 11-17615 D.C., <u>In re MERS</u>, 2:09-md-02119-JAT, in their <u>published opinion on **June 12, 2014**</u>.

31.     The Assignment appears to be executed in fraud or forgery. The validity of Carmelia Boone's signature is hereby challenged seeing as other documents purported to have been signed by her display signatures that don't resemble each other. (See instrument No. 20100605004 in Maricopa County Recorder, EXHIBIT "I", and compare to signature to one on Plaintiff's Assignment). The Defendants will have to

prove on the record, which one of the two, completely different signatures, is signed by Carmelia Boone.

32.    Further, the Assignment is not signed by a competent "material fact witness," one who can attest under penalty of perjury that he/she has seen and examined the original Note and DOT, as required by law, for transferring them to the successor.

33.    On the same day, August 24th, 2010, a Substitutions of Trustee in which BNY Mellon named ReconTrust the new trustee under the DOT, and Notice of Trustee Sale ("NTS") were recorded for the purpose of initiating foreclosure proceeding.

34.    BNY Mellon through SPS have recorded NTS #20110706281in the Office of the Maricopa County Recorder with Trustee Sale ("TS") # 11-0075989, the same TS number that Defendant Bank of America used for recording a NTS on August 24, 2011 and after duly challenged, canceled the recorded NTS on March 19, 2013 and paid restitution to Plaintiff for unlawful foreclosure attempt – **thus the nexus of title was broken.**

35.    On February 21, 2014, Plaintiff filed for an emergency Chapter 11 Bankruptcy to stop another unlawful Trustee Sale attempt by ReconTrust, case number: 2014-bk-02116-MCW.

36.    Consequently, ReconTrust, a full subsidiary of BANA in violation of Trust Law, closed its "Trustee Business" for good on April 1, 2014 after another billion dollar settlement with the Federal Government.

## VII
## FIRST CAUSE OF ACTION
## STANDING
### (Against all Defendants)

37.    Plaintiff reaffirms and realleges the general factual allegations and count specific claims above as set forth more fully herein below.

38.    In order for any of the Defendants to take any sort of action in relation to Plaintiff's home, Note, or DOT, they must either be a creditor/beneficiary, operating in the shoes of a creditor/beneficiary, or be acting in accordance to sort of contractual obligation to a creditor/beneficiary. In order to satisfy the requirements to be considered a creditor, an entity must show that it has standing as a party in interest.

39.    A creditor seeking to exercise some interest in a debtor's estate must demonstrate both constitutional and prudential standing. In <u>Re Veal</u>, 450 B.R. 897, 906 (9th Cir. BAP 2011).

40.    Constitutional standing requires, at minimum, an injury in fact, which is caused by or fairly traceable to some conduct or some statutory prohibition, and which the requested relief will likely redress. <u>Winn</u>, 131 S. Ct. at 1442; <u>Sprint Commc'ns Co. v. APCC Servs., Inc.</u>, 554 U.S. 269, 273-74 (2008). Defendants must show that they: (1) have suffered <u>an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical</u>; (2) the injury is fairly traceable to the challenged action of the Plaintiff; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. <u>Loren</u>, 2007 WL 2726704 at 7. In order to satisfy the minimum requirement of injury in fact, a party has to be a

lender, creditor, beneficiary or HDC (as defined in UCC 3-302, incorporated in the ARS) of the original Note.

41.     Prudential standing "embodies judicially self-imposed limits on the exercise of federal jurisdiction." Sprint, 554 U.S. at 289 (quoting Elk Grove, 542 U.S. at 11); County of Kern, 581 F.3d at 845. In this case, one component of prudential standing is particularly applicable. It is the doctrine that a party must assert its own legal rights and may not assert the legal rights of others,[1] meaning that a creditor must show that it is a "real party in interest."

42.     Plaintiff contents that none of the Defendants have either constitutional standing or prudential standing and that they are neither a real party in interest as a holder in due course or authorized agent of a holder in due course, and cannot show injury in fact as a result.

43.     In mortgage cases, the transfer of enforcement right and ownership, right to payment steam, of a Note (negotiable instrument),  is governed by Article 3 and 9 of the UCC respectively and the transfer of the mortgage generally is governed by the state law of conveyance and real property. ARS § 33-817 states that *"the transfer of any contract or contracts secured by a trust deed shall operate as a transfer of the security for such contract or contracts,"* which the Arizona Supreme Court has interpreted to mean that when the Note is transferred the Deed is also transferred as an "operation of law" <u>Vasquez v. Saxon Mortg., Inc.</u> (In re Vasquez), 228 Ariz. 35, 266

---

[1] <u>Sprint</u>, 554 U.S. at 289; <u>Warth</u>, 422 U.S. at 499; <u>Oregon v. Legal Servs. Corp.</u>, 552 F.3d 965, 971 (9th Cir. 2009).

P.3d 1053 (Ariz. 2011).

44.     In re Weisband, 427 B.R. 13, the Court stated that a party may establish standing by showing that it is a *"real party in interest."* The court held that a <u>holder of a note is a *"real party in interest"*</u> under FRCP 17 because, under the ARS § 47-3301, the note holder has the right to enforce it; further <u>Weisband</u> Court states that under Arizona law, a holder of a note is defined as, inter alia, ***"the person in possession of a negotiable instrument** that is payable either to bearer or to an identified person that is the person in possession."* Id. (citing ARS § 47-1201(B)(21)(a)). In addition to being a holder, a party may also show that it has standing by establishing that it is a "person entitled to enforce the note" ("PETE"), as laid out in UCC 3-301.

45.     Therefore, the UCC is directly relevant to nonjudicial foreclosure attempts that attempt to foreclose not under the Note but under the security instrument (DOT). This is because the UCC regulates how HDC status and right of enforcement of a Note and its subsequent security interest is transferred.

46.     Under Arizona Law HDC, ARS §47-3302(2), must take the instrument (a) **for value**, (b) **in good faith**, (c) <u>**without notice that the instrument is overdue or has been dishonored**</u>, and ARS § 47-3203(C), <u>**a person is not a HDC if the instrument is purchased**</u> (1) *"By legal process or **by purchase in an execution, bankruptcy or creditors' sale or similar proceeding**; (2) By purchase as a part of bulk transaction not in ordinary course of business of the transferor"*.

47.     Plaintiff rightfully alleges that his obligation was transferred in bulk, according to the terms of the securitized trust, and was in default and discharged

(dishonored) according to law, evidenced by his bankruptcy discharge order of 2009, 2:09-bk-00043-CGC, evident by the recordation of Substation of Trustee and NTS years after his discharge, unveiling that defendants SPS, BNY Mellon, and Real Time are debt collectors and not an HDC which was lawfully transferred the obligation according to UCC.

48.    None of the existing defendants are named on either Plaintiff's Note or DOT, with First Magnus ONLY, and thus have no legal right, under applicable substantive law, to enforce an obligation or seek a remedy with respect to it unless they can show this party in interest status (and thus, standing), either as HDC or as PETEs.

49.    Every copy of Plaintiff's note that has been sent to him in correspondence from the named Defendants at Plaintiff's request is bereft or any indorsements or permanently affixed allonge that show a proper chain of transfer from First Magnus either to an identified entity or in bearer. See EXHIBIT "J" for copy of the note, sans any indorsements.

50.    Arizona Courts have found that the security interest [enforcement of Deed] is only granted to the entity which has ownership of the Note as governed by the UCC. The Note, as a negotiable instrument, can be "negotiated" according to UCC § 3-201, or the holder may transfer it by way of an assignment or sale, rather than by negotiation, but its enforceability is determined by Article 3 rules that govern the transfer, UCC § 2-203; if these rules are not met, <u>one who is in mere possession of the note may not be entitled to enforce it</u>.

51.    Court should <u>Judicial Notice</u> that E-Sign 15 USC 7003 excludes the

Uniform Commercial Code Article 3, wherefore electronic (purported) transfer of promissory notes is <u>illegal</u>. *"In summary, the hallmark of negotiability in the paper world is the transfer of the right to payment (evidenced by the note) by delivery of the paper note itself, along with any necessary indorsement.[1]"*

52.     Proper negotiation, not just transfer and possession, secures HDC status, UCC § 3-302. If the foreclosing party is not holder in due course which has secured ownership of the note and enforcement rights through proper negotiation, indorsement, and/or delivery (transfer), than it loses its right to enforce the security interest (DOT). *"So, if 'the mortgage follows the note' has any meaning in the context of today's routine banking practice of splitting ownership of the note (often reposed in a securitized trust) from the right to enforce it as its holder, it could only be that the equitable right to enforce the lien follows the ownership of the note, not mere possession. That equitable right must be proven with evidence of a delivery with the intent to transfer ownership of both the note and the lien."* - <u>Pino v. BNY Mellon</u>, case No.: SC11-697.

53.     Further, other than possible signature fraud or forgery associated with the execution of the Assignment, Plaintiff contends that the involvement of MERS presents a problem, as upheld in almost every appellate court in the country.

54.     Many 9th Circuit courts, following landmark cases in other jurisdictions, recently held that the electronic shortcut of MERS makes it impossible for banks to

---

[1] www.mbaa.org/files/Technology/MBAResTechWhitePaper-SecurityInterestsinTransferableRecords.pdf

establish their ownership of property titles and therefore to foreclose on mortgaged

properties. MERS, (In Re Agard 48750818, 2011, US Bankruptcy Court for New

York, Memorandum Decision, MERS Business Model is Ruled Illegal), a company

that serves as the mortgagee of record for lenders, allows properties to change hand

without the necessity of recording each transfer. Recent cases, however, have held that

MERS is a mere "nominee[1]" – an entity appointed by the true owner simply for the

purpose of holding property in order to facilitate transactions and that this defect is not

just procedural but a substantive failure.

55. MERS was never part of the note and never gave or received any value

while recording or transferring a mortgage; therefore the note was never transferred

along with the mortgage, for valuable consideration, and many courts have ruled:

*"Since MERS did not own the underlying note, it could not transfer the beneficial*

*interest of the Deed of Trust to another. Any attempt to transfer the beneficial interest*

*of the trust deed without ownership of the underlying note is void under California*

*[Arizona[2]] law"*, see in In Re Walker, Case No. 10-21656-E-11, on May 20, 2010, the

United States Bankruptcy Court for the Eastern District of California held that MERS

could not, as a matter of law, have transferred a note to Citibank from the original

lender, Bayrock Mortgage Corp and acted *"only as a nominee"* for Bayrock. See also

In Re Vargas (California Bankruptcy Court), Landmark v. Kesler), LaSalle Bank v.

---

[1] (See one of the latest examples from June 2014 where ME Supreme Court of Appeal
in BANA v. Greenleaf adjudicated the *MERS can only assign its right as nominee*.)
[2] Rodney v. Arizona Bank, 836 P.2d 434 (Ariz. 1992) (assignee who obtained mortgage
assignment but not the promissory note could not foreclose on mortgage)

Lamy (New York).

56.    In re Weisband, 427 B.R. 13, 18-20 (Bankr.D.Ariz.2010), Hon. Judge

Hallwell, showed clear understanding of MERS by asserting that: **MERS Assignment**

**Of The DOT Did Not Provide GMAC With Standing.**

> GMAC argues that it has standing to bring the Motion as the assignee of MERS.
> In this case, MERS is named in the DOT as a beneficiary, solely as the
> "nominee" of GreenPoint, holding only "legal title" to the interests granted to
> GreenPoint under the DOT. A number of cases have held that such language
> confers no economic benefit on MERS. *See, e.g., In re Sheridan,* 2009 WL
> 631355, *4 (Bankr. D. Idaho 2009); *In re Mitchell,* 2009 WL 1044368, *3-4
> (Bankr. D. Nev. 2009); *In re Jacobson,* 402 B.R. 359, 367 (Bankr. W.D. Wash.
> 2009). As noted by the *Sheridan* court, MERS "collect[s] no money from
> [d]ebtors under the [n]ote, nor will it realize the value of the [p]roperty through
> foreclosure of the [d]eed of [t]rust in the event the [n]ote is not paid." 2009 WL
> 631355 at *4.
> Because MERS has no financial interest in the Note, it will suffer no injury if
> the Note is not paid and will realize no benefit if the DOT is foreclosed.
> Accordingly, MERS cannot satisfy the requirements of constitutional standing.
> GMAC, as MERS' assignee of the DOT, "stands in the shoes" of the assignor,
> taking only those rights and remedies the assignor would have had. *Hunnicutt
> Constr., Inc. v. Stewart Title & Trust of Tucson, Trust No. 3496,* 187 Ariz. 301,
> 304 (Ct. App. 1996) *citing Van Waters & Rogers v. Interchange Res., Inc.,* 14
> Ariz. App. 414, 417 (1971); *In re Boyajian,* 367 B.R. 138, 145 (9th Cir. BAP
> 2007). **Because GMAC is MERS' assignee, it cannot satisfy the
> requirements of constitutional standing either.**

57.    Defendants are seeking foreclosure relief based an Assignment, allegedly

executed in fraud, UCC § 3-501(b)(2) shifts the burden of proof on the party alleging to

enforce the note (HDC status),  as is ARS § 47-3308, (when the validity of indoresment

is challenged, the burden of demonstrating authenticity is on the party asserting it[1].)

58.    Plaintiff has challenged Defendants standing to foreclose by Proof of

Claims and Notice to Sue and they have all fallen barren prior to this Verified-Auction.

---

[1] In Re Tarantula, 4:09-bk-09703-EWH, July 29, 2010

59.     Defendants BANA, ReconTrust, BNY Mellon and SPS have heavily resorted to the purported Assignment (the Corporation Assignment) as a transfer of some rights to foreclose while Arizona Law, Security Laws and Case Law has determined the MERS cannot transfer beneficial interest in the obligation and an evidence of lawful transfer and delivery of the Mortgage and the Note is required for a HDC status.

60.     Real Time has never provided any relation to Plaintiff HELOC in blatant violation of Arizona Law, ARS § 33-818, and their only claim for payment is based a purported purchase *"of certain defaulted accounts"* where Plaintiff's name or HELOC is neither listed nor were any enforcement rights transferred. Consequently, no beneficiary rights were ever transferred to them.

## VIII
## SECOND CAUSE OF ACTION
## TORT AND DECEPTIVE CONSUMER PRACTICES WITH RESPECT TO FORECLOSURE
### (Against ReconTrust, BANA, SPS, BNY Mellon)

61.     Plaintiff reaffirms and realleges the general factual allegations and count specific claims above as set forth more fully herein below.

62.     None of the names Defendants has established any relationship to the Note and DOT Plaintiff signed or shown that they are a true HDC[1] of the Original, lawfully indorsed, Promissory Note AND Trust Deed, as defined under UCC  § 3-302(2).

---

[1] US Bank, N.A v. Madero 80 AD3d 751, 752 [2011]; U.S. Bank, N.A. v. Collymore, 68 AD3d 752-754 [2009]; BNY v. Silverberg, 86 AD3d 280-283; Aurora Loan Servc., LLC v. Weisblum, 85 AD3d 109; Bankers Trust v. Nagler, 229 NYS 2d 142, 143

63.   The validity of the Assignment has been duly challenged, both on the grounds of possible signature fraud and on the grounds that it was executed in a manner that did not adhere to terms in the PSA and the UCC.

64.   In order for the new Beneficiary named on the Assignment to legally Substitute a Trustee, the Corporate Assignment had to be conducted lawfully, otherwise the Substitution of Trustee would be void and original Trustee (which there was NONE) would be trying to foreclose.

65.   Further, the purported assignment of Plaintiff's mortgage was executed in 2011, four years after the closing date under the PSA, in violation of the agreement and federal laws. The Beneficiary, now supposedly BNY Mellon, which ReconTrust is attempting to conduct Trustee Sale for, has been unable to show that it has a colorable claim against Plaintiff's home by establishing its status as the holder, as a "person entitled to enforce," or as an entity with any ownership or other interest in the Note.

66.   The Arizona Supreme Court has ruled that an assignment of the Deed of Trust without the debt transfers no right upon the assignee, Hill v. Favour, 84 P.2d 575, 578–79 (Ariz. 1938). Arizona's nonjudicial foreclosure laws only grant trustee power of sale by virtue of its status as a trustee if the beneficiary has secured interest and rights to enforce it.

67.   Hogan v. Wash. Mutual Bank, N.A., 227 P.3d 781(Ariz. 2012), though deciding that Arizona Statutes do not impose the burden on beneficiaries of demonstrating their rights before a nonjudicial foreclosure may proceed, has noted that a beneficiary must first possess the right to enforce the loan note before it can

foreclose.

68.    Though Arizona is a nonjudicial foreclosure state, once a party's standing to foreclose and right to enforce is directly challenged in court, as is the case here where Plaintiff is even challenging that BNY Mellon is in legal possession of the mortgage or the Note, the party must prove that it has a secured interest, Arizona Administrative Code R20-4-1521, ARS § 33-811(C), and 15 U.S.C. §1692i(a).

69.    Further, by challenging Assignment of the DOT to BNY Mellon, Plaintiff is again challenging that ReconTrust is a valid Trustee. The transfers of interest are integral to the beneficiary's claim of authority. Only a beneficiary as defined by the statute—to be strictly construed—could validly appoint a trustee, and this could only occur "after a default" in the contract secured.  ARS § 33-807; Deed of Trust ¶22 (only a "Lender" can order the power of sale, and only after a default to the "Lender" occurs).

70.    If these interests are false, as Plaintiff alleges, then Plaintiff has pled facts that contest the beneficiary's identity, authority, and interest, and contest that the sale was noticed by a valid trustee, or that the trustee had an order to exercise the power of sale from a valid beneficiary.

71.    Moreover, according to the corporate disclosures sent by Defendant BANA and ReconTrust, ReconTrust is a full subsidiary of BANA which is a violation of Trust Laws, as noted in Bain v. Metro Mortg Grp.

72.    The Defendants have established a pattern: harass and steal through GRAND THEFT without fear of lawful repercussions. Blinded by greed and starving

to devour another man's house, they have violated even the ARS, in particular ARS §33-809(C), where the Plaintiff received the NTS in the mail more than a month after being recorded, versus the 5 days required by law, along with ARS § 33-420(A).

73. As a result of their action, Plaintiff has lost gainful employment and is living in constant fear of being unlawfully removed from his homestead, WITHOUT DUE PROCESS, of which he is in possession, with true title of ownership in fee simple, and as a result his health has gravely deteriorated and irreparable damages have transpired to his welfare and family affairs.

74. The unconstitutional foreclosure sale has been timely and duly challenged under FCRA § 623(a)(8)(D), 16 C.F.R § 660.4 and Arizona Administrative Code R20-4-1521and ARS § 33-811(C) (Notices have been sent to all Defendants).

75. Further, the court should take notice and action against defendant ReconTrust as they are in violation of ARS §§33-813 and 33-818. ReconTrust did not record cancelation of notice of sale and their resignation as required by law " *[i]f the sale is not held or is not properly postponed pursuant to this chapter, the trustee shall record a cancellation of the notice of sale. The cancellation of the notice of sale shall be recorded in the office of the county recorder in which the notice of sale was recorded*" – ARS § 33-813(F) and "*[n]otice of resignation of trustee*" –ARS § 33-818.

76. After being barred from many states, considered illegitimate, ReconTrust closed their business of [pretending] trusteeship for good as of April 1st, 2014. Plaintiff declares that he was informed on more than one occasion from

ReconTrust that they are not his trustee and they are not in the trustee business anymore. Yet, they never recorded a notice of cancellation of sale or their resignation as trustee in the county recorder, as required by Arizona law.

# VIIII
## THIRD CAUSE OF ACTION
### FDCPA & FCRA
**(Against All Defendants)**

77.     Plaintiff reaffirms and realleges the general factual allegations and count specific claims above as set forth more fully herein below.

78.     Plaintiff alleges that Defendants SPS, BANA, and Real Time are or have functioned as "debt collectors" in relation with Plaintiff within the meaning of 15 U.S.C. § 1692 et. seq., and in particular, 15 U.S.C. Section §1692a(6) in that they used the U.S. Mails in a business whose primary purpose is the collection of debts and have acquired the debt after it has been in default or alleged default.

79.     The distinction between a creditor and a debt collector lies precisely in the language of § 1692a(6)(F)(iii). For an entity that did not originate the debt in question but acquired it and attempts to collect on it, that entity is either a creditor or a debt collector depending on the default status of the debt at the time it was acquired. The same is true of a loan servicer, which can either stand in the shoes of a creditor or become a debt collector, depending on whether the debt was assigned for servicing before the default or alleged default occurred. Wadlington v. Credit Acceptance Corp., 76 F.3d 103, 106-8 (6th Cir. 1996); see also Perry v. Stewart Title Co., 756 F.2d 1197, 1208 (5th Cir. 1985).

80.    On February 8th, 2011, Plaintiff received a letter from BANA stating that effective July 1st, 2011, the servicing of the loan would be transferred from BAC Home Loan Servicing, LP, to Bank of America, N.A. (a date after Plaintiff's bankruptcy discharge and in effect a transfer of debt in default, rendering BANA a debt collector), (see EXHIBIT "K").

81.    On the same day Plaintiff received another letter giving additional information that *"under the Fair Debt Collections Practices Act and certain state laws, Bank of America, N.A. is considered a debt collector. As a result, we are sending you the enclosed [FDCPA] Notice,"* (see EXHIBIT "L").

82.    BANA being fully aware of Plaintiff's Chapter 7 Bankruptcy and discharge, continued to solicit and harass him in bad faith via phone calls and letters for about three (3) years after the fact in violation of 11 USC § 524(a)(2), Matter of Edgeworth, M.D. (5th Cir. 1993) 993 F.2d 51, 53; see also In re McGhan (9th Cir. 2002) 288 F.3d 1172, 1175 and Walls v. Wells Fargo Bank, N.A. (9th Cir. 2002) 276 F.3d 502, 507; assigning discharged debt for servicing; continuous harassment on Plaintiff after defaulting on Proof of Claim, violation FDCPA §809(b); Default on his Good Faith Offer to Pay the Entire Amount Due and trying to foreclose on Private Land, violating FDCPA §807(5) and §808(6).

83.    On August 30, 2011, Plaintiff sent Notice of Complaint and debt validation via Proof of Claim to BANA received by them on September 16, 2011 via USPS certified mail (See EXHIBIT "M"), to which Plaintiff did not received adequate response.

84.     As a result of Plaintiff's complaint BANA canceled the NTS (See Exhibit "N") and issued settlement check for wrongful foreclosure attempt (see Exhibit "O").

85.     Plaintiff is in possession of many Monthly Statements, Payment Adjustment Notices and Loan Modifications mailers where BANA does not identify the debt as discharged, in violation of FDCPA §807. See EXHIBIT "P" from July 28th, 2011, where BANA sent a Loan Statement demanding that any payments that are due "must be remitted immediately" and failing to state they are a debt collector.

86.     BANA was harassing Plaintiff for over one year with dunning letters and phone calls, attempting to unlawfully extort payments and presenting an undue burden to Plaintiff in violation of FDCPA §808 through malicious efforts to intimidate by instructing Defendant ReconTrust to file a Notice of Trustee Sale August 24th, 2011.

87.     Effective October 16, 2012, BANA, not being a HDC, sold the discharged debt to SPS without any warrants or guarantee; also known as "zombie" debt.

88.     SPS, upon acquiring the debt from BANA immediately attempted to modify it into "more affordable terms" (debt) while continuing to try and collect on a debt. After unsuccessful attempt to re-contract with the Plaintiff, on August 02, 2013, the Defendants recorded NTS, No. 20130709557 in Maricopa County Recorder, which the Plaintiff timely rebutted by sending NOTICE TO SUE via COURT PROCESSORS to all Defendants—included in this Verified Action-At-Law—REBUTTING the alleged debt ONCE again.

89.    Furthermore, on July 2, 2013, the Plaintiff directed a request via PROOF OF CLAIM under FDCPA §809 and Arizona Administrative Code R20-4-1514, to SPS to validate the alleged debt (See EXHIBIT "Q").

90.    This was followed by a second demand and default, sent by certified mail NO.: 23110770000057409879, delivered to them on August 6, 2013, (see EXHIBIT "Q") to which they tacitly admitted by estoppel that SPS do not have a Bona Fide Proof of Contract that BINDS Plaintiff to perform under Deed of Trust recorded on December 12, 2006, as Instrument Number 20061646998 in the Office of the Maricopa County Recorder, to which they claim to be a Servicer.

91.    In regards to Defendant ReconTrust, the term "debt collector" also includes security enforcers when they threaten nonjudicial action to dispossess property without a right or intention to take that property, 15 USC §1692a(6) and 15 USC §1692f(6).

92.    Plaintiff has alleged multiple times that neither BNY Mellon nor ReconTrust have or at any time had any "right to possession of the property claimed as collateral through an enforceable security interest," or an enforceable security instrument for that matter, in and of themselves or through any beneficiary they may claim to represent.

93.    Not only were early transfers of Plaintiff's Note and Deed not executed pursuant to the UCC and the terms of the PSA, as Plaintiff has shown in Doc. 53, (See EXHIBIT "R") BANA was never in lawful or physical possession of either Plaintiff's Note or DOT and thus had no rights to or enforcements rights under Plaintiff's

[subsequently invalid] Obligation.

94.    Plaintiff has alleged that BNY Mellon, the current purported "beneficiary," was not party to a lawful assignment granting it any beneficial interest or enforcement rights of Plaintiff's Obligation [if one exists still].

95.    Because ReconTrust is acting as Trustee for BNY Mellon, which Plaintiff alleges was never actually assigned or transferred any security interest in his land, especially in any manner pursuant to state, federal, contractual, or securities law, in "nonjudicial action to affect dispossession or disablement of property" through Trustee Sale, it is functioning as a debt collector under 15 USC §1692a(6) and committing unfair practices under 15 USC §1692f(6).

96.    Further, ReconTrust and BNY Mellon are liable under ARS § 33-420 for the recordation of false and misleading documents in which they claim an interest in, or a lien or encumbrance against, Plaintiff's home when they are not the beneficial title holders.

97.    As other cases have shown, foreclosure can be a debt collection act within the scope of the FDCPA. Wilson v Draper & Goldberg, PLLC, 443 F3d 373 (4th Cir. 2006), among others (See also Shapiro, 823 P.2d at 124 and Glazer v. Chase Home Fin LLC, 704 F.3d 453 (6thCir. 2013)), has ruled that it is; "a 'debt' remains a 'debt' even after foreclosure proceedings commenced," and that if mortgage foreclosures were not "debt collection" under the FDCPA then it: *"would create an enormous loophole in the [FDCPA] immunizing any debt from coverage if that debt happened to be secured by a real property interest and foreclosure proceedings were*

*used to collect the debt."* Id at 376.

98.     Also, in regards to ReconTrust's fiduciary status, "a trustee's actions to foreclose on a property pursuant to a Deed of Trust are not 'incidental' to its fiduciary obligations. Rather, they are central to it. Thus, to the extent Defendants use the foreclosure process to collect…alleged debt they cannot benefit from the exemption contained in [15 USC] §1692a(6)(F)(i)" Id at 377.

99.     The 9th Circuit upheld the FDCPA in Baker v. G.C.Serv. Corp., 677 F.2d 775, 777 (1982), *"[T]he Act is designed to protect consumer who have been victimized by unscrupulous debt collectors, regardless of whether a valid debt actually exists."*

100.     Court should take **judicial notice** of Chief United States District Judge for the District of Arizona Roslyn O. Silver Order, Doc. 33, in Carmen O'Quin v Bank of America, CV-12-00744-PHX-ROS, where after expositive pleading he affirmed that Trustee are debt collectors under the Act and are liable under 15 U.S.C §1692e.

101.     FTC Staff Commentary on the FDCPA has also held that a trustee appointed solely to conduct a foreclosure sale does not fall under this exemption; immediately after ReconTrust was supposedly appointed Trustee, a Notice of Trustee sale was issued on the same day, suggesting that ReconTrust was appointed solely for this purpose. Thus, ReconTrust is not exempt from under FDCPA from being defined as a debt collector.

102.     On September13, 2013 Real Time contacted Plaintiff identifying itself as a debt collector (See EXHIBIT "S") informing him that there is a lien on his property, suggesting that one of the way of settling the lien is *"selling your property."*

103.   Upon contacting them through the provided telephone number, Real Time claimed to be a servicer. It claims it has a security interest in Plaintiff's property which stem from a HELOC and DOT made with First Magnus.

104.   Real Time violated the FDCPS, 15 U.S.C. §§ 1692 *et seq.*, which prohibits debt collectors from making any false representations as to the "character, amount, or legal status of any debt," 15 U.S.C. § 1692e(2)(A), or collecting or attempting to collect amounts not "expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C.§ 1692f(1).

105.   Robey v. Shapiro, Marianos & Cejda, L.L.C., 434 F.3d 1208 (10th Cir. 2006). (Actual damages are not required for standing under the FDCPA as the attempt to recover unlawful fees was made actionable by Congress); Ruth v. Triumph P'ships, 577 F.3d 790 (7th Cir. 2009). (The FDCPA is a strict liability statute, and debt collectors whose conduct fails short of its requirements are liable here respective of their intentions); Randall v. Nelson & Kennard, 2010 WL 3636258 (D. Ariz. Sept. 20, 2010). (The FDCPA is considered a strict liability statute, meaning that a consumer need not show that the debt collector intentionally, fraudulently, or knowingly violated the Act); O'Connor v. Checkk Rite, 973 F. Supp. 1010 (D. Colo. 1997). (FDCPA is a strict liability statute and only one violation need be shown to entitle consumer to summary judgment.)

106.   On October 1, 2013, Plaintiff sent Real Time a request to validate the debt via certified USPS Mail, followed by a SECOND Proof of Claim and Notice to

Sue, sent on October 29, 2013, delivered on November 1, 2013 via USPS certified mail (See EXHIBIT "T").

107. The response Plaintiff received from Real Time did not present any proof that it has any relation to Plaintiff's HELOC, nor offer Bona Fide Proof of any executory contract signed between Plaintiff and Real Time.

108. Consequently, Defendant Real Time has submitted a Proof of Claim ("POC") in Plaintiff's Chapter 11 bankruptcy proceeding. On the original claim submitted there were no indorsements on the HELOC and there is no assignment of DOT in the Maricopa County Recorder. Thus, no admissible evidence ties interest in the HELOC or DOT to Real Time or any entity (BNY Mellon) which is claims to represent.

109. Real Time is using unfair debt collection practices and falsely and misleadingly presents himself as creditor in its pleadings[1], Goldman v. Cohen, 445 F.3d 152 (2nd Cir. 2006) (legal pleading is a "communication" within meaning of the FDCPA), in violation of 15 U.S. Code §§1692e and 1692f, thus liable for damages[2].

110. On the face of Claimant's Claim, the basis of claim is "money loaned" but Claimant has not loaned Debtor any money and has not been transferred any

---

[1] Henry v. Shapiro, 2010 WL 996459 (E.D. Pa. Mar. 15, 2010) The FDCPA **includes the contents of formal pleadings** within its scope except where formal pleadings are explicitly exempted by §§ 1692e(11) and 1692g(d); Donohue v. Quick Collect, Inc., 592 F.3d 1027 (9th Cir. 2010). "[A state court] complaint served directly on a consumer to facilitate debt-collection efforts is a communication subject to the requirements of §§ 1692e and 1692f.

[2] Robey v. Shapiro, Marianos & Cejda, L.L.C., 434 F.3d 1208 (10th Cir. 2006). Actual damages are not required for standing under the FDCPA as the attempt to recover unlawful fees was made actionable by Congress.

interest in Debtor's obligation or beneficial interest in Debtor's property by any secured creditor.

111.   Claimant had the audacity to open a HELOC account on Debtor's Credit Report in violation FCRA, (See Exhibit "U"), without proper notice or evidence of any contract between Debtor and Claimant, upon being duly informed [challenged] by Debtor to cease and decease all collection activities and to furnish him with Proof of Claim, (See EXHIBIT "Q"), violating 15 U.S.C. § 1681s-2(1)(B)(i) and is liable under 15 U.S.C. § 1681o, within the jurisdiction of this court, 15 U.S.C. § 1681p.

112.   Real Time is liable under Title 18 of USC for accessing Plaintiff commercial history, and recording wrong information under 15 U.S.C. § 1681q. Plaintiff has no information of how Real Time obtained his Social Security number as he has never signed any documents with them releasing his information neither he has received any adequate and viable information from them in response to his POC(S). Davis v. Trans Union, L.L.C., 526 F. Supp. 2d 577 (W.D. N.C. 2007). (Reporting to credit bureaus is a communication within the FDCPA.)

## X
## FOURTH CAUSE OF ACTION
## SECURITY VIOLATION
### (Against BANA, BNY Mellon,)

113.   Plaintiff reaffirms and realleges the general factual allegations and count specific claims above as set forth more fully herein below.

114.   Plaintiff alleges that the security interest was rendered null and void through Defendant BNY Mellon and BANA's infringements on the terms of the PSA

of the Trust that Plaintiff's mortgage is purportedly securitized into and violations of transfer pursuant to UCC, which made the Note an unsecured instrument and destroyed any security interest Defendants may claim to hold.

115.    Pursuant to the PSA of CWALT ALT-2007-OA7, we can track the chain of transfer that these two instruments (Note and DOT) evidencing Plaintiff's obligation and the security should have undergone.

116.    According to the Prospectus of the PSA, the depositor was to purchase the pool of loans from the seller and assign them to the Trustee for the benefit of the Certificateholders, the Trustee then giving them to a custodian to hold so that the investors can be protected against claims that the notes and mortgages are assets of the original lender; all of these entities were to have handled the Note and Mortgage in some capacity.

117.    All of these transfers were to be properly executed and recorded, according to the PSA and NY state laws, by the closing date of the PSA, with the last transfer being to BNY Mellon as beneficiary; if they were not, the consequence is that the Trustee under the Deed (or purported substitute ReconTrust) does not possess the authority to foreclose in the event of a default because the Trustee under the Security Trust (BNY Mellon) does not possess enforcement rights under the security agreement [Deed] or the Note.

118.    A California Appeals Court determined that a Plaintiff [nonparty to PSA] has standing to challenge a securitized trust's ownership. See Glaski v. Bank of America, N.A., 218 Cal. App. 4th 1079 (2013) which held:

We conclude that a borrower may challenge the securitized trust's chain of ownership by alleging the attempts to transfer the deed of trust to the securitized trust (which was formed under N.Y. law) occurred after the trust's closing date. Transfers that violate the terms of the trust instrument are void under New York law, and borrowers have standing to challenge void assignments of their loans even though they are not a party to, or a third party beneficiary of, the assignment agreement.

Pursuant to Article VI Section 3(b)(9) of the New York State

119.   Other cases have come to the conclusion that the timely delivery to the trust is necessary for the trust. These include:  Schwartz v. HomEq Servicing (In re Schwartz) (Bankr. D. Mass. 2011), 461 B.R. 93, 97-99 (Deutsche Bank dismissed on the grounds that he had acquired no title or separate control of the goods, hence, there was no actual trust over the property to breach; Kermani v. Liberty Mut. Ins., 4 A.D.2d 603 (N.Y. App. Div. 3d Dep't 1957) (did not acquire mortgage where they failed to follow PSA conveyance requirements); Kemp v. Countrywide Home Loans, Inc. (In re Kemp) (Bankr. D.N.J. 2010), 440 B.R. 624, 628-34 (bank's claim disallowed, failed to follow PSA conveyance requirements); Hendricks v. US Bank Nat'l Ass'n (Mich. Trial Ct. June 6, 2011), Case No. 10-849-CH, slip op. at 5-7 (bank's foreclosure claim barred where did not comply with PSA); Johnson v HSBC, 2012 WL 928433 (S.D. Cal. 2012): (court recognizes importance of establishing holder status of notes and chain of assignments in foreclosure cases).

120.   Mortgage Backed Securities ("MBS") Certificates are "pass through Certificates," where the Trust has elected to be treated as a Real Estate Mortgage Investment Conduit ("REMIC") to enjoy the tax exempt status allowed under 15 U.S.C. §§806A-G. This designation pertains to the Trust which Defendants hold

Plaintiff's Note and Mortgage are a part of.

121.   REMIC regulations impose very strict limitations as to the nature of the investments a REMIC trust may make (i.e. "permitted investments") and transactions which it may not undertake (i.e. "prohibited transactions").

122.   Any violation of REMIC regulations has significant tax implications for the Trust, as well as all Certificate holders. For example, any income realized by the Trust from a "prohibited transaction" is taxed at 100%.

123.   The REMIC regulations also provide that any entity that causes the REMIC regulations to be violated is liable to the Trust and the Certificate holders for the entire amount of the tax.

124.   Only income from "qualified mortgages" and "permitted investments" may enter a REMIC trust.

125.   A "qualified mortgage" is an obligation (i.e. mortgage) which is principally secured by an interest in real property which (1) was transferred to the Trust on the startup date, (2) was purchased by the REMIC Trust within 3 months after the startup date or (3) any qualified replacement mortgage.

126.   In order to maintain the REMIC status, the Trustee and the Servicers must ensure that the REMIC receives no income from any asset that is not a "Qualified Mortgage" or a "Permitted Investment." 26 U.S.C. § 806F(a)(2)(B).

127.   Prohibited Transactions include the disposition of a qualified mortgage (except where the disposition is "incident to" the foreclosure, default, or imminent default of the mortgage); or the receipt of any income from an asset that is not a

Qualified Mortgage or a Permitted Investment. 26 U.S.C. § 860F(a)(2)(B).

128.   Prohibited Transactions are taxed in an amount 100% of the REMIC's net income from such prohibited transaction. 26 U.S.C. § 860F(a)(1). Contributions of any "property" – e.g., cash, mortgages, etc. – made to the REMIC are taxed at 100% of the contribution. Any violation of REMIC regulations will defeat the privileged tax status and will subject the REMIC to 100% taxation, plus penalties and interest. These taxes and penalties are ultimately borne by the Certificate holders, under a surety bond, letter of credit or insurance policy.

129.   Plaintiff alleges that a transfer of his Note and DOT after the closing date violates the terms of the REMIC regarding Qualified Mortgages and Prohibited Transactions and thus the REMIC trust is liable for tax code violations.

130.   There is no default on the alleged security or BNY Mellon is not a HDC.

A). **The Trust cannot be a holder of the deed and the mortgage** because it was discharge in bankruptcy and is not performing asset, according to the PSA, Section 2.003(C), after 90 days of no payment the master servicer needs to remove the loan from the Trust fund an substituted or repurchase it. It is called *deleted mortgage*. The key is 90 days – this is when the insurance kicks in and pays the loan. Section 3.11 of the PSA Deals with realization upon defaulted mortgage loans; repurchase of certain mortgage loans. OR,

B). **The Trust is a Holder** and the security is still being traded without the signee (Plaintiff) consent.

131.   Once securitized the Note and the DOT are governed by Article 9 of the

UCC. Default under **UCC 9-607(b)** occurs when the Secured Party [the investors] (1) record or provide "a copy of the security agreement that creates or provides for a security interest in the obligation secured by the mortgage; and (2) the secured party's sworn affidavit in recordable form stating that: (A) a default has occurred: and (B) the secured party is entitled to enforce the mortgage non judicially. [as HDC]" None of these events have taken place in relation to Plaintiff's mortgage to substantiate default.

132.   Further, Plaintiff alleges that his obligation is discharged as a conclusion of law and paid through credit default swap insurance, FDIC, Freddy Mac, Fannie Mae insurances or other third parties and that <u>he is liable only for the unpaid</u>, if any, portion of the security, ARS § 47-3602 *"[a]n instrument is paid to the extent payment is made by or on behalf of a party obliged to pay the instrument and to a person entitled to enforce the instrument"*; see <u>Steinberger v. McVey ex rel</u>., Appl. WL333575, p. 13, 2014.

133.   Moreover, Defendants BANA, SPS and Real Time have all violated the UCC and ARS by assigning different loan numbers while pretending to use the Notes and the DOT'S Plaintiff signed with First Magnus where the loan number is clearly printed on the face of the security. ARS unambiguously states: ARS §47-3115(C) *"[i]f words or **numbers** are added to an incomplete instrument without authority of the signer, there is an <u>alteration</u> of the incomplete instrument under section 47-3407."* ARS §47-3407 calls such alteration fraud: *(A)(1) "An unauthorized change in an instrument that purports to modify in any respect the obligation of a party: or (2) An unauthorized addition of words or <u>numbers</u> or other change to an incomplete*

*instrument relation to the obligation of a party. [culminates in (B)] (B) [a]n **alteration**

**fraudulently made discharges a party whose obligation is effected by the alteration**."*

## XI
## FIFTH CAUSE OF ACTION
## ANTICIPATORY REPUDIATION (TENDER RULE)
### (Against BANA, BNY Mellon, SPS)

134.   Plaintiff reaffirms and realleges the general factual allegations and count

specific claims above as set forth more fully herein below.

135.   Upon years of struggle to locate the HDC of his obligation [security],

and after being harassed by BANA in violation of the permanent injunction ordered by

the bankruptcy court for the district of Arizona, and the alleged servicer SPS—who

consequently bought the discharged debt from BANA with purpose to collect debt—

Debtor offered tender of payment under ARS § 47-3603 and UCC §3-603.

136.   Debtor was furnished by pay off quote of his obligation from SPS, which

is a presentment as matter of law under ARS §47-3501 and UCC §3-501 to tender the

full amount "due"; under ARS §47-3501(2) [UCC], *"upon demand of the person to*

*whom presentments made, the person making presentment [SPS] must: (a) Exhibit the*

*instrument…(c) Sign a receipt on the instrument for any payment made or surrender*

*the instrument in full payment is made."*

137.   By   Certified   Mail   No.:   23110770000047322126,

23110770000047322096,   23110770000047322140,   23110770000047322102,

23110770000047322157,   23110770000047322119   and   23110770000047322133,

dated January 14, 2013 Debtor made a GOOD-FAITH OFFER TO PAY THE

ENTIRE AMOUNT DUE, to Claimant, amidst other parties as it utterly unclear who is the HDC,  with the ONLY reasonable request to surrender the instrument upon a full payment made, which was rejected and according to ARS §47-3603 [USS §3-603] (B) *"[I]f tender1 of payment of an obligation to pay an instrument is made to a person entitle to enforce the instrument and the tender is refused, there is discharge, ... (C) If tender of payment of an amount due on an instrument is made to a person entitled to enforce the instrument, the obligation of the obligor to pay interest after the due date on the amount tendered is discharged ..."* and the mandates of well-settled American Law and Jurisprudence, under Anticipatory Repudiation, caused the alleged Loan to be completely and totally Discharged2.

138.   By    Certified    Mail    No.:    23110770000047323628, 23110770000047323635,       23110770000047323642,      23110770000047323659, 23110770000047323666  and  23110770000047323673,  dated  January  31,  2013, Debtor presented his original NOTICE OF DEFAULT3 AND OPPORTUNITY TO CURE WITH ANOTHER GOOD-FAITH OFFER TO PAY THE ENTIRE AMOUNT DUE, this time requesting a Verified Accounting, and to know where to personally bring the legal tender cash in order to trade it for and to retrieve the original lawfully endorsed Promissory Note and Trust Deed in order to complete the original contracted

---

[1] The term "tender" as used in the books, denotes a legal offer, one which one party is under obligation to make and the other bound to accept.  See Duluth v. Knowlton, 42 Minn. 229; Patnote vs. Sanders, 41 Vt. 66.
[2] *"As applied to demands, claims, rights of action, encumbrances, etc., to discharge the debt or claim is to extinguish it, to annul its obligatory force to satisfy it."*  Black's Law Dictionary, Fourth Edition, page 549.
[3] ARS §47-3503(1),(2)(B) and the corresponding UCC §3-3415

transaction. This communication was also rejected according to law caused any part of the alleged Loan that was reinstated by the subject NOTICE OF DEFAULT AND OPPORTUNITY TO CURE to be completely and totally Discharged, AGAIN. The same happened through certified mail on February 19, 2013, and March 5, 2013 (when Offer was neither accepted[1] nor rejected).

139.   All Good Faith Offers are filed as EXHIBIT "V"

140.   The term "tender" as used in the books, denotes a legal OFFER, one which one party is under obligation to make and the other bound to accept. See: Duluth v. Knowlton, 42 Minn. 229; Patnote v. Sanders, 41 Vt. 66. See U.C.C. § 2-713, et. seq. "*A tender of the proper amount due, even if rejected, extinguishes the lien and precludes foreclosure*" (See, e.g. Winnett v. Roberts, supra, 179 Cal App. 3d 909, 902, Lich tv v. Whitney, supra, 80 Cal. App 2d 696, 701; see also Code Civ. Proc. SS 2074.)

141.   Moreover, Debtor's obligation is discharged under Arizona Law because the party bringing foreclosure action has no legal capacity under the purported DOT and note under FDCPA: ARS §47-3305(A)(b) "*[L]ack of legal capacity or illegality of the transaction which, under other law, nullified the obligation of the obligor; (c) Fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or it essential terms; [as plead in the civil complaint] or (d) Discharge of the obligor in insolvency proceedings.*"

---

[1] If creditor is silent in response to offer, creditor does not accept offer. Malan v. Tipton, 349 Or 638, 247 P3d 1223 (2011)

142.   Defendants' (SPS and BNY Mellon) aforementioned conduct violated the UCC 3-603 and UCC § 3-301 PETE ("person entitled to enforce the note") under the Deed of Trust, comprising recorded default under the Rules of Civil Procedures when the Plaintiff, owner of the estate in controversy, offered to pay in cash the balance of the alleged loan secured by the Deed of Trust in exchange for the physical instrument that secures it (The Note) in order to avoid future extortions under the same alleged instrument, UCC § 3-309, Morgan v. Farmers Merchs. Bank, 856 So. 2d 811, 819 (Ala. 2003).

## XII
### SIXTH CAUSE OF ACTION
### CONTRACTUAL FRAUD - VOID "ULTRA VIRES" CONTRACTS[1]
### (Against all Defendants Claiming Enforcement Rights Based on the Notes and DOT'S Plaintiff has Signed with First Magnus)

143.   Plaintiff reaffirms and realleges the general factual allegations and count specific claims above as set forth more fully herein below.

144.   *Black's Law* Dictionary defines the Latin term *"extra vires"* to mean beyond powers. *Black's Law* Dictionary explains the term *ultra vires* embraces "[a]n act performed without any authority to act on subject. Haslund v. City of Seattle, 86 Wash.2d 607, 547 P.2d 1221, 1230. Acts beyond the scope of the powers of a corporation, as defined by its charter or laws of state of incorporation. State ex rel. v. Holston Trust Col, 168 Tenn. 546, 79 S.W.2d 1012, 1016.

145.   The term has a broad application and includes not only acts prohibited by

---

[1] "When a contract is once declared ultra vires, the fact that it is executed does not validate it, nor can it be ratified, so as to make it the basis of suit or action, nor does the doctrine of estoppel apply." F&PR v. Richmond, 133 SE 898; 151 Va. 195.

the charter, but acts which are in excess of powers granted and not prohibited, and generally applied either when a corporation has no power whatever to do an act, or when the corporation has the power, but exercises it irregularly. <u>People ex rel. Barrett v. Bank of Peoria</u>, 295 Ill.App. 543, 15 N.E.2d 333, 335.

146.   By doctrine of *ultra vires* a contract made by a corporation beyond the scope of its corporate powers is unlawful. <u>Community Federal Sav. & Loan Ass'n of Independence, Mo. v. Fields, C.C.A., Mo.</u>, 128 F.2d 705, 708." *Black's* 6th Edition, p. 1522.

147.   The courts have long held that when a corporation executes a contract beyond the scope of its charter or granted corporate powers, the contract is void or "ultra vires". See infra, <u>Pullman v. Central Transp. Co.</u>, 139 U.S. 62, 11 S.Ct. 478, 35 L.Ed. 55.

**The Law of Contracts\* Requires These Elements OR The Contract Is Void**
Offer by person qualified to make the contract.
a.    Acceptance by party qualified to make and accept the contract.
b.    Bargain or agreement and **full disclosure** and complete understanding by both parties.
c.    **Consideration given.**
d.    Must have the element of time to make the contract lawful.
e.    Both parties must be sui juris; that is, of lawful age, usually 21 years old.
*\*Contracts, by John Calamari and Joseph Perillo, West Publishing Company, St. Paul, Minnesota 55102*

148.   The bank offered: *unconscionable bargain or contract* defined by Black's law as *"which no man in his senses, not under delusion, would make on the one hand, and which no fair and honest man would accept, on the other."* Plaintiff was led to believe (intentionally mislead) that he entered into a binding contract upon signing the

Deed of Trust and the Adjustable Rate Note, NOT KNOWING that he will be unilateral signer on said instrument, what was purported to be a contract between two parties, borrower and lender, *"for the loan that he has (already) received*[1]*"* the FACT the his signature will create new money of account[2] was not EVER disclosed to him. He signed in good faith, believing that he is receiving a **LOAN** *(Delivery by one party to, and receipt by another party, a **SUM OF MONEY**[3] upon agreement, express or implied, to repay it with or without interest)*[4], and the WELL ESTABLISHED FACT that banks cannot lend their own credit[5] and that only perform the role of <u>third party originator</u> was

---

[1] As misrepresented on the Note. "Any false representation of material facts made with knowledge of falsity and with intent that it shall be acted on by another in entering into contract, and which is so acted upon, constitutes 'fraud,' and entitles party deceived to avoid contract or recover damages." <u>Barnsdall Refining Corp. v. Bimarn Wood Oil Co.</u>, 92 F.2d S17.

[2] As defined in Chicago Federal Reserve's book, *Modern Money Mechanics* " ... money are just book entries"

[3] ". . . checks, drafts, money orders and bank notes are not lawful money of the United States . . ." <u>State v. Neilon</u>, 73 Pac. 324, 43 Ore. 168.

[4] "A loan may be defined as the delivery by one party to, and the receipt by another party of, a sum of money upon an agreement, express or implied, to repay the sum with or without interest." <u>Parsons v. Fox</u> 179 Ga 605, 176 SE 644. Also see <u>Kirkland v. Bailey</u>, 155 SE 2d 701 and <u>United States v. Neifert White Co.</u>, 247 Fed Supp 878, 879.

[5] "In the federal courts, it is well established that a national bank has not power to lend its credit to another by becoming surety, endorser, or guarantor for him.'" <u>Famers and Miners Bank v. Bluefield Nat 'l Bank</u>, 11 F 2d 83, 271 U.S. 669; "A national bank has no power to lend its credit to any person or corporation . . . <u>Bowen v. Needles Nat. Bank</u>, 94 F 925 36 CCA 553, certiorari denied in 20 S.Ct 1024, 176 US 682, 44 LED 637; "The doctrine of ultra vires is a most powerful weapon to keep private corporations within their legitimate spheres and to punish them for violations of their corporate charters, and it probably is not invoked too often . . . <u>Zinc Carbonate Co. v. First National Bank</u>, 103 Wis 125, 79 NW 229. American <u>Express Co. v. Citizens State Bank</u>, 194 NW 430; "A bank may not lend its credit to another even though such a transaction turns out to have been of benefit to the bank, and in support of this a list of cases might be cited, which-would look like a catalog of ships." [Emphasis added] <u>Norton Grocery Co. v. Peoples Nat. Bank</u>, 144 SE 505. 151 Va 195.

never disclosed to him. **FIRST MAGNUS did not provide any CONSIDERATION**, the cause that induces parties to enter into a contract.

149.   The purported loan became **VOID AB INITIO** because the FIRST MAGNUS have committed the following illegal acts: the problematic representation of facts; the lending of credit does not constitute value[1] according to UCC 3-303 and ARS and leads to problematic consideration, and; lending investors' money as their own, while providing neither protection for the investors or disclosure to the borrower.  The issue of whether the purported lender, who writes and passes a "bad" check or makes a "credit" loan, has a claim for relief against the borrower is easy to answer, providing the purported lender can prove that he gave a lawful consideration based upon lawful acts, but did the purported lender give a lawful consideration? To give a lawful consideration, the lender must prove that he gave the borrower lawful money such as coins or currency. Failing that, he can have no claim for relief in a court at law against the borrower as the lender's actions were *Ultra vires* or *void ab initio*.

150.   It seems unconscionable that a bank would ask homeowners to put up a homestead as collateral for a "credit loan" that the bank created out of thin air. Would a court of law or equity allow a counterfeiter to foreclose against a person's home because the borrower has challenged an unlawful loan? If the court were to do so, it would be contrary to all principles of law. The question of valuable consideration does not depend on any value imparted by the lender, but by false confidence instilled in the "bad" check

---

[1] "... holds the mere extension of credit to be insufficient to constitute value"
<u>Atkinson v. Englewood State Bank</u>, 348 P.2d 702

or "credit" loan by the lender. In a court at law or equity, the lender has no claim for relief because there was no lawful consideration given by the purported lender.

151.   Further, the **purported lender took the role of an ORIGINATOR, conveying credit to the borrower from a third party—investors in securities—mere conduit of an unlawful *table-funded loan*, while pretending to be a CREDITOR.**

152.   The contract is **NULL AND VOID** as in First Bank Of Montgomery v. Jerome Daly, Case No.: 19144 *"That Plaintiff is not entitled to recover the possession of lot 19, Fairview Beach, Scott County, Minnesota according to the plat thereof on file in the Register of Deeds office. That because of failure of a lawful consideration the note and Mortgage dated May 8, 1964 are null and void."* See also the following cases: "*Any false representation of material facts made with knowledge of falsity and with intent that it shall be acted on by another in entering into contract, and which is so acted upon, constitutes 'fraud,' and entitles party deceived to avoid contract or recover damages.*" Barnsdall Refining Corn. v. Birnam Wood Oil Co.. 92 F 26 817; "*Any conduct capable of being turned into a statement of fact is representation. There is no distinction between misrepresentations effected by words and misrepresentations effected by other acts.*" Leonard v. Springer 197 Ill 532. 64 NE 301; "*If any part of the consideration for a promise be illegal, or if there are several considerations for an un-severable promise one of which is illegal, the promise, whether written or oral, is wholly void, as it is impossible to say what part or which one of the considerations induced the promise.*" Menominee River Co. v. Augustus Spies L & C Co., 147 Wis 559. 572; 132 NW 1122; "*The contract is void if it is only in part connected with the*

*illegal transaction and the promise single or entire."* <u>Guardian Agency v. Guardian Mut. Savings Bank</u>, 227 Wis 550, 279 NW 83; *"It is not necessary for rescission of a contract that the party making the misrepresentation should have known that it was false, but recovery is allowed even though misrepresentation is innocently made, because it would be unjust to allow one who made false representations, even innocently, to retain the fruits of a bargain induced by such representations."* <u>Whipp v.Iverson</u>, 43 Wis 2d 166.

> ***Ex dolo malo no oritur action***: Maxim of Law in this matter. Out of fraud no action arises; fraud never gives a right of action. No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act.

## XIII
## SEVENTH CAUSE OF ACTION
## <u>USURY</u>
### (Against BANA, BNY Mellon, SPS, Real Time)

153.   Plaintiff reaffirms and realleges the general factual allegations and count specific claims above as set forth more fully herein below.

154.   Article I, Section 10, Paragraph 1 of the Constitution of the united States of America specifically states that no state shall **" . . . coin money, emit bills of credit, make any Thing but gold and silver coin a Tender in Payment of Debts,** pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligations of Contracts . . ."** [Emphasis added.] The states that grant the Charters of state banks also prohibit the emitting of bills of credit by not granting such authority in bank charters.

155.   It is obvious that *"We the people"* never delegated to Congress, state government, or agencies of the state, the power to create and issue money in the form of

checks, credit, or other *"bills of credits."* The Federal Government today does not authorize banks to emit, write, create, issue and pass checks and credit as money, but banks do, and get away with it, UNLESS challenged by the Federal Government.

156.   Each time when sued by the Government, banks were reluctant to settle and by some accounts, there are more than 300 billion dollars in settlement and counting. At the same time when a homeowner, the backbone of our society—the producer, the taxpayer, the entrepreneur, the doctor, the scientist—brings the same arguments to court, his/her complaint is swept under the rug.

157.   Banks assign their privately created money more misleading names, like "credit," "demand deposits," or "checkbook money." However, the true nature of "credit money" and "checks" does not change regardless of the deceptive terminology used to describe them. Such money in common use by privately[1] owned banks is illegal under Article I, Sec. 10, Par. 1 of the Constitution of the united States of America as well as unlawful under the laws of the United States.

158.   The dollar once represented something intrinsically valuable made from gold or silver. For example, in 1792 Congress defined the silver dollar as a silver coin containing 371.25 grains of pure silver. The legal dollar is now known as "United States coins and currency." However, the Banker's dollar has become a unit of measure of a different kind of money. Therefore, with Bankers there is a "dollar" of coins and a "dollar" of cash (legal money), a "dollar" of debt, a "dollar" of credit, a "dollar" of

---

[1] "Each Federal Reserve bank is a separate corporation owned by commercial banks in its region . . ." Lewis v. United States, 680 F.2d 1239 (1982).

checkbook money or a "dollar" of checks. When one refers to a dollar spent or a dollar loaned, he should now indicate what kind of "dollar" he is talking about, since Bankers have created so many different kinds.

159.   A dollar of bank "credit money" is the exact opposite of a dollar of "legal money." The former is a liability while the latter is an asset. Thus, as it can be seen from the book *I Bet You Thought,* that money can be privately issued as: *"Money doesn't have to . . . be issued by a government or be in any special form."* It should be carefully noted that <u>banks that issue and lend privately created money demand to be paid with government issued money</u>. However, payment in like kind under natural equity would seem to indicate that a debt created by a loan of privately created money can be paid with other privately created money, without regard for "any special form" as there are no statutory laws to dictate how either private citizens or banks may create money.

160.   **Extending credit (not giving value) and demanding to be repaid by government issued money is USURY under the law of equity**.

161.   Since we have established that the lender of unlawful or counterfeit money has no claim for relief under a <u>void contract</u>, the question is does the Plaintiff have a claim for relief against the purported lender for notes or obligations unlawfully created by an *Ultra vires* contract for lending "credit" money? The Courts have long held Plaintiffs have a claim for relief against the lender to have the Note, security agreement (DOT) the Plaintiff signed, declared ***null and void***.

162.   Further Plaintiff has usury claims for charging an interest rate several times greater than the amount agreed to in the contract for any <u>lawful money actually</u>

risked by the purported lender that will give him Constitutional standing[1] in this Article III court.

163.   For example, if the purported lender risked any FRN ("Federal Reserve Notes") while operating under the fractional banking rules, if on a $100,000 loan it can be established that the lender actually risked only $5,000 (5% Federal Reserve ratio) with a current interest rate of 10%, the lender has then loaned $95,000 of "credit" and $5,000 of "lawful money" while charging 10% interest ($10,000) on the entire $100,000. The true interest rate on the $5,000 of "lawful money" actually risked by the lender is 200%, which violates Usury laws.

164.   If no "lawful money" was loaned, then the interest rate is an infinite percentage. Such techniques, the bankers learned and usurp from the trade secrets of the Goldsmiths – pioneers of our *promise to pay*[2] fractional banking, as codified in many publically available books as *The Modern Money Mechanism, I Bet You Thought, Bull by the Horne* and so on.

165.   The Courts say that such contracts with borrowers are wholly void from the beginning of the transaction because banks are not granted powers to enter into such contracts by either state or national charters.

### XIII
### EIGHT CAUSE OF ACTION
### TILA VIOLATIONS
### (Against BANA, SPS)

---

[1] "A bank is not the holder in due course upon merely crediting the depositor's account." Bankers Trust v. Nagler, 229 NYS2d 142, 143.
[2] "A promise to pay cannot, by argument, however ingenious, be made the equivalent of actual payment . . ." Christensen v. Beebe, 91 P 133, 32 Utah 406.

166.   Plaintiff reaffirms and realleges the general factual allegations and count specific claims above as set forth more fully herein below.

167.   Congress enacted the Truth in Lending Act (TILA) in 1968 to inform consumer about the cost of credit so they can make informed credit decision and to protect them against unfair credit practices such as Plaintiff alleges herein.

168.   Defendants BANA and SPS have attempted to foreclose on Plaintiff's house in their own name without being part of his Note or Deed of Trust, under color of law, pretending to be servicers for BNY Mellon under the fraudulent assignment filed in Maricopa County Recorder.

169.   Each time when duly challenged, Defendants claimed that they are foreclosing in name of BNY Mellon as holder of the Note and the Security in a REMIC Trust. Under the Security Violation claim, Plaintiff explains that it is lawfully impossible for a REMIC Trust to be a holder of defaulted security, as Defendants claim as premise of their illegal foreclosure actions.

170.   Upon verification with BNY Mellon Plaintiff received confirmation the they (in their own words) " ... *do not physically OWN the LOAN (Note and DOT) or the property. BNY Mellon does not have any say of how the property is disposed,*" (see EXHIBIT "W"). No REMIC Trust can be a holder of the Mortgage if they are not a holder of the Note according to the PSA and state law.

CWALT ALT 2007-OA7 PSA Section 2.02 (pg 53)
Acceptance by Trustee of the Mortgage Loans "(a) The Trustee acknowledges receipt of the documents identified in the Initial Certificate in the form annexed

hereto as Exhibit F-1 and declares that it holds and will hold such documents and other documents delivered to it constituting the Mortgage Files."

171.   In section 2.02(a), The Bank of New York also agreed to deliver and execute on the "Closing date to the Depositor, the Master Servicer and Countrywide…an Initial Certification in the from annexed to this Agreement as Exhibit F-1."

From Exhibit F-1 Initial Certification of Trustee
**"In accordance with Section 2.02 of the above-captioned [PSA], the undersigned, as Trustee, hereby certifies that, as to each Initial Mortgage Loan listed in the Mortgage Loan Schedule…<u>it has received: (i)(a) the original Mortgage Note endorsed [in blank]…(ii) a duly executed assignment of the Mortgage</u>"**

172.   The question before the Court, asked to make a judicial determination, is, if BNY Mellon is not a HDC can BANA and SPS foreclose in their own names? YES, if they ARE a "covered person." Consistent with the legislative purpose, to become a "covered person" subject to 12 CFR §226.39, (see Federal Register /Vol 75, No. 185/ Rules and Regulations 58489, incorporated herein by this reference) the entire a person must become the owner of an existing mortgage loan by acquiring legal title to the debt obligation.

Section 226.39—Mortgage transfer disclosures
39(a) Scope. Paragraph 39(a)(1). TILA REGULATION Z
Covered persons. The disclosure requirements of this section apply to any "covered person" that becomes the legal owner of an existing mortgage loan, whether through a purchase, or other transfer or assignment, regardless of whether the person also meets the definition of a "creditor" in Regulation Z. <u>The fact that a person purchases or acquires mortgage loans and provides the disclosures under this section does not by itself make that person a "creditor" as defined in the regulation.</u> [Servicer does not become a creditor simply by providing disclosures.]
Acquisition of legal title. To become a "covered person" subject to this section, <u>a person must become the owner of an existing mortgage loan by acquiring legal title to the debt obligation.</u>

173.   BANA and SPS claimed that the owners of the existing mortgage loan, by acquiring legal title to the debt obligation, are the certificateholders of the BNY Mellon REMIC Trust. Respectfully, neither one of them claimed the status of "covered person".

174.   The Public Comments in in 12 CFR §226.39(c)(1) " ... *suggested that the final rule clarify that each covered person must disclose* **a full chain of title so that** **all transfers of ownership throughout the history of the loan** *are listed in each disclosure. Consumer advocates also stated that, if the 30-day period is lengthened in the final rule, the rule should provide that (1) no foreclosure action is permitted without first* **providing information to the consumer about the current holder of the note and mortgage, and (2) no foreclosure action is permitted in the name of a party that no longer owns the loan.*"

175.   BANA, SPS and BNY Mellon collectively, coercively and maliciously tried to sell Plaintiff's house on foreclosure sale without claiming a *covered person* status or ownership of the mortgage and the obligation (Note). They have shifted ownership to the certificateholders according to the fraudulent and lawfully impossible Corporation Assignment.

Section 226.39—Mortgage transfer disclosures
Exclusions.
i. Beneficial interest. <u>Section 226.39 does not apply to a party that acquires only a beneficial interest or a security interest in the loan</u>, or to a party that assumes the credit risk without acquiring legal title to the loan. **For example an investor that acquires mortgage-backed securities, pass-through certificates**, or participation interests and does not acquire legal title in the underlying mortgage loans is not covered by this section.

ii. Loan servicers. Pursuant to TILA Section 131(f)(2), <u>the servicer of a mortgage loan [SPS] is not the owner of the obligation for purposes of this section if the servicer holds title to the loan as a result of the assignment of the obligation to the servicer solely for the administrative convenience of the servicer in servicing the obligation.</u>

176.    While the above-cited loan is clear, the investors(certificateholdrs) that acquire mortgage-backed securities cannot claim a status of "covered person." Further section 226.39 does not apply to persons who acquire only a beneficial interest or a security interest in the loan, such as when the owner of the debt obligation uses the loan as security to obtain financing and the party providing the financing obtains a security interest in the loan.

177.    On Sept. 25, 2014, 9 judges signed an opinion under Cashmere Valley Bank v. WA Dept of Revenue in WA Sup Ct the REMIC investors are not secured by the mortgage.

178.    Section 226.39 also does not apply to a party that assumes the credit risk without acquiring legal title to the loans. Accordingly, an investor who purchases an interest in a pool of loans (such as mortgage-backed securities, pass-through certificates, participation interests, or real estate mortgage investment conduits) but does not acquire legal title in the underlying mortgage loan, is not covered by § 226.39. See 155 Cong. Rec. S5098–99 (daily ed. May 5, 2009).

179.    Based on limited public information, neither BANA, SPS or BNY Mellon can claim a covered person status, and nor are any of them an HDC who paid value (consideration) for Plaintiff's Note and DOT in good faith and without knowledge of borrower's defenses. Therefore, every attempt to foreclose on Plaintiff's

house was in wanton violation of TILA.

## XV
## NINTH CAUSE OF ACTION
## RICO VIOLATIONS
### (Against BANA, SPS, ReconTrust, BNY Mellon)

180.   Plaintiff reaffirms and realleges the general factual allegations and count specific claims above as set forth more fully herein below.

181.   Plaintiff has claims for relief under "Civil RICO" Federal Racketeering laws (Title 18 U.S.C. 1964) as the purported lenders and servicers, all individually and collectively, have established a "pattern of racketeering activity" by attempting to collect an unlawful debt without having a verifiable and lawful claim as injured party or a party with enforcement rights of the alleged Security and Note.

182.   Collectively Defendants coerced and conspired against Plaintiff in order to deprive him of property without due process of law in violation of Title 42 U.S.C. 1983 (Constitutional injury), 1985 (Conspiracy) and 1986 ("Knowledge" and "Neglect to Prevent" a U.S. Constitutional Wrong). Under Title 18 U.S.C.A. 241 (Conspiracy), violators "shall be fined not more than $10,000 or imprisoned not more than ten (10) years or both."

183.   A scheme to defraud is any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations.

184.   Defendants have sent countless pieces of mail through USPS trying to coerce Plaintiff to admit or modify debt that is either inexistent or they have not proven

any lawful relation to.

185.   Each time when duly challenged Defendants threaten to foreclose by creating and recording fraudulent transfers, assignment, NTS and recording them in Maricopa County Recorder's Office.

186.   BANA, ReconTrust and SPS have scheduled foreclosure sales on Plaintiff's home without proper debt validation or enforcement rights over the Note and Deed of Trust he signed with First Magnus.

187.   *"The RICO statute makes it unlawful for 'any person . . . associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'"* In re ClassicStar, 727 F.3d at 490 (quoting18 U.S.C. § 1962(c)) (alterations in original). An enterprise *"includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."* 18 U.S.C. § 1961(4).

188.   *An "association-in-fact enterprise" is "a group of persons associated together for a common purpose of engaging in a course of conduct."* United States v. Turkette, 452 U.S. 576, 583 (1981). The association-in-fact enterprise must be separate and distinct from the pattern of racketeering activity in which it engages, but the enterprise could have been formed solely for the purpose of engaging in the racketeering activity. Ouwinga v. Benistar 419 Plan Servs., Inc., 694 F.3d 783, 793–94 (6th Cir. 2012).

The enterprise "must have at least three structural features: a purpose,

relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*,556 U.S. 938, 946 (2009). The enterprise need not have a hierarchical structure or chain of command, members of the group need not have fixed roles, the group need not have a name, and the enterprise may engage in "spurts of activity punctuated by periods of quiescence." *Id.* at 948.

189.    Defendants are incorporated entities and regulated by various government agencies. BANA and ReconTrust have executed a fraudulent assignment of the Note and the Deed of Trust from their corporate office in Texas in a gruesome attempt to steal Plaintiff's real property.

190.    As a full subsidiary of BANA, ReconTrust has wantonly and maliciously recorded two Trustee Sale notices in the Maricopa County Recorder, in violation of trust law, in blatant attempt to deprive Plaintiff of due process of law; example of a well-established pattern within the enterprises the lead to thousands of foreclosures in several states before their unlawful scheme was dismembered behind the veil of another hefty settlement with the federal government.

191.    As a result of Defendants relentless attempts to steal Plaintiff's estate while violating Trust law, Arizona Law and misrepresenting themselves as HDC as this Verified-Action alleges with particularity, Plaintiff mental and physical health have been greatly deteriorated.

192.    The Supreme Court has found that the Plaintiff in a civil RICO action need establish only a criminal "violation" and not a criminal conviction. Further, the Court held that the Defendant need only have caused harm to the Plaintiff by the commission of a predicate offense in such a way as to constitute a "pattern of

Racketeering activity."

193.    That is, the Plaintiff need not demonstrate that the Defendant is an organized crime figure, a mobster in the popular sense, or that the Plaintiff has suffered some type of special Racketeering injury; all that the Plaintiff must show is what the Statute specifically requires. The RICO Statute and the civil remedies for its violation are to be liberally construed to effect the Congressional purpose as broadly formulated in the statute. See Sedima, SPRL v. Imrex Co., 473 US 479 (1985).

194.    Wherefore, Plaintiff alleges that recording fraudulent documents in coordinated attempt to steal private property is criminal offence under the statue[1].

## XVI
## TENTH CAUSE OF ACTION
## QUIET TITLE FOR REAL PROPERTY
### (Against all Defendants)

195.    Plaintiff reaffirms and realleges the general factual allegations and count specific claims above as set forth more fully herein below.

196.    A primary claim against defendants is that none of them is a true holder-in-due-course through unbroken chain of title of the original, lawfully indorsed Adjustable Rate Note(s) (unseparated from the security) that Plaintiff signed with First Magnus, or PETE, and thus do not have a claim to interest in Plaintiff's obligation or the underlying security (his house) that would grant them a right to enforce.

197.    Plaintiff believes and therefore alleges that he is the rightful Successor of title to his Allodial land, and the fact that Defendants, each and every one, defaulted on

---

[1] See Slorp v Lerner et al (US 6th Appellate Sept. 29, 2014)

his Good Faith Offers to pay, under the American law of Presentment presents sufficient evidence to the Court to Quiet his title.

198.   Plaintiff, in his complaint and correspondences to Defendants, has pled affirmative fact showing material falsities in the recorded documents which challenge the beneficiary's identity and authority, and the identity and authority of the trustee. He has challenged that ReconTrust is the current lawful trustee under the Deed, that there was ever a lawfully executed, unfalsified Substitution of Trustee, and that BNYM is the lawful beneficiary, through a proper assignment of the Note and Mortgage, which has a right to "foreclose on its security interest" and which even possesses a security interest in Plaintiff's mortgage.

199.   The real party in interest on the lender side may be the owner of the asset backed security issued by the SPV, the insurer through some claim of equitable interest, or the Federal government through the United States Department of the Treasury or the Federal Reserve. The security is a "securitized" bond deriving its value from the underlying mortgages of which the subject mortgage is one. Thus Plaintiff is entitled to quiet title against Defendants, clearing title of the purported subject mortgage encumbrance.

200.   Plaintiff alleges that no real party of interest, and only pretend parties, have commenced an action to collect on an obligation of a note payable or enforce a security interest in an obligation within the six year statute of limitation after the due date, pursuant to ARS §47-3118. Thus, if a real party in interest where to come forward, its claim to an obligation and right through enforce, including through foreclosure sale,

is barred through the statute of limitation. See Memorandum Decision <u>Mariposa Enters.,</u>

<u>Inc. v. Lawyers Title of Ariz.,</u> No. 2 CA-CV 2006-0086, ¶ 24.

201.   Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when (if) ascertained.

202.   Plaintiff is informed and believes and thereupon alleges that and each of the Defendants claim or might claim an interest in the property adverse to plaintiff herein. However, the claim of said Defendants is without any right whatsoever, and said Defendant have no legal or equitable right, claim, or interest in said property.

203.   Plaintiff therefore seeks a declaration that the title to the subject property is vested in plaintiff alone and that the defendants herein, and each of them, be declared to have no estate, right, title or interest in the subject property and that said defendants and each of them, be forever enjoined from asserting any estate, right, title or interest in the subject property adverse to plaintiff herein.

**XVII**
**ELEVENTH CAUSE OF ACTION**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(Against Defendants BANA, ReconTrust, BNY Mellon, SPS)**

204.   Plaintiff reaffirms and realleges the general factual allegations and count specific claims above as set forth more fully herein below.

205.   Plaintiff moves this Court to declare that the Corporation Assignment, Substitution of Trustee and NTS are executed in fraud in the offices of ReconTrust, full

subsidiary of BANA in violation of trust law, signed by Carmelia Boone (or forged her signature as shown with exhibit "I") as alleged and unequivocally argued herein.

206.   Further Plaintiff moves this Court to issue an Order to expunge the said documents from Maricopa County Recorder's Office.

## XVIII
## CONCLUSION

207.   Under Arizona Revised Statutes ARS §47-3303 *"Value and Consideration (a) An instrument is issued and transferred for value if: (1) the instrument is issued or transferred for a promise of performance, to the extent the promise has been performed... (b)...The drawer or maker of an instrument has a defense if the instrument is issued without consideration. If an instrument is issued for a promise of performance, the issuer has a defense to the extent performance of the promise is due and the promise has not been performed."*

208.   The alleged lender/mortgagee through MERS, converted The Note and negotiated it for an undisclosed and unknown sum, then funded the alleged loan with the funds from the sale of the Note.  (Please see the attached hereto and incorporated herein   the   following   illustration)



# RMBS Loan Securitization (using MERS) Diagram
## What Actually Happened:

There was no (lawful) loan made. The pretend lender took Plaintiff's Note, converted it, and sold it to fund the alleged loan. So in effect, without full disclosure and

consideration, Plaintiff funded his own transaction by being deceived into issuing what in reality was a negotiable security. That scenario is grounds for immediate rescission under ARS §47-3305 Defenses and Claims in Recoupment at *(a) (1) (C) "fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms."*

209.   The obligation and the security were separated, evidence by the unequivocal facts and arguments Plaintiff has presented under this Verified-Action-at-Law.

210.   On the closing table, First Magnus did not bring any lawful currency, skillfully defrauding the REMIC investors who funded the transaction; therefore the pretend lender did not extend any consideration. They did not extend a *loan* but originated transfer as a conduit; *table funded loan* – unlawful under statutory laws and common law. They have tricked Plaintiff, along with 65 million homeowner to sign under the Note *"for the loan he has received"*.

211.   The REMIC investors did not receive any protection because they were not listed under the Note as a true creditor and due to the way the pretend lender wrote the subrogation insurance, defrauding creditors and the federal government – evidenced by the 300 billion and counting that "too big to fail" have paid in settlements each time they have been lawfully challenged.

212.   Based on the problems detected in the subject transaction, as of August 30, 2011 when BANA, MERS, BNY Mellon, ReconTrust and [Frist Magnus] signed the Certified Mail Return Receipt for the Notice mailed to BANK OF AMERICA, (See

EXHIBIT "X") Plaintiff has RESCINDED the transaction from the beginning. As the original funds transferor, **PLAINTIFF MAKES A CLAIM FOR RECOUPMENT OF HIS ORIGINAL NOTES, ALL MONEY MADE FROM THE SALE AND SECURITIZING OF SAID NOTES TO 3RD PARTIES WITHOUT FULL DISCLOSURE AND HIS CONSENT (BASED ON PSA RECORD)** and of all funds paid by him since the origination of the fraud, under ARS § 47-3306 and the UCC.

## XIX
## EXHIBITS TO COMPLAINT

213.   Plaintiff has filed in this matter a separate document entitled "EXHIBITS TO COMPLAINT". The exhibits filed hereto are incorporated herein and made a part hereof by way of reference as "Exhibit A-Z". Further, Plaintiff would like to move the court to take Judicial Notice, under Rule 201 (D), of all Exhibits and pleading filed prior this Second Amended Complaint, incorporated herein and made hereof a part of this Action and FRE 801, 802, 1001 and 1002.

## XX
## PRAY FOR RELIEF

214.   **WHEREFORE**, Plaintiff prays this Court will enter judgment against Defendants and each of them, as follows:

  a.   For an order compelling said Defendant, and each of them, to transfer or release legal title and alleged encumbrances thereon and possession of the subject property to Plaintiff herein;

  b.   For a declaration and determination that Plaintiff is the rightful holder of title to the property and that Defendant herein, and each of them, be declared to have no estate, right, title or interest in said property;

c.  For a judgment forever enjoining said Defendants, and each of them, from claiming any estate, right, title or interest in the subject property;

d.  For actual damages;

e.  For compensatory damages;

f.  For statutory damages;

g.  For punitive damages;

h.  For equitable relief, including restitution;

i.  For disgorgement of all profits Defendants obtained as a result of tricking Plaintiff into signing the Notes the Deed of Trusts and securitizing them thereafter;

j.  For interest as permitted by law;

k.  For declaratory relief;

l.  For costs of suit herein incurred;

m.  For such other and further relief as is just, proper and equitable.


Respectfully submitted this 23rd day of October, 2014


**Ivaylo Tsvetanov Dodev**, ARR, *Pro Se* Plaintiff
**6312 South 161st Way, Gilbert, Arizona**
**(480) 457-8888 Phone**

## __VERIFICATION__

I, the undersigned, attest and declare that:

**I am the Plaintiff in the foregoing document entitled, VERIFIED ACTION-AT-LAW, SECOND AMENDED COMPLAINT.**

I have read and know the contents thereof and certify that the matters stated therein are facts of my own knowledge, except as to those matters, which are therein stated upon my information or belief, and as to those matters - I believe them to be correct.

I declare under the penalty of perjury of the Laws of Arizona that the foregoing is correct and complete to the best of my knowledge, information, and belief, and that this verification is executed in Phoenix, Arizona and is dated this 23 day of the 10 month, in the year two thousand and fourteen.

**Ivaylo Tsvetanov Dodev, ARR, Plaintiff**
**6312 South 161st Way, Gilbert, Arizona**
**(480) 457-8888 Phone**

## CERTIFICATE OF SERVICE

**ORIGINAL** and **ONE COPY** of this Verified-Action-at-Law, **Second Amended Complaint and Exhibits** plus **SUMMONS FOR REAL TIME RESOLUTION, INC** are hand-delivered to The United States District Court, for The District of Arizona on this 23rd day of October, 2014 by Ivaylo Tsvetanov Dodev.

I HEREBY CERTIFY that a true and correct copy of the above Second Amended Complaint and Exhibits will be furnished by certified U.S. Mail, in a timely manner, to certified process servers to duly serve: REAL TIME RESOLUTIONS, INC.

I HEREBY FURTHER CERTIFY that the following parties through their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system: BANK OF AMERICA, NA, RECONTRUST, NA, SELECT PORTFOLIO SERVING, NA, AND BANK OF NEW YORK MELLON.

PLAINTIFF WILL FILE an Affidavit of Service on the record in timely manner upon service of Real Time Resolutions, Inc.

Ivaylo Tsvetanov Dodev, Plaintiff
6312 South 161st Way, Gilbert, Arizona
(480) 457-8888 Phone

# EXHIBITS TO COMPLAINT

# Filed hereto and incorporated herein

# Under this Verified-Action-at-Law

# 2:13-CV-02155-DLR

# Contents

EXHIBIT "A"        Plaintiff's Warranty Deed, Acknowledgment, Homestead
                   Declaration with Land Patent

EXHIBIT "B"        Plaintiff's Affidavit of Secured Interest

EXHIBIT "C"        Plaintiff is paying his own taxes

EXHIBIT "D"        Plaintiff is paying his own insurance

EXHIBIT "E"        Plaintiff's Deed of Trust

EXHIBIT "F"        Plaintiff's HELOC

EXHIBIT "G"        PSA (Pooling and Servicing Agreement)

EXHIBIT "H"        Corporation Assignment

EXHIBIT "I"        Carmelia Boone different signatures in Maricopa County Recorder

EXHIBIT "J"        Plaintiff's Adjustable Rate Note (the Note)

EXHIBIT "K"        BANA letter from July 1, 2011

EXHIBIT "L"        BANA sent notice that they are debt collectors

EXHIBIT "M"        Proof of Claim to BANA 2011

EXHIBIT "N"        Cancellation of NTS (2011)

EXHIBIT "O"        Settlement Check from BofA for wrongful foreclosure

EXHIBIT "P"        BANA demands payments without identifying themselves as debt
                   collectors

EXHIBIT "Q"        Proof of Claim (2) to SPS sent 2013

EXHIBIT "R"        PAS Brief as filed under Doc. 53 under this action

EXHIBIT "S"        Real Time letter – September 13, 2013

EXHIBIT "T"        Proof of Claim and Notice to Sue (2) to Real Time sent 2013

EXHIBIT "U"        Real Time Reporting to Credit Reporting Agencies

EXHIBIT "V"        Four Offers to Pay the entire amount due sent to all Defendants,
                   payoff departments and their attorneys

EXHIBIT "W"        Responses from BNY Mellon claiming that they *do not physically
                   own the loan or the property*

EXHIBIT "X"        Notice of Complaint, Letter of Rescission sent to BofA, BNY Mellon,
                   ReconTrust in 2011. Part of this Notice of Complaint was sent in the
                   Notice to Sue to all Defendants in 2013

**EXHIBIT "A"**

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20040852027   07/26/2004   10:56
ELECTRONIC RECORDING

Recorded at the request of *Capital Title Agency Inc.*
when recorded mail to

**IVAYLO T. DODEV**
**23410 South 161st Way**
**Gilbert, AZ 85242**

22040541-3-4-1--
Fimbrezr

# Warranty Deed

Escrow No. 22040541

For the consideration of Ten Dollars, and other valuable considerations, I or we, **JUSTIN C. FRANKS, an unmarried man and DAIDRIA FRANKS, an unmarried woman**, do/does hereby convey to **IVAYLO T. DODEV and NIKOLINA T DODEVA**, husband and wife, the following real property situated in Maricopa, County, Arizona:

**See Exhibit A attached hereto and made a part hereof.**

\* Who acquired title as Daidria Howe, An unmarried woman

SUBJECT TO:   Current taxes and other assessments, reservations, in patents and all easements, rights of way, encumbrances, liens, covenants, conditions, restrictions, obligations, and liabilities as may appear of record.

And I or we do warrant the title against all persons whomsoever, subject to the matters set forth above.

Dated July 16, 2004.

_____
**JUSTIN C. FRANKS**

_____
**DAIDRIA FRANKS**

STATE OF ARIZONA
COUNTY OF **MARICOPA** } SS.

This instrument was acknowledged before me this 16th day of July, 2004 by:
JUSTIN C. FRANKS and DAIDRIA FRANKS.

My Commission Expires: 9/5/2006

_____
Notary Public

OFFICIAL SEAL
DORIS BURRELL
Notary Public - State of Arizona
MARICOPA COUNTY
My Comm. Expires Sep. 5, 2006

Therefore, if some Right is not expressly reserved, directly on the actual United States Land Patent, it can never be reserved on a later date. *Summa v. California. 466 U.S. 198.* This patent reserves no Rights for the state, county, city, or town, private or public settlement, roads, and easements, with the exception of aforementioned limited water rights expressly for the United States [federal] government, and *"there is reserved from the land hereby granted, a right of way thereon for ditches or canals constructed by the authority of the United States."* Patent 505230, Pg. 8.

I am the declared Homestead owner of the above declared Homestead. I own the following interest in the above declared Homestead: 100%. The above declared Homestead is my principal dwelling and I am currently residing on that declared Homestead. Residing in the sense that it is used as a shelter from the elements for me and my immediate family, a place to live, plant orchards and vineyards, and raise livestock in order to ensure sustenance for ourselves, a place of protection.

The facts as stated in this Declaration of Homestead are known to be true as of my own personal knowledge and this documented is executed in my authorized capacity, as my free will act and deed.

Offered at Arm's Length on this 15th day of July 2013

By: _____
I, Ivaylo T. Dodev, ARR, Explicitly Without

Prejudice

STATE OF ARIZONA        )
                        ) SS
COUNTY OF MARICOPA      )

Subscribed and sworn to (or affirmed) before me on this 15 day of July, 2013 by Ivaylo T. Dodev, proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, as his free will act and deed, for the purposes and considerations therein expressed. I certify under PENALTY OF PERJURY under the laws of the State of Arizona that the foregoing statement is true and correct. WITNESS my hand and the official seal.

Executed by my own free will

_____ (Seal)
Notary Public

Curtis Feller
NOTARY PUBLIC
MARICOPA COUNTY, ARIZONA
My Commission Expires
04-28-2015

Initials: _____

Aforementioned land tract falls under Patent #50523 in the USA Record of Patents, registered with the United Sates Department of the Interior, Bureau of Land Management, official since its signing on December 30th, 1915 by Woodrow Wilson, to be kept in the national archive FOREVER; EXHIBIT B, attached hereto and made a part hereof. Patent is as referenced in Warranty Deed.

Land, and Rights or privileges in association with, are granted exclusively to the owner of apportioned land tract, originally the Santa Fe Pacific Railroad Company at the time of patent issue.

*"NOW KNOW YE, That the UNITED STATES OF AMERICA, in considerations of the premises, HAS GIVEN AND GRANTED, and by these presents DOES GIVE AND GRANT, unto the said Santa Fe Pacific Railroad Company, and to its successors, the lands above described"* Patent 505230, Page 7.

Successor defines as, *"a term borrowed from the civil law, denoting a person who succeeds to the rights of a former owner in a single article of property, (as by purchase,) as distinguished from a universal successor, who succeeds to all the rights and powers of a former owner, as in the case of a bankrupt or intestate estate."* Black's Law Dictionary, 4th Edition, Pg. 1600.

Through acquisition of the aforementioned land tract, as substantiated through warranty deed (EXHIBIT C, attached hereto and made a part hereof), and absorption of the Rights, powers, and responsibilities associated with the article of property of the original grantee, I, Ivaylo T. Dodev, hereby declared myself to be the qualified Successor and Assignee of the land tract now known as 6312 S 161st Way, Gilbert, AZ 85298.

Patent notes that land is given *"TO HAVE AND TO HOLD the same, together with all of the rights, privileges, immunities, and appurtenances, of whatever nature, thereunto belonging, unto the said Santa Fe Pacific Railroad Company, and to its successors and assigns forever; subject to any vested and accrued water rights for mining, agricultural, manufacturing or other purposes, and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local custom, laws and decisions of courts."* Patent 505230, Pg. 8.

And those Rights are reserved and passed down to me, the lawful owner of my homestead, FOREVER. I hereby claim possession of said land, rights, privileges, immunities, and appurtenances, as established with the fruition of Patent #505230 through the endorsement of president Woodrow Wilson.

By definition, a Land Patent is the only form of proof of absolute title to Land in the United States of America. *"A patent is the highest evidence of title and is conclusive as against the government and all claiming under junior patents or titles"* U.S. v. Stone 2 U.S. 525.  The patented *"grant of land is a public law standing on the statute books of the State, and is notice to every subsequent purchaser under any conflicting sale made afterward."* Wineman v. Gastrell 2 U.S. App. 581. *"State statutes that give less authoritative ownership of title than the patent can not even be brought into federal court"* Langdon v. Sherwood, 124 U.S. 74, 81.

Initials

Ivaylo T. Dodev
6312 S 161st Way
Gilbert, AZ 85298

# HOMESTEAD DECLARATION

I, Ivaylo T. Dodev, do hereby certify and declare as follows:

I hereby claim and declare Homestead the premises (land tract and its appurtenances) located in the City of Gilbert, County of Maricopa, State of Arizona, commonly known as

6312 SOUTH 161st WAY, GILBERT, ARIZONA 85298

AKA 23410 SOUTH 161st WAY, GILBERT, ARIZONA 85297

and more particularly described as follows:

6312 S 161st Way in the City of Gilbert, County of Maricopa, State of Arizona as per Map recorded in Book 502, Page 8 of the Official Records of Maricopa County Recorder Helen Purcell. Assessor's Parcel No. 304-77-004.

Homestead is in Township 2 S, Range 6 E, Section 22, SW$^{1/4}$ as surveyed by Wickerly and Associates for Vineyard Land Company, LLC; EXHIBIT A, attached hereto and made a part hereof. Legal description of property is as follows:
Commencing at the Southwest corner of Section 22;
Thence North 90 degrees 00 minutes 00 seconds East, a distance of 1284.85 feet;
Thence North 00 degrees 00 minutes 00 seconds East, a distance of 415.05 feet;
Thence South 90 degrees 00 minutes 00 seconds West, a distance of 193.02 feet to the point of beginning;
Thence South 90 degrees 00 minutes 00 seconds West, a distance of 367.57 feet;
Thence North 00 degrees 03 minutes 42 seconds East, a distance of 9.56 feet;
Thence North 18 degrees 49 minutes 40 seconds East, a distance of 266.94 feet;
Thence North 90 degrees 00 minutes 00 seconds East, a distance of 279.44 feet;
Thence South 00 degrees 25 minutes 50 seconds East, a distance of 262.23 feet to the point of beginning.

Initials

Page 1 of 3

We, the undersigned witnesses, do hereby swear or affirm that Ivaylo T. Dodev has stated to us that this is his freewill act and deed to execute his acceptance of said deed and lawful ownership of the property under the terms of the deed and to record this "Acknowledgement for the Acceptance of Deed" at the Maricopa County Recorder.

Witness: *Yehuda Gur-Arie*
Yehuda GUR-ARIE                    15 of July, 2013

Witness: *Marcia Gur-Arie*
Marcia Gur-Arie                    15 of July, 2013


STATE OF ARIZONA                          )
                                          ) SS
COUNTY OF MARICOPA                        )


Subscribed and sworn to (or affirmed) before me on this 15 day of July, 2013 by Ivaylo T. Dodev, proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, as his free will act and deed, for the purposes and considerations therein expressed. I certify under PENALTY OF PERJURY under the laws of the State of Arizona that the foregoing statement is true and correct. WITNESS my hand and the official seal.


Executed by my own free will

*Curtis Fetter*                    (Seal)
Notary Public

Curtis Fetter
NOTARY PUBLIC
MARICOPA COUNTY, ARIZONA
My Commission Expires
04-28-2015

# EXHIBIT A:
## ACKNOWLEDGEMENT FOR THE ACCEPTANCE OF DEED

I, Ivaylo T, a living man, of the family Dodev, made in the Creator's image, in the capacity of IVAYLO T. DODEV, with indefeasible title to my land, and lawful owner of the landed Estate known as IVAYLO T. DODEV and its real property and interest, under the seal: "Ivaylo T. Dodev," and any or all derivations thereof, am recorded as the grantee on the Warranty Deed for the real property described on the attached certified copy of said deed. Said Warranty Deed is Instrument Number 2004-0852027, recorded July 26th, 2004 as part of the Official Records of Maricopa County Recorder Helen Purcell in the COUNTY OF MARICOPA, STATE OF ARIZONA.

Let it be known by these presents, that it is my freewill act and deed to execute this Acknowledgement for my Acceptance of the Deed, and lawful ownership of the property, in fee simple, to have and to hold, under the terms of the deed in accordance with the land patent and covenants, as my claim of unalienable right. I demand that the record on file in the Maricopa Recorder's Office be updated to show my acceptance of the deed, as lawful owner of the real estate. All other real property and interest issued for this real estate and its gain is to be immediately returned to me.

Further let it be known by these presents that I accept the oaths of all public officers and bind them to such, as well as bestow my sovereign immunity on them while administering my lawful orders. This public record under the seal of a competent court is guaranteed full faith and credit per Article 4 Section 1 of the United States Constitution.

I, Ivaylo T. Dodev, on this _____ day of July, 2013, do hereby swear under oath, attest and affirm, that I have prepared this document for the sole purposes as set forth herein, and not for any other purpose and not to mislead, obstruct, obscure or impede the rightful due processes as provided by law, public codes and legal statutes. As the below signatory claimant, I declare under penalty of perjury that this instrument is not recorded for the purpose of slandering title to real property and is filed with good faith and clean hands to preserve my interests as described, and as signatory claimant hereby enter this into the public record based on informed firsthand knowledge and stating that the herein contained information is true, correct, complete and certain, and claimant will testify to the veracity thereof.

Witness my Hand and Seal as my freewill act and deed,
Offered at Arm's Length on this 15⁰⁰ day of July 2013

By: _Ivaylo Do_
Ivaylo T. Dodev, Executor

## ATTESTATION OF NOTARY AND ADMINISTERING OF OATH

I, Curtis Fetter, the below subscribed Notary in and for the State of Arizona, do solemnly attest that I administered an Oath to the Man, Ivaylo T. Dodev, as the living being who swore to the veracity and validity of this Acknowledgment for the Acceptance of Deed, that he did so of his own freewill act and deed, and that I personally witnessed his execution of same with original wet ink signature and seal as entered above. Be it further known by these presents that I, Curtis Fetter, as Witness for the herein matter, on this 15 day of July, 2013, am a third party and not a party to the matter. As Witness in this matter I am acting for the purpose of taking and administering the oath of the party as stated and of sealing same into the public record.

_Curtis Fetter_
Affirmed on the date as set forth herein

Page 1 of 2

Exhibit A

A PORTION OF LAND IN THE SOUTHWEST QUARTER OF SECTION 22, TOWNSHIP 2 SOUTH, RANGE 6 EAST, GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS;

COMMENCING AT THE SOUTHWEST CORNER OF SECTION 22;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 1284.85 FEET;

THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF  415.04 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF  193.02  FEET TO THE POINT OF BEGINNING;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 367.57 FEET;

THENCE NORTH 00 DEGREES 03 MINUTES 42 SECONDS EAST, A DISTANCE  OF 9.56 FEET;

THENCE NORTH 18 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE  OF 266.94 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE  OF 279.44 FEET;

THENCE SOUTH 00 DEGREES 25 MINUTES 50 SECONDS EAST, A DISTANCE  OF 262.23 FEET TO THE POINT OF BEGINNING.

20040852027
OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL



The foregoing instrument is an
**electronically prepared**
full, true and correct copy
of the original record in this
office.
Attest:  10/22/2013  11:17:40 AM

By ⎯⎯⎯⎯⎯⎯⎯Recorder

To Verify this purchase visit
http://recorder.maricopa.gov/cert.aspx?id=112988

# EXHIBIT A

# UNDER WARRANTY DEED



OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
99-0466504    05/17/99    11:41

99-0466504 -- See Book 502  Map    8

Recorded on 5/17/99 at 11:41am



CORNER SURVEY

1 Page

Township    2
Range       6
Section      22

Lot      RESULTS OF SURVEY MAP ONLY

DYER DENNIS L                                          GRANTEE
RESULTS OF SURVEY MAP VINEYARD LAND COMPANY           GRANTOR
WECKERLY AND ASSOCIATES                               GRANTEE

http://recorder.maricopa.gov/cert.aspx?id=106380 [19990466504] 2 Pages



http://recorder.maricopa.gov/cert.aspx?id=106390 (19990466504) 2 Pages

19990466504
OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL



The foregoing instrument is an
electronically prepared
full, true and correct copy
of the original record in this
office.
Attest: 07/05/2013  03:52:32 PM

By _____Recorder

To Verify this purchase visit
http://recorder.maricopa.gov/cert.aspx?id=106390

EXHIBIT B

UNDER WARRANTY DEED

Phoenix 022272.        4—1043-B.

# The United States of America,

### To all to whom these presents shall come, Greeting:

WHEREAS, the Santa Fe Pacific Railroad Company, being the owner
of certain lands situated and included within the limits of the Navajo
Indian Reservation, Arizona, has, under the provisions of the Act ap-
proved April 21, 1904 (33 Stat., 189-225), entitled "An Act making
appropriations for the current and contingent expenses of the Indian
Department and for fulfilling treaty stipulations with the various In-
dian tribes for the fiscal year ending June 30, 1905, and for other
purposes," reconveyed and relinquished the said lands to the United
States and has, under the provisions of said act, selected in lieu
thereof the following-described tracts of vacant public land now open
to settlement, to-wit:

Gila and Salt River Meridian  - Arizona.

Township one south of Range six east.
The north half of the southwest quarter and the north half of the
southeast quarter of Section thirty-five;

Township one south of Range seven east.
Section one; the Lots one and two, the south half of the northeast
quarter and the south half of Section three; the west half of Section
nine; the southwest quarter of Section ten; the north half, the north
half of the southeast quarter and the north half of the southwest quar-
ter of Section eleven; the north half and the southeast quarter of Sec-
tion twelve; Section thirteen; the south half of the northeast quarter,
the south half of the northwest quarter and the south half of Section
fourteen; Section fifteen; the Lots three and four and the east half of
the southwest quarter of Section eighteen; the north half, the north half
of the southeast quarter and the Lot one of Section twenty-two; Section
twenty-three; the north half and the southeast quarter of Section twen-
ty-four; and the Lot one of Section thirty-four;

RECORD OF PATENTS: Patent Number __505230__
8—2158

1

Township twenty-one north of Range six west.
The north half and the southeast quarter of Section ten;

Township two south of Range six east.
The southwest quarter of Section twenty-two;and the Lots one, two and three, the east half of the northwest quarter, the northeast quarter of the southwest quarter and the north half of the northeast quarter of Section thirty-one;

Township two south of Range twenty-three west.
The Lots three, four and five, the southeast quarter of the northwest quarter, the south half of the northeast quarter, the east half of the southwest quarter and the southeast quarter of Section six; the Lots two, three and four, the southeast quarter of the northwest quarter, the southwest quarter of the northeast quarter, the east half of the southwest quarter and the south half of the southeast quarter of Section eighteen; and the Lots one and two, the east half of the northwest quarter, the north half of the northeast quarter, the southwest quarter of the northeast quarter, the northeast quarter of the southwest quarter and the northwest quarter of the southeast quarter of Section nineteen;

Township five south of Range twenty-two east.
The east half of the northwest quarter, the southwest quarter of the northwest quarter and the northwest quarter of the southwest quarter of Section nine; the north half of the southeast quarter, the southwest quarter of the southeast quarter and the southeast quarter of the southwest quarter of Section eighteen; and the southwest quarter and the southwest quarter of the southeast quarter of Section twenty-five;

Township seven south of Range six east.
The southwest quarter of Section thirteen;

Township eight south of Range eighteen west.
The Lots three and four and the east half of the southwest quarter

505230

2

of Section thirty;

Township eleven south of Range eleven east.
The west half of Section twenty-six;

Township twelve south of Range nineteen east.
The southeast quarter of the northeast quarter, the east half of
the southeast quarter and the southwest quarter of the southeast quarter
of Section nineteen;

Township twelve south of Range twenty-eight east.
The southeast quarter and the southwest quarter of Section twenty-
nine; and the Lots three and four, the east half of the southwest quarter
and the southeast quarter of Section thirty;

Township fifteen south of Range twenty-six east.
The southwest quarter of Section five; the southeast quarter of Sec-
tion six; and the east half of the east half of Section seven;

Township seventeen south of Range fourteen east.
The west half of the east half of Section eight;

Township eighteen south of Range twenty-six east.
The north half of the southwest quarter and the north half of the
southeast quarter of Section two;

Township eighteen south of Range twenty-seven east.
The Lots three and four, the east half of the southwest quarter and
the south half of the southeast quarter of Section thirty; and the Lots
one, two, three and four, the southeast quarter of the northwest quarter
and the east half of the southwest quarter of Section thirty-one;

Township twenty south of Range seventeen east.
The southeast quarter of the northwest quarter, the southwest quar-
ter of the northeast quarter, the northeast quarter of the southwest quar-
ter and the northwest quarter of the southeast quarter of Section twenty-
one;

505230

3

Township twenty south of Range twenty-six east.

The southeast quarter of the northwest quarter, the southwest quarter of the northeast quarter and the east half of the southwest quarter of Section nineteen; the southeast quarter of Section thirty; and the Lots one, two and three, the east half of the northwest quarter, the west half of the northeast quarter, the east half of the southwest quarter and the southwest quarter of the southeast quarter of Section thirty-one;

Township twenty-one south of Range twenty east.

The northwest quarter of Section twenty-three;

Township twenty-one south of Range twenty-one east.

The Lots one and two and the east half of the northwest quarter of Section thirty;

Township twenty-one south of Range twenty-six east.

The southeast quarter of Section eight; and the east half of Section thirteen;

Township twenty-two south of Range sixteen east.

The Lots one, two and three and the southeast quarter of the northeast quarter of Section six;

Township twenty-two south of Range twenty east.

The east half of the southwest quarter and the west half of the southeast quarter of Section twenty-six;

Township twenty-two south of Range twenty-one east.

The south half of Section seventeen; the Lots three and four and the east half of the southwest quarter of Section nineteen; and the Lots one and two and the east half of the northwest quarter of Section thirty;

Township twenty-three south of Range twenty east.

The north half of the northeast quarter and the north half of the

505260

4

northwest quarter of Section one;

Township twenty-three south of Range twenty-six east.
The northeast quarter of Section thirty-four;

Township twenty-four south of Range twenty-six east.
The northeast quarter of Section eight; and the northwest quarter
of Section nine;

Township one north of Range six east.
The northwest quarter of Section twelve; the east half of the south-
east quarter of Section twenty-three; and the southwest quarter and the
south half of the southeast quarter of Section twenty-four;

Township four north of Range one east.
The east half of Section twenty-one; and the north half of Section
twenty-two;

Township four north of Range two east.
The northwest quarter of Section twenty-four;

Township seven north of Range four west.
The southeast quarter of the northwest quarter, the east half of the
southwest quarter and the southwest quarter of the southeast quarter of
Section eighteen;

Township seven north of Range five west.
The southwest quarter of the southwest quarter of Section twelve;
and Section thirteen;

Township eight north of Range thirty-one east.
The Lots one, two, three and four, the west half of the northwest
quarter and the west half of the southwest quarter of Section eleven;

Township nine north of Range thirty east.
The Lots three, four, five and six of Section six; and the east
half of the southwest quarter and the south half of the southeast quar-
ter of Section thirty;

505250

Township eleven north of Range three west.

The southwest quarter of Section fourteen; the northeast quarter, the northeast quarter of the southeast quarter, the west half of the southwest quarter and the southeast quarter of the southwest quarter of Section fifteen; the east half of the northeast quarter and the northwest quarter of Section twenty-two; and the northwest quarter of Section twenty-three;

Township thirteen north of Range thirty-one east.

The southwest quarter of the northwest quarter, the southeast quarter of the northeast quarter, the northeast quarter of the southeast quarter and the northwest quarter of the southwest quarter of Section twenty;

Township fourteen north of Range one west.

The Lots four, five, six and seven of Section six;

Township fourteen north of Range twenty-seven east.

The south half of the northwest quarter and the south half of Section twenty-six;

Township fifteen north of Range four east.

The Lots one and two and the south half of the northwest quarter of Section one;

Township twenty-one north of Range six west.

The Lots one, two, three and four, the south half of the northeast quarter, the south half of the northwest quarter and the southeast quarter of Section four; and the west half, the west half of the southeast quarter and the west half of the northeast quarter of Section twelve;

Township twenty-three north of Range one east.

The east half of the northwest quarter and the west half of the northeast quarter of Section thirty;

Township twenty-eight north of Range one west.

The southeast quarter of Section six;

Township twenty-eight north of Range one west.

The north half of the northwest quarter, the southwest quarter of the northwest quarter and the northwest quarter of the southwest quarter of Section seventeen;

Township twenty-eight north of Range two west.

The northeast quarter of the northeast quarter, the south half of the northeast quarter and the northwest quarter of the southeast quarter of Section twenty-five;

Containing in the aggregate twenty thousand nine hundred ninety-five and eleven-hundredths acres:

NOW KNOW YE, That the UNITED STATES OF AMERICA, in consideration of the premises, HAS GIVEN AND GRANTED, and by these presents DOES GIVE AND GRANT, unto the said Santa Fe Pacific Railroad Company, and to its successors, the lands above described; TO HAVE AND TO HOLD the same,

505250

7

4—1044—B.

together with all the rights, privileges, immunities, and appurtenances, of whatsoever nature, thereunto belonging, unto the said Santa Fe Pacific Railroad Company, and to its successors and assigns forever; subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws and decisions of courts. And there is reserved from the lands hereby granted, a right of way thereon for ditches or canals constructed by the authority of the United States.

IN TESTIMONY WHEREOF, I,     Woodrow Wilson

President of the United States of America, have caused these letters to be made

Patent, and the Seal of the General Land Office to be hereunto affixed.

GIVEN under my hand, at the City of Washington, the     THIRTIETH

(SEAL)     day of     DECEMBER     in the year of our Lord one thousand

nine hundred and     FIFTEEN     and of the Independence of the

United States the one hundred and     FORTIETH,

By the President:     Woodrow Wilson,

By     M.K. Gulick, Assistant Secretary,

L.Q.C. Lamar,

Recorder of the General Land Office.

RECORD OF PATENTS: Patent Number 505230

8—2196

8

**EXHIBIT "B"**

**Recording Requested By:**
**Ivaylo Dodev**

**When recorded mail documents to:**
**Ivaylo Dodev**
**6312 S 161st Way**
**Gilbert, AZ 85298**

# AFFIDAVIT OF SECURED INTEREST
# OF IVAYLO DODEV

STATE OF ARIZONA )
) SS
COUNTY OF MARICOPA )

Comes now, Ivaylo Dodev, hereinafter known as Affiant; being of sound mind, competent to testify and being over the age of 21 years, after first being duly sworn according to law to tell the truth to the facts related herein, states the he has firsthand knowledge of the facts stated herein and believes these facts to be true to the best of his knowledge.

1. Your Affiant, Ivaylo Dodev, entered into an agreement to purchase specific real property on the 16th of July, 2004.

2. Your Affiant, Ivaylo Dodev, notices that the address of said property is 6312 South 161st Way, Gilbert, Arizona 85298.

3. Your Affiant, Ivaylo Dodev, notices that the legal description of said property is as attached. See EXHIBIT A.

4. Your Affiant, Ivaylo Dodev, had a mortgage agreement specific to said property in which the sales price was $385,000.00

5. Your Affiant, Ivaylo Dodev, made a down payment of $19,300.00, paid to the Sellers, JUSTIN C. FRANKS AND DAIDRIA FRANKS, through CAPITAL TITLE AGENCY, INC., AN ARIZONA CORP on July 21, 2004.

6. As of September 29th 2008, Your Affiant, Ivaylo Dodev, made payments totaling $120,000.00. (All Loan Servicing Companies, which include first's, second's, refinanced loans, Home Equity Lines of Credit, Taxes, Insurance, etc.) to multiple alleged servicers,

1

pursuant to the alleged loan agreement specific to the purchase of the above described property, including but not limited to Select Portfolio Servicing, Inc.

7. Your Affiant, Ivaylo Dodev, as of the 8th of July, 2013, has Nine Years (Original loan date to present) of maintenance and upkeep of said property, which have an approximate value of $807,760.00. See exhibit B

8. Your Affiant, Ivaylo Dodev, has made improvements to said property, from the time of original purchase, which has an approximate value of $106,100.00. See exhibit B.

9. Your Affiant, Ivaylo Dodev, has a total secured interest in the above referenced property, as of 10th of July, 2013, of approximately $1,053,160.00 (Total amount of all payments made on 4-9).

10. To date, no party has made any offer to Your Affiant, Ivaylo Dodev, to settle Affiant's interest in said property.

11. Further, Affiant sayeth naught

Offered at Arm's Length on this _15-th_ day of July 2013

By: _____

I, Ivaylo Dodev, ARR, Explicitly Without Prejudice

STATE OF ARIZONA                )
                                    ) SS

COUNTY OF MARICOPA       )

Subscribed and sworn to (or affirmed) before me on this _15_ day of July, 2013 by Ivaylo Dodev, proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, as his free will act and deed, for the purposes and considerations therein expressed. I certify under PENALTY OF PERJURY under the laws of the State of Arizona that the foregoing statement is true and correct. WITNESS my hand and the official seal.

Executed by my own free will

_____ (Seal)
Notary Public



2

# EXHIBIT A

## *PROPERTY LEGAL DESCRIPTION*

### PHYSICAL ADDRESS:

## 6312 South 161st Way, Gilbert, Arizona 85298

*Legal Description*

Commencing at the Southwest corner of Section 22;

Thence North 90 degrees 00 minutes 00 seconds East, a distance of 1284.85 feet;

Thence North 00 degrees 00 minutes 00 seconds East, a distance of 415.05 feet;

Thence South 90 degrees 00 minutes 00 seconds West, a distance of 193.02 feet to the point of beginning;

Thence South 90 degrees 00 minutes 00 seconds West, a distance of 367.57 feet;

Thence North 00 degrees 03 minutes 42 seconds East, a distance of 9.56 feet;

Thence North 18 degrees 49 minutes 40 seconds East, a distance of 266.94 feet;

Thence North 90 degrees 00 minutes 00 seconds East, a distance of 279.44 feet;

Thence South 00 degrees 25 minutes 50 seconds East, a distance of 262.23 feet to the point of beginning.

*The Above Legal Description is the same property conveyed in deed recorded 07/26/2004 as Instrument No. 20040852027 in the Official Records of Maricopa County Recorder Helen Purcell.*

3

# EXHIBIT B
## *IMPROVEMENTS AND MAINTENANCE*

### 6312 South 161st Way, Gilbert, Arizona 85298

*Legal Description*
*See Attached Exhibit A*
*Instrument No. 20040852027*

IMPROVEMENTS FROM JULY 25, 2004 TO JULY 10, 2013
   Built Barn: $ 65,000.00
   Window Tinting, Coverings and Repairs:  $ 3,500.00
   AC Repair: $ 4,000.00
   Garage- Built In Cabinets and Door Insulation: $1,200.00
   New wood floors: $6,000.00
   Landscaping- Planting Orchard: $13,400.00
   Water Softener: $2,200.00
   Reverse Osmosis System: $600.00
   Fencing, Decorative Columns: $9,000.00
   Water Heater: $1,200.00

   **TOTAL: $106,100.00**

MAINTENANCE AND UPKEEP FROM JULY 25, 2004 TO JULY 10, 2013
   Weed/Pest Control: $1,260.00
   Landscape: $9,500.00
   Irrigation of Pastures: $5,800.00
   Air Filters: $700.00
   Carpet/House Cleaning: $1,500.00
   Total Maintenance at $10.00 per hour 24/7: ≈$789,000.00

   **TOTAL: $807,760.00**

4

**EXHIBIT "C"**

Certified Mail # 7013 0600 0000 3572 3322

Ivaylo Dodev
6312 S 161st Way
Gilbert, AZ 85298
Owner of Account:
304-77-004W

# Lawful Notification Letter

September 30, 2013

**MARICOPA COUNTY TREASURER'S OFFICE**
**CHARLES "HOS" HOSKINS**
**301 W JEFFERSON**
**PHOENIX, AZ 85003**

Mr. CHARLES "HOS" HOSKINS, This letter is a lawful notification to you and the MARICOPA COUNTY TREASURE'S OFFICE that I, Ivaylo Dodev, owner of account #304-77-004W, am alive and well and able to pay the taxes associated with my house, located at 6312 S. 161st Way, Gilbert, Arizona. I am including the first portion of taxes due for year 2013, $1,019.02, Wells Fargo Bank, NA, check # 545, along with a Tax Statement.

**The reason for this letter is to instruct you not to accept any payments towards my account from third parties and that I will be responsible for all payments due. Any and all statements, bills or notices should be addressed to me at the address associated with my account.**

Further, any future payment from the following companies: SELECT PORTFOLIO SERVICING, INC., BANK OF NEW YORK MELLON, NA, BANK OF AMERICA, NA or any other party should be returned to the sender/originator.

Some, or all, of the aforementioned company has attempted to steal my property through theft by deception, and a Legal Notice to Sue has been Processed and they have been Served. By accepting a payment from a third party, you might put yourself or your office in a situation where a judge might rule that you aided and abetted a party with unclean hands, especially after you have read this notice. A response is not necessary and if I do not hear from you in 15 days I will assume that my notice and instructions are clear, understood and implemented.

Respectfully,

*[signature]*

Ivaylo T Dodev, ARR

**Subject:**   USPS Shipment Info for 70130600000035723322

**From:**   US_Postal_Service@usps.com (US_Postal_Service@usps.com)

**To:**   dodev7@yahoo.com;

**Date:**   Sunday, October 6, 2013 2:36 PM

This is a post-only message. Please do not respond.

Ivaylo Dodev has requested that you receive the current Track & Confirm information, as shown below.

Current Track & Confirm e-mail information provided by the U.S. Postal Service.

Label Number: 70130600000035723322

Service Type: Certified Mail™

| Shipment Activity | Location | Date & Time |
|---|---|---|
| Delivered | PHOENIX, AZ 85003 | October 1, 2013 8:48 am |
| Depart USPS Sort Facility | PHOENIX, AZ 85043 | October 1, 2013 |
| Arrival at Unit | PHOENIX, AZ 85034 | October 1, 2013 4:17 am |
| Processed at USPS Origin Sort Facility | PHOENIX, AZ 85043 | September 30, 2013 10:13 pm |
| Dispatched to Sort Facility | HIGLEY, AZ 85236 | September 30, 2013 2:46 pm |
| Acceptance | HIGLEY, AZ 85236 | September 30, 2013 1:57 pm |

USPS has not verified the validity of any email addresses submitted via its online Track & Confirm tool.

For more information, or if you have additional questions on Track & Confirm services and features, please visit the Frequently Asked Questions (FAQs) section of our Track & Confirm site at http://www.usps.com/shipping/trackandconfirm.htm

CHARLES "HOS" HOSKINS
TREASURER
301 W JEFFERSON
PHOENIX, AZ 85003-2199
(602)506-8511

PARCEL/ACCOUNT #  304-77-004W

PRESORTED
FIRST CLASS MAIL
U.S. POSTAGE
PAID
PHOENIX, AZ
PERMIT #359

C-160531

# 2013
**Tax Information
Statement
for mortgaged property**

**Sign up for
Parcel Watch**
at
http://treasurer.maricopa.gov

96    474   ****AUTO**SCH 5-DIGIT 85297
DODEV IVAYLO T
5312 S 161ST WAY
GILBERT, AZ 85296-8455

Tax Code 800600

| | 2013 | Ratio | Assessed |
|---|---|---|---|
| Limited Value (Primary) | 209,300 | .100 | 20,930 |
| Full Cash Value (Secondary) | 209,300 | .100 | 20,930 |
| **Total 2013 Taxes Assessed** | | | **$2,038.04** |

IVAYLO T DODEV
NIKOLINA T DODEV
5312 S 161ST WAY
GILBERT, AZ 85296-8455

545

91-527/1221 5307
3629182149

Sept 30, 2013

Pay to the Order of _Maricopa County Treasurer_   $ 1,019.02

_One Thousand Nineteen / 02/100_   Dollars

for _304-77-004W_

⑆122105278⑆ ▮▮▮▮▮▮ 00545

**UNITED STATES POSTAL SERVICE ®**

# CUSTOMER'S RECEIPT

SEE BACK OF THIS RECEIPT
FOR IMPORTANT CLAIM
INFORMATION

Pay to _Maricopa County_

Address _Treasurer_

KEEP THIS
RECEIPT FOR
YOUR RECORDS

**NOT NEGOTIABLE**

| Serial Number | Year, Month, Day | Post Office | Amount | Clerk |
|---|---|---|---|---|
| 54 | 2014-10-09 | 852341 | $636.60 | 0005 |

**UNITED STATES POSTAL SERVICE**

## POSTAL MONEY ORDER

| Serial Number | Year, Month, Day | Post Office | U.S. Dollars and Cents |
|---|---|---|---|
| 154 | 2014-10-09 | 852341 | **$636.60** |

Amount SIX HUNDRED THIRTY SIX DOLLARS & 60c **********

Clerk 0005

Pay to _Maricopa County Treasurer_

Address _PO Box 52133_
_Phx AZ 85072_

Memo _304-77-004W_

From _Ivo Dodev_
Address _6312 South 161 Way_
_Gilbert Arizona_

© 2008 United States Postal Service. All Rights Reserved.

SEE REVERSE WARNING • NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

---

**UNITED STATES POSTAL SERVICE ®**

# CUSTOMER'S RECEIPT

SEE BACK OF THIS RECEIPT
FOR IMPORTANT CLAIM
INFORMATION

Pay to _Maricopa County Treasurer_

Address

KEEP THIS
RECEIPT FOR
YOUR RECORDS

**NOT NEGOTIABLE**

| Serial Number | Year, Month, Day | Post Office | Amount | Clerk |
|---|---|---|---|---|
| 143 | 2014-10-09 | 852341 | $636.60 | 0005 |

**UNITED STATES POSTAL SERVICE**

## POSTAL MONEY ORDER

| Serial Number | Year, Month, Day | Post Office | U.S. Dollars and Cents |
|---|---|---|---|
| 143 | 2014-10-09 | 852341 | **$636.60** |

Amount SIX HUNDRED THIRTY SIX DOLLARS & 60c **********

Clerk 0005

Pay to _Maricopa County Treasurer_

Address _PO Box 52133_
_Phx, AZ 85072_

Memo _304-77-004W_

From _Ivo Dodev_
Address _6312 South 161 Way_
_Gilbert Arizona_

© 2008 United States Postal Service. All Rights Reserved.

SEE REVERSE WARNING • NEGOTIABLE ONLY IN THE U.S. AND POSSESSIONS

# PARCEL/ACCOUNT # 304-77-004W



**Charles "Hos" Hoskins**
**MARICOPA COUNTY**
**TREASURER**
301 W JEFFERSON ST — Room 100
PHOENIX, AZ 85003—2199

Sign up for

# Parcel Watch

and receive tax bill
notifications via email

http://treasurer.maricopa.gov

Property taxes are mailed once a year. If you change mailing address, pay off a Mortgage that pays your taxes or purchase after the cut off, you may not receive a bill. It is important to update your mailing address with the Treasurer's Office because taxes are due even if a bill in not received.

## http://treasurer.maricopa.gov
### (602) 506-8511

46 52  ***********AUTO**SCH 5-DIGIT 85297
DODEV IVAYLO T
6312 S 161ST WAY
GILBERT AZ 85298-8455

**MARICOPA COUNTY**
**CONSOLIDATED**
**2014 PROPERTY TAX**
**STATEMENT**
So we can provide you with more of the information you want regarding your property taxes...

## Detailed tax information is now on the other side ⟶

---

### Your 2014 Property Tax Summary for Parcel # 304-77-004W

(UM7-17035=PRTCNTL)

| | 2013 | Ratio | Assessed | 2014 | Ratio | Assessed |
|---|---|---|---|---|---|---|
| Limited Value (Primary) | 209,300 | .100 | 20,930 | 230,230 | .100 | 23,023 |
| Full Cash Value (Secondary) | 209,300 | .100 | 20,930 | 263,500 | .100 | 26,350 |

| Previous Year Total | $2,038.04 | Total 2014 Assessed Taxes | $2,546.40 |
|---|---|---|---|

---

### WHO IS ACCOUNTABLE FOR MY 2014 PROPERTY TAXES?

| | |
|---|---|
| A) Your elected State Officials have levied............................... | 154.06 |
| B) Your elected County Board of Supervisors have levied............. | 358.43 |
| C) Your combined elected School Boards have levied a total of.... | 1,435.27 |
| D) Voters of your district approved to impose................................. | 973.40 |
| E) Your elected City Council has levied.................................... | 0.00 |
| F) Independent special district boards combined to impose........... | 48.90 |
| G) Your property has received a Credit for State Aid to Education | -423.66 |

| Your total 2014 Property Taxes for this parcel are.................... | $2,546.40 |
|---|---|

---

### Find the answers to FAQ
### (Frequently Asked Questions)
### at http://treasurer.maricopa.gov

---

### Payments

**First half tax is due 10/1/14.** Interest penalty after 5pm on 11/3/14.

**Second half tax is due 3/1/15.** Interest penalty after 5pm on 5/1/15.

If the entire amount is paid in full by 12/31/14, no interest is charged.

Interest on late payments is 16% per year (ARS § 42-18053).

**Pay with E-Check:** Contact your bank or visit our web site. No service fees when paid using the Treasurer's Office website.

**Pay by credit card:** Third-party service fees apply. Visit our web site.

**Pay by check:** Mailed payments must be postmarked on or before the due date. Your cancelled check is your receipt. Legal payment exists when the check has cleared your bank. A $25 fee will be assessed for returned checks. Use enclosed envelope and payment coupon and write your parcel number on your check. U.S. funds only.

**Pay in person:** With the attached 2014 coupon, current year taxes can be paid in person using check or cash at any Arizona Chase Bank.

---

## Please remember that your second half payment is due
## in March and no additional notification is sent.

*Paid by the owner on 10/9/14*

**EXHIBIT "D"**

# Your insurance bill

Oct 10, 2013                                                                    Page 1 of 2

*Nikolina Dodev*
*Ivaylo Dodev*

Account number  J7█████
Home policy   97103-31-39   6312 S 161st Way Gilbert, AZ 85298

## Welcome to Farmers.



Important - Payment Must Be Received by the Due Date.

### Pay in full by the due date and save on service charges.

If the minimum amount is paid, your next payment of $377.67 will be due on 01/30/2014 and includes a $5.00 service charge.

Changes to your policy may change your next payment amount.

### Your agent

JOSEPH LAMBROS
Phone: (480)551-4442
Email: jlambros
       @farmersagent.com

**Questions about your bill?**
You can call 1-877-327-6392
7:30 am - 10:00 pm Mon-Fri(CST)
9:30 am - 6:00 pm Sat-Sun(CST).

**Get the latest at**
**farmers.com**
Make a payment or get
up-to-date information on your
coverage and payments.

**Farmers HelpPoint®**
For assistance with insurance
claims, call us immediately!
We're here for you 24/7, at
1-800-HelpPoint(435-7764)
Espanol 877-732-5266.

**Pay Plan Options**
Other pay plan options may be
available to you. Please contact
your agent for details.

---

36-3090    04-10

## Thank you for your business.

# Payment Stub

**Paying by check?**
Please make your check payable to *Farmers Insurance Exchange*, write your Account number on it, and mail it to us with this payment stub.

JOSEPH LAMBROS
916 E BASELINE #103
MESA, AZ. 85204

NIKOLINA DODEV
IVAYLO DODEV
6312 S 161ST WAY
GILBERT AZ 85298-8455

| | |
|---|---|
| Account number: | J7█████ |
| Pay in Full: | $372.67 |
| Minimum due: | $0.00 |
| Due Date: | Oct 30, 2013 |

Amount enclosed: $ _____

*The Returned payment charge for payments not honored by your bank will be $25.00.*

*Payments received after the due date will incur a $10.00 late payment service charge.*



88J7003010550037267000000000000002007

# Your insurance bill



**FARMERS**
INSURANCE

Aug 31, 2014

Page  1 of  2

~olina Dodev
*Ivaylo Dodev*

**Your agent**
JOSEPH LAMBROS
Phone: (480)551-4442
Email: jlambros
@farmersagent.com

**Account number** J700301055
**Home policy** 97103-31-39    6312 S 161st Way Gilbert, AZ 85298

## Your billing summary

| | |
|---|---|
| Pay in full | $797.67 |
| Minimum due | $398.83 |
| Due date | September 30, 2014 |

Payments and policy changes processed after Aug 31 will appear on your next bill.

Important - Payment Must Be Received by the Due Date.

### Pay in full by the due date and save on service charges.

If the minimum amount is paid, your next payment of $403.84 will be due on 01/30/2015 and includes a $5.00 service charge.

Changes to your policy may change your next payment amount.

**Questions about your bill?**
You can call 1-877-327-6392
7:30 am - 10:00 pm Mon-Fri(CST)
9:30 am - 6:00 pm Sat-Sun(CST).

**Get the latest at farmers.com**
-Make a Payment
-Discontinue Paper Mailing
-Get current information on coverages and payments

**Farmers HelpPoint®**
For assistance with insurance claims, call us immediately!
We're here for you 24/7, at 1-800-HelpPoint(435-7764)
Espanol 877-732-5266.

**Pay Plan Options**
Other pay plan options may be available to you. For added convenience, combine multiple accounts into a single account. Ask your agent how.

26-5090    06-14

### Thank you for your business.

## Payment Stub

**Paying by check?**
Please make your check payable to *Farmers Insurance Exchange*, write your Account number on it, and mail it to us with this payment stub.



*Paid 9/9/14*

JOSEPH LAMBROS
916 E BASELINE #103
MESA, AZ. 85204

NIKOLINA DODEV
IVAYLO DODEV
6312 S 161ST WAY
GILBERT AZ 85298-8455

| | |
|---|---|
| Account number: | J700301055 |
| Pay in Full: | $797.67 |
| Minimum due: | $398.83 |
| Due Date: | Sep 30, 2014 |

Amount enclosed: $

*The Returned payment charge for payments not honored by your bank will be $25.00.*

*Payments received after the due date will incur a $10.00 late payment service charge.*

**EXHIBIT "E"**

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20061646998  12/18/2006  03:48
ELECTRONIC RECORDING

52354-22-2-2--
Esquivela

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

## Federal Title Agency, LLC

Recording Requested By:
FIRST MAGNUS FINANCIAL CORPORATION

Return To:
FIRST MAGNUS FINANCIAL CORPORATION

603 N. WILMOT
TUCSON, AZ  85711

Prepared By:

FIRST MAGNUS FINANCIAL CORPORATION
603 N. WILMOT
TUCSON, AZ 85711

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST

LOAN NO.: _____80433
ESCROW NO.:  00052354001

MIN  100039265311804332
MERS Phone: 1-888-679-6377

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.
(A) "Security Instrument" means this document, which is dated             DECEMBER 12, 2006
together with all Riders to this document.
(B) "Borrower" is
IVAYLO T. DODEV, A MARRIED MAN, AS HIS SOLE AND SEPARATE PROPERTY

Borrower is the trustor under this Security Instrument. Borrower's mailing address is
23410 SOUTH 161ST WAY, GILBERT, AZ  85297
(C) "Lender" is
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

Lender is a  CORPORATION
organized and existing under the laws of  ARIZONA

Initials: ___

ARIZONA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS   Form 3003  1/01 (rev. 6/02)
VMP-6A(AZ) (0208)                    Page 1 of 15          LENDER SUPPORT SYSTEMS INC. MERS6AAZ.NEW (05/04)

Lender's mailing address is
603 North Wilmot Road, Tucson, AZ  85711
(D) "Trustee" is

Trustee's mailing address is

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI  48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated          DECEMBER 12, 2006          .
The Note states that Borrower owes Lender
SIX HUNDRED EIGHTY ONE THOUSAND SEVEN HUNDRED FIFTY AND NO/100 X X X X X X

                                                                                                    Dollars
(U.S. $ 681,750.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than     JANUARY 01, 2037          .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider        ☐ Condominium Rider            ☐ 1-4 Family Rider
☐ Graduated Payment Rider      ☐ Planned Unit Development Rider ☐ Biweekly Payment Rider
☐ Balloon Rider                ☐ Rate Improvement Rider       ☐ Second Home Rider
☐ Other(s) [specify]

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

VMP-6A(AZ) (0206)                    Page 2 of 15                    Form 3003   1/01   (rev. 6/02)

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                          of                          MARICOPA                          :

  [Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]

LEGAL DESCRIPTION ATTACHED HERETO AND MADE PART HEREOF ......AND BEING MORE PARTICULARLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 304-77-004                          which currently has the address of

23410 SOUTH 161ST WAY                          [Street]

GILBERT                          [City] , Arizona          85297          [Zip Code]

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials

VMP-6A(AZ) (0206)                          Page 3 of 15                          Form 3003   1/01   (rev. 6/02)

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

VMP-6A(AZ) (0208)          Page 4 of 15          Form 3003  1/01  (rev. 6/02)

Initials:

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials:

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials

http://recorder.maricopa.gov/cert.aspx?id=106393 [2006 1646998] 23 Pages

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials: 

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

http://recorder.maricopa.gov/cert.aspx?id=106393 [2006164699B] 23 Pages

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Initials

**VMP-6A(AZ)** (0206)          Page 8 of 15          Form 3003  1/01  (rev. 6/02)

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials _____

VMP-6A(AZ) (0206)          Page 9 of 15          Form 3003  1/01  (rev. 6/02)

http://recorder.maricopa.gov/cert.aspx?id=106393 [2006164699B] 23 Pages

20061646998

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

VMP-6A(AZ) (0206)                    Page 10 of 15                    Form 3003  1/01  (rev. 2002)

MCR 10 of 23

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

VMP-6A(AZ) (0206)                    Page 11 of 15                    Form 3003   1/01  (rev. 6/02)

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

MCR 12 of 23

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Time of Essence.** Time is of the essence in each covenant of this Security Instrument.

## EXHIBIT A

A PORTION OF LAND IN THE SOUTHWEST QUARTER OF SECTION 22, TOWNSHIP 2 SOUTH, RANGE 6 EAST, GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS;

COMMENCING AT THE SOUTHWEST CORNER OF SECTION 22;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 1284.85 FEET;

THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 415.04 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 193.02 FEET TO THE POINT OF BEGINNING;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 367.57 FEET;

THENCE NORTH 00 DEGREES 03 MINUTES 42 SECONDS EAST, A DISTANCE OF 9.56 FEET;

THENCE NORTH 18 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE OF 266.94 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 279.44 FEET;

THENCE SOUTH 00 DEGREES 25 MINUTES 50 SECONDS EAST, A DISTANCE OF 262.23 FEET TO THE POINT OF BEGINNING.

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

ALTA Commitment – Exhibit A

# ADJUSTABLE RATE RIDER
### (MTA-Twelve Month Average Index – Payment Caps)

LOAN NO.: ███████80433

MIN: 100039265311804332
MERS Phone: 1-888-679-6377

THIS ADJUSTABLE RATE RIDER is made this 12th day of      DECEMBER, 2006    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

("Lender") of the same date and covering the property described in the Security Instrument and located at:

23410 SOUTH 161ST WAY, GILBERT, AZ 85297

[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agrees as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

2. INTEREST
(A) Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      1.750     %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

(B) Interest Rate Change Dates
The interest rate I will pay may change on the   1st   day of      FEBRUARY, 2007     , and on that day every month thereafter. Each date on which my interest rate could change is

PayOption MTA ARM Rider
FE-5315  (0511)  Page 1 of 6    LENDER SUPPORT SYSTEMS, INC. COU-5315.COU (01/06)

Initials: ███████

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

   **(C) Index**
   Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

   If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

   **(D) Calculation of Interest Rate Changes**
   Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding       THREE  AND  400/1000THS       percentage point(s)       3.400       % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than       9.950       %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3. PAYMENTS
   **(A) Time and Place of Payments**
   I will make a payment every month.
   I will make my monthly payments on the  1st   day of each month beginning on    FEBRUARY, 2007       . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on       JANUARY 01, 2037     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
   I will make my monthly payments at First Magnus Financial Corporation, An Arizona Corporation 603 North Wilmot Road, Tucson, AZ  85711
or at a different place if required by the Note Holder.

   **(B) Amount of My Initial Monthly Payments**
   Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $       2,435.51       unless adjusted under Section 3(F).


**PayOption MTA ARM Rider**
**FE-5315  (0511)**              Page 2 of 6                     Initials: 

http://recorder.maricopa.gov/cert.aspx?id=106393 [2006164669981] 23 Pages

### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of       FEBRUARY, 2008       , and on that day every 12th month thereafter.  Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date.  The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap."  This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment.  I also have the option to pay the Full Payment for my monthly payment.

### (E) Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**PayOption MTA ARM Rider**
**FE-5315  (0511)**                              Page 3 of 6                              Initials:

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**
    My unpaid Principal can never exceed the Maximum Limit equal to
ONE HUNDRED FIFTEEN AND 000/1000THS        percent ( 115.000 %) of the Principal
amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to
Minimum Payments and interest rate increases. In that event, on the date that my paying my
monthly payment would cause me to exceed that limit, I will instead pay a new monthly
payment. This means that my monthly payment may change more frequently than annually
and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum
Payment will be in an amount that would be sufficient to repay my then unpaid Principal in
full on the Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**
    On the    fifth    Payment Change Date and on each succeeding fifth Payment Change
Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my
monthly payment changes again. I also will begin paying the Full Payment as my Minimum
Payment on the final Payment Change Date.

**(H) Payment Options**
    After the first Interest Rate Change Date, Lender may provide me with up to three (3)
additional payment options that are greater than the Minimum Payment, which are called
"Payment Options." I may be given the following Payment Options:

**(i)    Interest Only Payment:** the amount that would pay the interest portion of the
monthly payment at the current interest rate. The Principal balance will not be decreased
by this Payment Option and it is only available if the interest portion exceeds the Minimum
Payment.
**(ii)    Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and
Interest) at the Maturity Date in substantially equal payments.
**(iii)   15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and
Interest) within a fifteen (15) year term from the first payment due date in substantially
equal payments. This monthly payment amount is calculated on the assumption that the
current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
    Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial
Interest in Borrower" is amended to read as follows:

**PayOption MTA ARM Rider**
**FE-5315  (0511)**                    Page 4 of 6                    Initials:

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

**PayOption MTA ARM Rider**
**FE-5315  (0511)**                    Page 5 of 6                    Initials: 

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____(Seal)          _____(Seal)
IVAYLO T DODEV                    -Borrower                                        -Borrower

_____(Seal)          _____(Seal)
                                  -Borrower                                        -Borrower

_____(Seal)          _____(Seal)
                                  -Borrower                                        -Borrower

_____(Seal)          _____(Seal)
                                  -Borrower                                        -Borrower

PayOption MTA ARM Rider
FE-5315  (0511)                   Page 6 of 6

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

http://recorder.maricopa.gov/cert.aspx?id=106393 [20061646998] 23 Pages

20061646998
OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL



The foregoing instrument is an
**electronically prepared**
full, true and correct copy
of the original record in this
office.
Attest:  07/05/2013  04:01:16 PM

By _____ Recorder

To Verify this purchase visit
http://recorder.maricopa.gov/cert.aspx?id=106393

**EXHIBIT "F"**

DATE: JANUARY 02, 2007
BORROWER:
IVAYLO DODEV

LOAN #:
PROPERTY ADDRESS:
23410 SOUTH 161ST WAY, GILBERT, AZ 85297



This is a True and Certified Copy of the Original

## HOME EQUITY CREDIT LINE AGREEMENT AND DISCLOSURE STATEMENT

MIN: 100039230201271778
MERS Phone: 1-888-679-6377

This Home Equity Credit Line Agreement and Disclosure Statement ("Agreement") governs my Home Equity Credit Line Account ("Account") with you,
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

The words "I," "me" and "my" refer to the Borrower signing this Agreement. If more than one Borrower signs this Agreement, the words "I," "me" and "my" refer to all who sign, separately and together. The words "you" and "your" refer to
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

**1. LOANS: DRAW AND REPAYMENT PERIOD.** Subject to the limitations explained in this Agreement, upon my request for loans, you agree to lend money to me from time to time until the last day of the sixtieth (60th) consecutive calendar month following the date set forth above ("Initial Draw Period") or until the last day of any renewed Draw Period, up to my Credit Limit indicated in paragraph 5 below. (You will not make any loans if my Account is sooner terminated or suspended under paragraphs 12.B, 12.D, 13.B or 16.A below.) You will not make any loan before the fourth business day following the signing of this Agreement, except to the extent of proceeds of this loan that are for the purchase or initial construction of the Property.

I agree that prior to the end of the Initial Draw Period, you have the right to review my Account to decide whether such Initial Draw Period will be renewed. Unless you have sent me written notice not later than the sixtieth (60th) day before the Initial Draw Period ends that you have decided not to renew such Initial Draw Period, such Initial Draw Period will automatically renew for one additional sixty (60) month period, and the Draw Period on my Account shall thereafter be considered to be 120 months for purposes of this Agreement. If the Initial Draw Period is not renewed, then the Draw Period on my Account shall thereafter be considered to be 60 months for purposes of this Agreement.

After the Draw Period ends, I will no longer be able to obtain loans and then must pay the outstanding balance over the specified Repayment Period unless my Account is sooner terminated under paragraph 13.B. below, in which case my Account is due and payable in full at the time of such termination. The Repayment Period shall be 180 months.

**2. MAKING LOANS.** You will make loans under this Agreement (up to my Available Credit Limit) by (i) honoring Equity Credit Line Checks you provide to me requesting advances of at least $  250.00  ; (ii) if you issue an access card ("Card"); by honoring advances I request by using the Card at any Merchant or servicer provider ("Merchant") or any participating automated teller machine ("ATM") networks; (iii) paying closing costs and finance charges in accordance with paragraph 8.C below; (iv) paying certain other amounts on my behalf in accordance with my disbursement authorization provided to you at or before the time I sign this Agreement; (v) paying any unpaid taxes, assessments, property insurance or other sums as provided under this Agreement or the Deed of Trust; or (vi) any other method or procedure you establish.

**3. SPECIAL CARD TERMS AND CONDITIONS.** I understand that you, in your sole discretion and at your sole option, may cause to be issued a Card, as an access device and an additional means by which I may obtain advances under the Account. By applying for the Account, I have requested that you issue the Card to me if my application is approved and if you, at your option and in your sole discretion, provide access to my/our Account by the Card after the Account is opened. If one or more Cards are issued to me as a means of obtaining loan advances on my Account, I agree that my use of the Card and any related loan advances will be governed by the following terms and conditions unless I cancel my card within [30] days of receiving the Card and have not authorized the use of the Card or Card account number. I also agree to comply with any agreement between me and the Card Issuer:

A. *Account Access.* In addition to any means by which I may access my Account as described in the Agreement, I may be permitted to obtain (up to my Available Credit Limit) loan advances by using any Card you provide, at any merchant or service provider ("Merchant") that allows me to use the Card to pay for goods or services. If you provide me with a Personal Identification Number ("PIN"), I may also obtain loan advances by using the Card at participating automated teller machine ("ATM") networks. I agree not to write my PIN on my Card(s) or disclose it to others. If I use my Card at an ATM, I understand that the owner of the ATM may charge me a fee for the transaction. I understand that in order to use my Card at an ATM, I must call the 800 assistance number which appears on the reverse side of my Card to request a PIN. I also understand that Card loan advances (whether at a Merchant or ATM) may be subject to transactional limits that could restrict the full use of my Available Credit Limit. There are no minimum draw requirements that apply when I use the Card, except for any limits that may be imposed separately by a Merchant or ATM owner. I agree that if you decide in your sole discretion to approve any transactions above my Available Credit Limit, I will be responsible for the full amount of any such advances. I understand that if I make reservations or purchases of any kind using my Card, my Account may be immediately charged for the full amount of the reservation or purchase, regardless of whether I have received the goods or services requested at the time my Account is charged.

B. **Liability**. I agree that all borrowers who have executed the Agreement are jointly and severally liable under the terms of the Agreement for any Card transactions that are posted to the Account, whether or not a Card has been issued to all borrowers.

C. **Authorizations**. All Card transactions are processed through the applicable bankcard networks that are branded on the Card ("Bankcard Networks") according to the requirements and procedures of the Bankcard Networks. Some Card transactions may require prior authorization by you or pursuant to the requirements and procedures of the Bankcard Networks before they are approved for processing. The Bankcard Networks may refuse to process any Card transaction if it appears to be illegal or fraudulent, or if the Merchant or the transaction does not otherwise meet the requirements of the Bankcard Networks. In addition, you or the Card Issuer may deny authorization for any Card transaction if my Account has been suspended or terminated. I also agree that if you or the Card Issuer detects any suspicious or unusual use, you or the Card Issuer may suspend use of any Card.

D. **Lawful Transactions**. I agree to use my Card only for valid and lawful purposes. If I use my Card for any other purpose or transaction (herein called a ("Prohibited Activity"), including, without limitation, gambling activities, I agree to promptly reimburse you, the Card Issuer (if other than you) and the Bankcard Networks for all amounts or expenses paid by any such party as a result of such use. You reserve the right to block any Prohibited Activity and/or to not approve any authorization request for a Prohibited Activity. Card transactions for any Prohibited Activity made by me or for my benefit shall be considered authorized by me. You will not be liable if I engage in any Prohibited Activity using the Card, and I will be responsible for the full amount of any loan advances made in connection with such Prohibited Activity. Display by an online merchant of the service mark of any Bankcard Network branded on the Card does not mean that a Card transaction over the Internet is legal where I reside.

E. **Transactions With Merchants**. I understand and agree that: (1) If a Merchant discloses a policy such as "no returns", "no refund", "no return or credit without receipt", "as is", "store credit only", "all sales final", or similar language, I will be bound by that policy when I use my Card to pay for goods or services from that Merchant; (2) When using my Card to make travel or lodging reservations, I must obtain the Merchant's cancellation policy and follow it if I cancel the reservations. If I cancel, I must obtain the cancellation number that the Merchant is required to give me pursuant to the requirements and procedures of the Bankcard Networks. The Merchant may charge me for a cancelled transaction unless I can provide you with a correct cancellation number. (3) If I authorize a Merchant to charge repeat transactions to my Account without my presenting my Card for each charge, then I must notify the Merchant when I want to discontinue the repeat transactions or if my Account is suspended or closed. Otherwise, I will be responsible to you for the amount of all such repeat transactions. I understand that if my loan advance privileges or my use of the Card is suspended or cancelled for any reason, it is my responsibility to pay for such repeat transactions directly until loan advance privileges and/or Card use are reinstated. (4) If I disagree with any transaction on my monthly statement or have a dispute with any Merchant as a result of a Card transaction, I agree to comply with the section entitled MY BILLING RIGHTS - I SHOULD KEEP THIS NOTICE FOR FUTURE USE in my Agreement. I will promptly provide you with such information or assistance as you reasonably request.

F. **Foreign Transactions**. I agree to pay you in U.S. dollars. If I make a Card transaction in a foreign currency, the appropriate Bankcard Network will convert the transaction amount into U.S. dollars at the rates, and in accordance with its operating regulations in effect at the time the transaction is processed. Currently, the regulations of the Bankcard Networks provide that the currency conversion rate to be used is either a wholesale market rate selected by the Bankcard Networks or a government-mandated rate, each in effect one day prior to the processing date, plus an adjustment factor (currently 1%) established by the Bankcard Networks. The Bankcard Networks may change the currency conversion rate, and the formula used to establish that rate, from time to time. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or the posting date. The currency conversion rate used may be the same as, greater than or less than the amount that would be calculated by conversion through a financial institution in the country in which the transaction occurred. I understand that you do not determine the currency conversion rate or the formula to establish the rate that is used by the Bankcard Networks and that you do not receive any portion of the currency conversion rate used by the Bankcard Networks.

G. **Limitation of Liability**. Your liability to me, if any, for wrongful dishonor of any loan request I make using my Card is limited to my actual damages. I also agree that you are not responsible if any transaction is not approved, whether by you, a Merchant, Bankcard Network, or a third party, even if I have sufficient credit available.

H. **Termination/Suspension of Account**. Upon any termination or cancellation of my Account by you or by me, or any suspension of my loan advance privileges under the Agreement, I agree that all Cards will be destroyed by me upon your instruction, or may be retrieved by you or your agent.

I. **Cancellation/Expiration of Cards**. I may be permitted to use the Card to access my account only so long as the access card program remains active and you permit me to participate in the program. If more than one person has executed the Agreement, any one of us may request that our Cards be cancelled. The request, at your option, may be made verbally or in writing. You may also cancel any Card at your sole discretion at any time, including if (1) the contracts with current or future providers of services used to operate the Card program expire or are terminated; or (2) I have not used my Card to obtain a loan advance on my Account at least once during any 12 month period; (3) my card is lost, stolen, or otherwise subject to unauthorized use; or (4) any part of the Program, including use of the Card, is prohibited by applicable law. I understand and agree that the terms governing my ability to obtain loan advances during the Initial Draw Period and any renewed Draw Period are set forth in the Agreement and that those terms supersede any inconsistent expiration date(s) printed on any Cards that are issued to me to the extent that such expiration date(s) is (are) later than the expiration date of any Draw period defined in the Agreement.

J. **Lost or Stolen Cards.** I agree to promptly notify you at 1-800-556-5678 if any Card is lost or stolen, or if I suspect unauthorized use. You reserve the right not to honor any loan advance request made using a Card if any of my Cards has been cancelled or reported lost or stolen.

K **Unauthorized Transactions.** I will not be liable for the unauthorized use of my Card. I agree to assist you in your investigation of any claims of unauthorized Card transactions and understand that I may be required to provide you with a written statement and/or an Affidavit of Forgery. I agree that if I permit a person to use the Card or Card account number, or if I benefit from another person's use of the Card or Card account number, such use is not unauthorized use of the Card, even if I did not intend to be responsible for such use.

L. **Special Rule for Card Purchases.** The following is in addition to the notice at the end of the Agreement entitled MY BILLING RIGHTS - I SHOULD KEEP THIS NOTICE FOR FUTURE USE:

   **Special Rule for Card Purchases.**
   If I have a problem with the quality of property or services that I purchased with my Card, and I have tried in good faith to correct the problem with the merchant, I may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

   (a)  I must have made the purchase in my home state or, if not within my home state, within 100 miles of my current mailing address; and

   (b)  The purchase price must have been more than $50. These limitations do not apply if you or the Card Issuer own or operate the merchant, or if you or the Card issuer mailed me the advertisement for the property or services.

## 4. PROMISE TO PAY; MINIMUM PAYMENT; METHOD OF PAYMENT.

A. I promise to pay to your order, when and as due, all loans made under this Agreement, plus all unpaid finance charges, insurance premiums, collection costs and other charges I owe to you now or in the future. I agree to make my payments in the manner specified in my periodic statement, and if I do so such payments will be credited as of the day of receipt.

B. At a minimum, you will send me a periodic statement monthly, except that my first periodic statement may be generated and mailed to me between thirty and sixty days after I open my Account. The periodic statement will show all Account activity during the billing cycle and contain other important information, including my "New Balance", my Annual Percentage Rate, the amount of my "Minimum Payment Due", my "Payment Due Date" and the place and manner of making payments.

C. I may pay all or any part of my "New Balance" at any time, subject to an Account Termination Fee or Low Balance Fee FINANCE CHARGE as applicable, as described in paragraph 8.D and 7.B(6) respectively. If I pay my entire "New Balance" shown on my periodic statement for any billing cycle by the "Payment Due Date," any periodic finance charge incurred from the first day of the next billing cycle until the posting of my payment will appear on my periodic statement for the next billing cycle.

D. Unless you terminate my Account and require immediate payment of the entire outstanding balance as provided in paragraph 13.B below, I must pay you at least the "Minimum Payment Due" for each billing cycle by the "Payment Due Date" shown on my periodic statement.

E. During the Draw Period, my "Minimum Payment Due" equals all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due." My "Minimum Payment Due" during the Draw Period will not reduce the principal balance that is outstanding on my account.

F. During the Repayment Period, if the Draw Period on my Account is 60 months or 120 months, my "Minimum Payment Due" equals 1/180 of the outstanding principal balance of my Account as of the last day of the Draw Period plus all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due."

**5. MY CREDIT LIMIT.** My Credit Limit under this Agreement is $    **124,500.00**    . I promise not to request a loan which will cause the unpaid principal balance of my Account to exceed my Credit Limit. You can increase the Credit Limit at any time without prior notice to me. You can refuse to make loans that cause my obligations under this Agreement to exceed my Credit Limit. You will make loans on my Account based on the "Available Credit Limit" shown on my most recent periodic statement. However, I agree that when I make payments on my Account by check or other non-cash method, you reserve the right to make loans based on the "Available Credit Limit" shown on the last periodic statement issued prior to the most recent periodic statement. In addition to each "Minimum Payment Due," I must pay immediately, without notice or demand from you, any part of the principal balance of my Account that exceeds my Credit Limit.

**6. ANNUAL PERCENTAGE RATE.**
*One box must be checked by Lender.*

☐    **A.** The initial Daily Periodic Rate is      %. The initial ANNUAL PERCENTAGE RATE is      %. These rates are "discounted" rates. This means that these rates are lower than the rates that would be in effect if the formula set forth in paragraph 6.C below had been used, in which event the initial Daily Periodic Rate would be    0.0291    % and the initial ANNUAL PERCENTAGE RATE would be      %. These discounted rates will be in effect from the date of this Agreement until      . Thereafter, the Daily Periodic Rate and the Annual Percentage Rate will be determined using the formula set forth in paragraph 6.C below.

☒    **B.** The initial Daily Periodic Rate is    0.0291    % and the initial ANNUAL PERCENTAGE RATE is    10.625    %. These rates are not discounted.

**C.** My Annual Percentage Rate and Daily Periodic Rate may increase or decrease (the first day after my "discounted" rate has expired, if applicable) according to the following procedure: The ANNUAL PERCENTAGE RATE shall be the "Index" plus a "Margin." The "Index" will be the highest Prime Rate as published in the "Money Rates" table of <u>The Wall Street Journal</u> as of the first business day of the calendar month. The "Margin" is equal to the number of percentage points disclosed in paragraph 6.D below. Each billing cycle will end on the last day of the calendar month. Any new Index value shall be effective as of the first day of the billing cycle in which such new Index value is established.

Upon a change in the Index, any resulting change in my Daily Periodic Rate and Annual Percentage Rate will take effect without prior notice to me, and will apply to new loans and to the outstanding principal balance in my Account. The new Annual Percentage Rate and Daily Periodic Rate will apply to my then existing unpaid principal balance and all new loans I obtain until my Annual Percentage Rate and Daily Periodic Rate change again. The Daily Periodic Rate at any time equals the ANNUAL PERCENTAGE RATE divided by 365.

**D.** The "Margin" to be used under paragraph 6.C above to determine my ANNUAL PERCENTAGE RATE is    2.375    percentage points.

**E.** The Annual Percentage Rate is a simple interest rate. The Annual Percentage Rate includes only periodic interest and not other costs. The ANNUAL PERCENTAGE RATE will never increase above    18.000    %.

**F.** If the Daily Periodic Rate (and the corresponding Annual Percentage Rate) increases, I will have to pay additional periodic finance charges and, as a result, I will have to pay larger "Minimum Payments."

**7. FINANCE CHARGE.** I agree to pay finance charges on my Account as explained below.

**A.** Periodic FINANCE CHARGE.

**(1)** A loan represented by an Equity Credit Line Check will be posted to my Account on the date that such a check is presented to you for payment. Any loan advance represented by a Card transaction will be posted to my Account as of the date that you receive the transaction for processing. The periodic finance charge begins to accrue on my Account from the time a loan is posted to my Account. There is no grace period during which I can repay loan advances without incurring a periodic finance charge.

**(2)** You compute the periodic finance charge on my Account by applying the Daily Periodic Rate to the "Average Daily Balance" in my Account (including current transactions). To determine the periodic finance charge for any billing cycle, the "Average Daily Balance" is multiplied by the Daily Periodic Rate, then this product is multiplied by the number of days in the billing cycle.



(3) To get the "Average Daily Balance," you take the beginning principal balance of my Account each day, add any new loans and subtract any principal payments or credits. This gives you the Daily Balance. Then you add up all the Daily Balances for the billing cycle and divide by the total number of days in the billing cycle. This gives you the "Average Daily Balance."

**B. Other FINANCE CHARGES.**

**(1) Points FINANCE CHARGE.**

I agree to pay a Points FINANCE CHARGE of $                    at the time I sign this Agreement.

| | $ | |
|---|---|---|
| | $ | |
| | $ | |
| | $ | |
| | $ | |

**(2) Broker Fee FINANCE CHARGES.**
I agree to pay Broker Fee FINANCE CHARGES of $                    at the time I sign this Agreement.

| | $ | |
|---|---|---|
| | $ | |
| | $ | |
| | $ | |
| | $ | |

**(3) Settlement Agent FINANCE CHARGES.**
I agree to pay the following Settlement Agent FINANCE CHARGES at the time I sign this Agreement:

Sub Escrow/Full Escrow

| | $ | |
|---|---|---|
| | $ | |
| | $ | |
| | $ | |
| | $ | |

**(4) Miscellaneous FINANCE CHARGES.**
I agree to pay the following Miscellaneous FINANCE CHARGES at the time I sign this Agreement:

| | $ | |
|---|---|---|
| | $ | |
| | $ | |
| | $ | |
| | $ | |
| | $ | |

**(5) Annual Maintenance Fee FINANCE CHARGES.**

☐   I agree to pay an annual maintenance fee FINANCE CHARGE of $75.00 which you will charge to my Account on the first anniversary of this Agreement and every anniversary date thereafter, whether or not I have used or continue to use my Account; except that such fee shall be waived for the entire term of this Agreement if I meet both of the following conditions:  (a) I maintain an average outstanding daily balance which does not fall below $20,000.00 from the date of this Agreement through the first anniversary of this Agreement; and (b) I make each monthly payment during that period on or before the due date for each such payment.  You will not rebate any portion of the annual fee if my Account is terminated or suspended before the end of any annual period.

**(6) Low Balance Fee FINANCE CHARGES.**

☐   In consideration of having an Account with a reduced Margin, I agree to maintain an Average Daily Balance of $40,000 in each monthly billing cycle during the first two years of my Account. I further agree to pay a Low Balance Fee FINANCE CHARGE of $40 for each monthly billing cycle during the first two years of my Account in which I fail to maintain an Average Daily Balance of $40,000. You will not charge me this fee for the month in which you charge me an Account Termination Fee pursuant to the terms of paragraph 8.D.



**8. OTHER CHARGES.**

A. I agree to pay each of the charges listed below, which shall constitute additional indebtedness under this Agreement. Any charges assessed will be shown on my periodic statement for the billing cycle in which such charge is assessed:

(1) If I fail to make my "Minimum Payment Due" within ten (10) days of the "Payment Due Date," I agree to pay a late fee of 5% of the late payment or $5.00, whichever is greater.

(2) For each Equity Credit Line Check written for less than $250 which you honor, I agree to pay a Processing Fee of $5.

(3) I agree to pay a Return Item Fee of $15 for each check you receive in payment of my Account which is returned unpaid upon second presentment.

B. I agree to pay you or my broker the following closing costs at or before the time I sign this Agreement:

| | |
|---|---|
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| LESS Amounts Paid by Lender | $ _____ |
| Total Paid by Borrower | $ _____ |

C. I may elect to pay the closing costs described in paragraph 8.B above and the finance charges described in paragraph 7.B above in cash or by check at or before the time I sign this Agreement or I may elect to finance some or all of such costs and finance charges by allowing you to make a loan under my account to pay some or all of such costs and finance charges.

D. I agree to pay an Account Termination Fee of $ 350.00 to cover your costs of processing and administering my Account if I pay in full and terminate my Account with you and ask you to reconvey my Deed of Trust on or before the fifth (5th) anniversary of this Agreement.

E. I agree to pay a Demand Statement Expedited Delivery Fee of $30 for the expedited delivery by facsimile transmission of a statement of the amount necessary to pay in full the debt evidenced by this Agreement (a "Demand Statement"). I agree to pay this fee upon payment in full of the Account. You will not charge me this fee if I request that you deliver a Demand Statement by United States mail.

F. I agree to pay a Reconveyance Preparation Fee of $30 for satisfying the deed of trust securing the debt evidenced by this Agreement.

**9. REAL PROPERTY SECURITY.** To secure the payment of all loans I obtain and the performance of all promises I make in this Agreement, I and all co-owners are giving you a Deed of Trust (the "Deed of Trust") covering my dwelling located at

23410 SOUTH 161ST WAY, GILBERT, AZ 85297

(the "Real Property"). The Deed of Trust is security for my current and future obligations under this Agreement. I will continue to be obligated to make payment to you under this Agreement even if the Real Property is damaged or destroyed and whether or not any insurance proceeds are available.

**10. SECTION INTENTIONALLY OMITTED.**

**11. PROPERTY INSURANCE.** I agree to obtain and maintain property insurance against loss or damage to the Real Property, in such amounts, against such risks (including, but not limited to, flood damage insurance required by law), and according to such terms as you may require in the Deed of Trust or otherwise. I may obtain property insurance from any company of my choice that is acceptable to you. If the amount of the premiums for property insurance increases at any time during the term of my Account, I agree to pay any such increase(s).

**12. YOUR RIGHTS TO TEMPORARILY SUSPEND MY LOANS OR REDUCE MY CREDIT LIMIT.**

    **A.** You may take the actions listed in paragraph 12.B below during the period that any of the following events or conditions occur:

        (1)   the value of the Real Property declines significantly below its appraised value for the purposes of my Account;

        (2)   you reasonably believe that I will not be able to meet the repayment requirements under my Account due to a material change in my financial circumstances, such as the filing of a bankruptcy petition by or against me;

        (3)   I am in default of any material obligation of this Agreement, such as my important obligations listed in paragraph 14 below;

        (4)   government action (such as enactment of a state usury law) prevents you from imposing the Annual Percentage Rate provided for in this Agreement;

        (5)   government action (such as imposition of a tax lien) impairs the priority of the lien of the Deed of Trust such that the value of the lien of the Deed of Trust is less than 120% of my Credit Limit;

        (6)   the maximum Annual Percentage Rate set forth in paragraph 6.E above is reached;

        (7)   the creditor is notified by its regulatory agency that continued advances constitute an unsafe and unsound practice.

    **B.** During the period in which a condition described in paragraph 12.A above occurs, you may refuse to make any additional loans or reduce my Credit Limit or do both. You will mail or deliver written notice to me after you suspend my Account or reduce my Credit Limit and this notice will describe the specific reasons for your action. You are obligated to reinstate my credit privileges when the condition(s) which caused the suspension or reduction have been cured or have changed, provided I have notified you in writing, explaining in detail and documenting how the condition(s) have been cured or have changed and no new condition(s) under paragraph 12.A above or 13.A below have occurred.

    **C.** Before reinstating my right to obtain loans, or restoring my Credit Limit, you may conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) as you deem appropriate, and you may require me to reimburse you on demand for any costs you actually incur for obtaining credit reports and appraisals. You may take these steps to verify that (i) the condition(s) that caused your suspension of my loans or reduction of my Credit Limit no longer exist, and (ii) the priority of the lien of the Deed of Trust is not impaired.

    **D.** If more than one Borrower signs this Agreement and any such Borrower requests that you cease making loans, you may comply with such a request. All Borrowers who have signed this Agreement must join in any request to reinstate the loans for such request to be effective. If all such persons subsequently request reinstatement of the loans, you must honor such a request unless a condition listed in paragraph 12.A above or 13.A below has occurred.

    **E.** If an event or condition described in paragraph 12.A above occurs which is also an event or condition described in paragraph 13.A below, your rights and remedies described under paragraph 13.B below apply and supersede your rights described in this paragraph 12.

**13. YOUR RIGHTS TO TERMINATE AND ACCELERATE MY ACCOUNT AND TAKE OTHER ACTION.**

    **A.** You may take the actions listed in paragraph 13.B below if any of the following events or conditions occur:

        (1)   I fail to meet the repayment terms of this Agreement, such as my failure to make any Minimum Payment Due to you on or before the Payment Due Date;

        (2)   I engage at any time in fraud or material misrepresentation in connection with my Account, whether in any application, in this Agreement or in the Deed of Trust;

        (3)   I sell or transfer title to the Real Property without first obtaining your written permission;

        (4)   I fail to maintain insurance on the Real Property as required under this Agreement or the Mortgage;

        (5)   I act or fail to act and as a result a lien senior to the lien of the Deed of Trust is recorded against the Real Property;

(6)   I die and I am not survived by another person obligated as a Borrower under this Agreement;

(7)   All or part of the Real Property is taken through eminent domain, condemnation or similar government taking;

(8)   A prior lienholder on the Real Property begins foreclosure under its security document;

(9)   The Real Property is used for an illegal purpose which could subject the Real Property to seizure;

(10)  I fail to pay taxes on the Real Property; or

(11)  My action or inaction adversely affects the Real Property or your rights in the Real Property. Such action or inaction could include, for example, the following:

    (a)   A judgment is filed against me;

    (b)   I commit waste or otherwise destructively use or fail to maintain the Real Property;

    (c)   I die and I am survived by another person obligated as a Borrower under this Agreement; or

    (d)   I move out of the Property.

B.   If an event described in paragraph 13.A above occurs, subject to any notice or other limitation of applicable law, you may do any combination of the following things:

(1)   you may terminate any of my rights under my Account;

(2)   you may temporarily or permanently refuse to make any additional loans;

(3)   you may declare all sums owing under this Agreement and any other agreement I have made with you to be immediately due and payable;

(4)   you may foreclose the Deed of Trust;

(5)   you may reduce my Credit Limit; and

(6)   you may take any other action permitted by this Agreement, by law or in equity.

**14. MY IMPORTANT OBLIGATIONS.**   I agree that:

A.   I will pay all of my existing and future debts to you under any existing or future agreement with you and I will pay all of my existing and future debts to my other creditors as they become due and will not allow a creditor to obtain a judgment against me.

B.   I will not permit any person or entity to levy upon, attach, garnish or otherwise take any money, account or other property in your possession that belongs to me.

C.   From time to time, if requested, I will supply you with current financial information about me.

D.   I have not made and will not make any misrepresentation in connection with my Account whether in my application, in this Agreement, or in the Deed of Trust.

E.   I will not permit a receiver, trustee, guardian, conservator or other judicial representative to be appointed for me or any of my property or for the Real Property.

F.   I will not use or allow use of the Real Property for any illegal purpose.

G.   I will not move out of the Real Property.

H.   I will not permit a lien to be filed which takes priority over the Deed of Trust for future advances made under this Agreement.

I.   I will not break any promise made in this Agreement or in the Deed of Trust such as:

    (1)   my promise not to exceed my Credit Limit; and

    (2)   my "Important Obligations" listed in the Deed of Trust.

**15. COSTS OF COLLECTION.**   Subject to any limits of applicable law, I must pay for your reasonable and actual costs of collection, or trustee's sale such as reasonable attorneys' or trustee's fees. Periodic finance charges will continue to accrue at the rates provided in this Agreement before you hold a trustee's sale.

## 16. MY RIGHTS TO TERMINATE MY RIGHTS TO OBTAIN LOANS.

**A.** <u>Termination by Me</u>. I may terminate my right to obtain loans by sending you a written notice which will become effective upon receipt by you. If more than one person signs this Agreement as Borrower, my right to obtain loans may be terminated by written notice pursuant to this paragraph 16.A signed by any one or more of such persons. I may also suspend my right to obtain loans pursuant to paragraph 12.D above.

**B.** <u>Termination by You</u>. My right to future advances under my Account will terminate at the end of the Draw Period or any renewed Draw Period if not sooner upon your exercise of your termination or suspension rights under paragraphs 12.B or 13.B above or my exercise of my suspension or termination rights under paragraphs 12.D or 16.A above.

**C.** <u>Effect of Termination</u>. Upon termination or suspension of my Account, whether by you or by me, I must continue to pay the "Minimum Payment Due" on or before my "Payment Due Dates" until all amounts owed to you under this Agreement are paid in full. However, I may be required to repay all my obligations to you immediately if you exercise your rights under paragraph 13.B above. I must return unused Equity Credit Line Checks to you upon termination. I may be required to pay an Account Termination Fee pursuant to paragraph 8.D above.

## 17. CHANGES TO AGREEMENT.

**A.** You may change this Agreement to the extent not prohibited by federal or state law, such as the changes listed as follows:

    **(1)**    if the original Index is no longer available, you may change the Index and Margin;

    **(2)**    you may make any change I agree to in writing;

    **(3)**    you may make a change which is unequivocally beneficial to me, such as offering me more minimum payment options, extensions or renewals of my Account, reductions in the rate or fees, and additional means to access loans; and

    **(4)**    you may make insignificant changes, such as changing the address to which payments must be sent, name changes, operational changes involving the billing cycle date, the date the Minimum Payment is due, the day of the month on which Index values are measured to determine my rate, your rounding rules and the balance computation method.

**B.** If required by applicable law, you will mail me notice of such a change before the effective date of the change. The change will be effective as to any existing unpaid balance and as to any future transactions under this Agreement.

## 18. INTEREST.

I agree to pay an effective contracted for rate of interest equal to the Annual Percentage Rate as provided in this Agreement plus the additional rate of interest resulting from the Points Finance Charge, the Account Opening Fee Finance Charge, the Account Termination Fee Finance Charge, as applicable, and any Additional Sums. The Additional Sums shall consist of all fees, charges, goods, things in action or other sums or things of value (other than the Points Finance Charge, the Account Opening Fee Finance Charge, the Account Termination Fee Finance Charge and periodic interest resulting from application of the Annual Percentage Rate) paid or payable by me, whether pursuant to this Agreement, the Deed of Trust or any other document or instrument in any way pertaining to the Account, that may be deemed to be interest for the purpose of any law of the State of Arizona that may limit the maximum amount of interest to be charged with respect to the Account. The Additional Sums shall be deemed to be additional interest for the purposes of any such law only.

## 19. OTHER PROVISIONS.

**A.** <u>Third Parties</u>. This Agreement obligates me and my estate, heirs and personal representatives. This Agreement benefits you and your successors and assigns. You may add or release parties, or permit the addition or substitution of real property collateral that secures this Agreement, or modify, extend or amend this Agreement without in any way affecting my obligations under this Agreement. My rights under this Agreement belong only to me, I cannot transfer or assign them to anyone else. You may transfer and assign your rights and obligations under this Agreement and the Deed of Trust at any time without my consent.

**B.** <u>Additional Credit Reports and Appraisals</u>. I authorize you to conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) concerning me, the Real Property and the Deed of Trust as you may deem necessary from time to time. I will cooperate in having the Real Property reappraised.

**C.** <u>Tax Deductibility</u>. I know that I should consult a tax adviser regarding the deductibility of interest and charges.

**D.** <u>Applicable Law</u>. I agree that this Agreement is to be governed by federal law and, to the extent not preempted by federal law, by the laws of the state where the Real Property is located.

**E.** <u>Application of Payments</u>. You may apply payments and proceeds of the Real Property in such order as you shall deem advisable or as otherwise required by applicable law.

**F.** <u>Failure to Perform</u>. If I violate or fail to perform any term or condition of this Agreement (or the Security Deed), you may (but are under no obligation to) perform on my behalf. All costs you incur will be added to the unpaid principal of my Account and finance charges will be figured at the rates described above. I agree to pay these costs and finance charges on demand. Your performance of any of my obligations will not be a waiver of any of your rights or remedies under this Agreement.

**G.** <u>Complete Understanding of the Parties</u>. There are no oral agreements concerning this Agreement. This Agreement will not be amended or modified orally. If any provision of this Agreement is held to be void or unenforceable, the rest of this Agreement shall remain in effect.

**H.** <u>Waiver of Notice</u>. I waive presentment, demand, protest, notice of default, nonpayment, partial payments and all other notices and formalities in connection with the delivery, acceptance, performance, default or enforcement of this Agreement, except those notices that are required by federal Regulation Z or applicable state law.

**I.** <u>Meaning of Words</u>. All words in this Agreement will be read to be of such gender and number as the context may require. The section headings in this Agreement are for convenience and do not limit or amend any of the Agreement's provisions. Any list of conditions or events in this Agreement preceded by the phrase "such as" is not intended as a full or comprehensive list, but merely as a set of examples of such conditions or events. Other conditions or events are intended to be included to the fullest extent permitted under federal and state law, even if different from the listed conditions or events.

**J.** <u>Payment Marked "Payment in Full."</u> I agree not to submit any checks to you in payment of my Account marked "Payment in Full" or similar wording unless the amount of the check is equal to the total amount then owing on my Account. If I do submit a check to you marked "Payment in Full" or similar wording for a sum less than the total amount then owing on my Account, you may accept it in partial payment of my Account but will not be bound by the "Payment in Full" or similar notation. Communications concerning a dispute as to amounts owing on my Account, including any checks submitted to you as full satisfaction of my Account, must be sent to

603 North Wilmot Road, Tucson, AZ 85711

**K.** <u>Enforcement</u>. You can accept any late or partial payment or otherwise waive or delay enforcing your rights under this Agreement and still exercise your rights at a later time.

**L.** <u>Notices</u>. Except for any notice required under applicable law to be given in another manner, (a) any notice to me provided for in this Agreement shall be given by delivering it or by mailing such notice to me by regular first class mail, addressed to me at my last address appearing on your records or at such other address as I may designate by written notice to you as provided in this paragraph 19.L. and  (b) any notice to you provided for in this Agreement shall be given by mailing such notice to you by  certified mail, return receipt requested, at
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION<br>5304 E. SOUTHERN AVE, SUITE 101, MESA, AZ 85206

or to such other address as you may designate by written notice to me as provided in this paragraph 19.L.

**M.** <u>Riders/Addenda</u>. The covenants and agreements of the rider/addendum checked below are incorporated into and supplement and amend the terms of this Agreement.

| XX | BILLING RIGHTS |
|----|----------------|

## 20. MY BILLING RIGHTS. I SHOULD KEEP THIS NOTICE FOR FUTURE USE.

This notice contains important information about my rights and your responsibilities under the Fair Credit Billing Act.

**I Must Notify You in Case of Errors Or Questions About My Bill.**

If I think my bill is wrong, or I need more information about a transaction on my bill, I must write you on a separate sheet at the address listed on my bill. I must write to you as soon as possible. You must hear from me no later than 60 days after you sent me the first bill on which the error or problem appeared. I can telephone you, but doing so will not preserve my rights.

In my letter, I must give you the following information:

- My name and account number.

- The dollar amount of the suspected error.

- I must describe the error and explain, if I can, why I believe there is an error. If I need more information, I must describe the item I am not sure about.

**My Rights and Your Responsibilities After You Receive My Written Notice**

You must acknowledge my letter within 30 days, unless you have corrected the error by then. Within 90 days, you must either correct the error or explain why you believe the bill was correct.

After you receive my letter, you cannot try to collect any amount I question, or report me as delinquent. You can continue to bill me for the amount I question, including finance charges, and you can apply any unpaid amount against my credit limit. I do not have to pay any questioned amount while you are investigating, but I am still obligated to pay the parts of my bill that are not in question.

If you find that you made a mistake on my bill, I will not have to pay any finance charges related to any questioned amount. If you didn't make a mistake, I may have to pay finance charges, and I will have to make up any missed payments on the questioned amount. In either case, you will send me a statement of the amount I owe and the date that it is due.

If I fail to pay the amount that you think I owe, you may report me as delinquent. However, if your explanation does not satisfy me and I write to you within ten days telling you that I still refuse to pay, you must tell anyone you report me to that I have a question about my bill. And, you must tell me the name of anyone you reported me to. You must tell anyone you report me to that the matter has been settled between us when it finally is.

If you don't follow these rules, you can't collect the first $50 of the questioned amount, even if my bill was correct.

BY SIGNING BELOW, (1) I AGREE THAT I HAVE READ ALL PAGES OF THIS AGREEMENT INCLUDING ANY RIDERS/ADDENDA, (2) I AGREE AND INTEND TO BE LEGALLY BOUND BY ALL OF ITS TERMS AND CONDITIONS, INCLUDING ANY TERMS AND CONDITIONS LISTED IN ANY RIDERS/ADDENDA, AND (3) I ALSO ACKNOWLEDGE RECEIVING A COMPLETED COPY OF THIS AGREEMENT AND ANY RIDERS/ADDENDA. I ALSO ACKNOWLEDGE THAT I RECEIVED A COPY OF YOUR HOME EQUITY EARLY DISCLOSURE ENTITLED, "IMPORTANT TERMS OF OUR HOME EQUITY LINE OF CREDIT", THE HOME EQUITY BROCHURE ENTITLED, "WHEN YOUR HOME IS ON THE LINE" AND TWO COPIES OF THE HOME EQUITY LINE OF CREDIT NOTICE OF RIGHT TO CANCEL.

_____ (Seal)          _____ (Seal)
IVAYLO DODEV                    -Borrower                                              -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                              -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                              -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                              -Borrower

DATE: JANUARY 02, 2007
BORROWER:
IVAYLO DODEV

LOAN #:
PROPERTY ADDRESS: 23410 SOUTH 161ST WAY, GILBERT, AZ 85297

## ADDENDUM TO
## HOME EQUITY CREDIT LINE AGREEMENT AND
### DISCLOSURE STATEMENT

MIN: 100039230201271778
MERS Phone: 1-888-679-6377

This "ADDENDUM TO HOME EQUITY CREDIT LINE AGREEMENT AND DISCLOSURE STATEMENT" is incorporated into and shall be deemed to amend and supplement the Home Equity Credit Line Agreement and Disclosure of the same date made by the undersigned.

7.B. Other FINANCE CHARGES.

Points FINANCE CHARGES.

Broker Fee FINANCE CHARGES.

Miscellaneous FINANCE CHARGES.

| | |
|---|---:|
| SETTLEMENT/CLOSING FEE | 700.00 |
| TAX SERVICE FEE | 75.00 |
| PROCESSING FEE | 340.00 |
| UNDERWRITING FEE | 300.00 |
| FLOOD CERTIFICATION FEE | 15.00 |
| APPLICATION FEE | 65.00 |
| ASSIGNMENT FEE | 10.00 |
| COURIER FEE | 25.00 |
| DOCUMENT PREPARATION | 180.00 |

8.B. CLOSING COSTS

TOTAL PAID BY BORROWER              $              1,710.00

By signing below, I hereby acknowledge receipt of this Addendum to the Home Equity Credit Line Agreement and Disclosure Statement.

_____ (Seal)          _____ (Seal)
IVAYLO DODEV                    -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                  -Borrower

Federal Title Agency, LLC

**WHEN RECORDED MAIL TO:**
FIRST MAGNUS FINANCIAL CORPORATION

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20070033621 01/09/2007 09:59
52605-6-1-1--
ELECTRONIC RECORDING

RECEIVED
DODEV

## DEED OF TRUST WITH ASSIGNMENT OF RENTS
### (Line of Credit)

MIN: 100039230201271778
MERS Phone: 1-888-679-6377

THIS DEED OF TRUST WITH ASSIGNMENT OF RENTS ("Deed of Trust"), dated
JANUARY 02, 2007          , is by
IVAYLO DODEV A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY

with a mailing address of
23410 SOUTH 161ST WAY, GILBERT, AZ 85297
the person or persons signing as Trustor below and hereinafter referred to as "we" or "us," in favor of
FEDERAL TITLE

with a mailing address of
840 EAST MCKELLIPS ROAD SUITE 110, MESA, AZ 85203
and hereinafter referred to as the "Trustee," for the benefit of "Mortgage Electronic Registration Systems, Inc.
("MERS") (solely as nominee for
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

(here inafter "you" or "Lender") and Lender's successors and assigns)," with a mailing address of P.O. Box
2026, Flint, MI 48501-2026, tel. (888) 679-MERS, as beneficiary.

Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this
Deed of Trust; but, if necessary to comply with law or custom, MERS, (as nominee for Lender and Lender's
successors and assigns), has the right: to exercise any or all of those interests, including, but not limited to, the
right to foreclose and sell the Premises; and to take any action required of Lender including, but not limited to,
releasing or canceling this Deed of Trust.
RIDERS TO THIS SECURITY INSTRUMENT: If one or more riders are executed by Borrower and recorded
together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated
into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s)
were a part of this Security Instrument.
[Check box below]

GRANT IN TRUST: In consideration of the loan hereinafter described, we hereby grant, convey,
transfer and assign to the Trustee, with power of sale, for your benefit, the Premises located at:

23410 SOUTH 161ST WAY
Street

| GILBERT | MARICOPA | | 85297 | (the "Premises"), |
| Municipality | County | Arizona | Zip | |

and further described as:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE PART HEREOF ......AND BEING MORE
PARTICULARLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 304-77-004

Initials:

The Premises includes all buildings and other improvements now or in the future on the Premises and all rights and interests which derive from our ownership, use or possession of the Premises and all appurtenances thereto.

**LOAN:** This Deed of Trust will secure your loan in the principal amount of $       124,500.00       or so much thereof as may be advanced and readvanced from time to time to
**IVAYLO DODEV**

the Borrower(s) under the Home Equity Credit Line Agreement And Disclosure Statement (the "Note") dated    JANUARY 02, 2007   ,plus interest and costs, late charges and all other charges related to the loan, all of which sums are repayable according to the Note. This Deed of Trust will also secure the performance of all of the promises and agreements made by us and each Borrower and Co-Signer in the Note, all of our promises and agreements in this Deed of Trust, any extensions, renewals, amendments, supplements and other modifications of the Note, and any amounts advanced by you under the terms of the section of this Deed of Trust entitled "Our Authority To You." Loans under the Note may be made, repaid and remade from time to time in accordance with the terms of the Note and subject to the Credit Limit set forth in the Note.

**OWNERSHIP:** We are the sole owner(s) of the Premises. We have the legal right to grant a lien in the Premises.

**BORROWER'S IMPORTANT OBLIGATIONS:**

(a) **TAXES:** We will pay all real estate taxes, assessments, water charges and sewer rents relating to the Premises when they become due. We will not claim any credit on, or make deduction from, the loan under the Note because we pay these taxes and charges. We will provide you with proof of payment upon request.

(b) **MAINTENANCE:** We will maintain the building(s) on the Premises in good condition. We will not make major changes in the building(s) except for normal repairs. We will not tear down any of the building(s) on the Premises without first getting your consent. We will not use the Premises illegally. If this Deed of Trust is a unit in a condominium or a planned unit development, we shall perform all of our obligations under the declaration or covenants creating or governing the condominium or planned unit development, the bylaws and regulations of the condominium or planned unit development and constituent documents.

(c) **INSURANCE:** We will keep the building(s) on the Premises insured at all times against loss by fire, flood and any other hazards you may specify. We may choose the insurance company, but our choice is subject to your reasonable approval. The policies must be for at least the amounts and the time periods that you specify. We will deliver to you upon your request the policies or other proof of the insurance. The policies must name you as "mortgagee" and "loss payee" so that you will receive payment on all insurance claims, to the extent of your interest under this Deed of Trust, before we do. The insurance policies must also provide that you be given not less than 10 days prior written notice of any cancellation or reduction in coverage, for any reason. Upon request, we shall deliver the policies, certificates or other evidence of insurance to you. In the event of loss or damage to the Premises, we will immediately notify you in writing and file a proof of loss with the insurer. You may file a proof of loss on our behalf if we fail or refuse to do so. You may also sign our name to any check, draft or other order for the payment of insurance proceeds in the event of loss or damage to the Premises. If you receive payment of a claim, you will have the right to choose to use the money either to repair the Premises or to reduce the amount owing on the Note.

(d) **CONDEMNATION:** We assign to you the proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Premises, or part thereof, or for conveyance in lieu of condemnation, all of which shall be paid to you, subject to the terms of any Prior Deed of Trust.

(e) **SECURITY INTEREST:** We will join with you in signing and filing documents and, at our expense, in doing whatever you believe is necessary to perfect and continue the perfection of your lien and security interest in the Premises.

FE - 4331(AZ)  (0204)          Page 2 of 5          Initials:
                                                      10/94

(f) **OUR AUTHORITY TO YOU:** If we fail to perform our obligations under this Deed of Trust, you may, if you choose, perform our obligations and pay such costs and expenses. You will add the amounts you advance to the sums owing on the Note, on which you will charge interest at the interest rate set forth in the Note. If, for example, we fail to honor our promises to maintain insurance in effect, or to pay filing fees, taxes or the costs necessary to keep the Premises in good condition and repair or to perform any of our other agreements with you, you may, if you choose, advance any sums to satisfy any of our agreements with you and charge us interest on such advances at the interest rate set forth in the Note. This Deed of Trust secures all such advances. Your payments on our behalf will not cure our failure to perform our promises in this Deed of Trust. Any replacement insurance that you obtain to cover loss or damages to the Premises may be limited to the amount owing on the Note plus the amount of any Prior Deeds of Trust.

(g) **PRIOR DEED OF TRUST:** If the provisions of this paragraph are completed, this Deed of Trust is subject and subordinate to a prior deed of trust dated _____ and given by us to _____ as beneficiary in the original amount of $ _____, recorded in the Office of the County Recorder of _____ County, Arizona on _____ at Recording No. _____ or in Docket _____ at Page _____ (the "Prior Deed of Trust"). We shall not increase, amend or modify the Prior Deed of Trust without your prior written consent and shall upon receipt of any written notice from the holder of the Prior Deed of Trust promptly deliver a copy of such notice to you. We shall pay and perform all of our obligations under the Prior Deed of Trust as and when required under the Prior Deed of Trust.

(h) **HAZARDOUS SUBSTANCES:** We shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Premises. We shall not do, nor allow anyone else to do, anything affecting the Premises that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Premises of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Premises. As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Premises are located that relate to health, safety or environmental protection.

(i) **SALE OF PREMISES:** We will not sell, transfer ownership of, encumber, or otherwise dispose of our interest in the Premises, in whole or in part, or permit any other lien or claim against the Premises without your prior written consent.

(j) **INSPECTION:** We will permit you to inspect the Premises at any reasonable time.

**NO LOSS OF RIGHTS:** The Note and this Deed of Trust may be negotiated or assigned by you without releasing us or the Premises. You may add or release any person or property obligated under the Note and this Deed of Trust without losing your rights in the Premises.

**SUBSTITUTION OF TRUSTEE:** You may remove the Trustee and appoint a successor Trustee to any Trustee appointed under this Deed of Trust. A Notice of Substitution of the Trustee will be signed and recorded in accordance with applicable law.

**DEFAULT:**

(a) **REMEDIES:** Except as may be prohibited by applicable law, and subject to any advance notice and cure period if required by applicable law, if any event or condition described in Paragraph 12.A. of the Note occurs, you may require us to make immediate payment in full of all sums secured by this Deed of Trust without demand. You may also invoke the power of sale and arrange for the Premises to be sold, as provided by law, in order to pay off what we owe on the Note and under this Deed of Trust.

Initials: _____
10/94

(b) TRUSTEE'S SALE OF PREMISES: If you invoke the power of sale, you shall give written notice to the Trustee of the occurrence of an event of default and of your election to cause the Premises to be sold. The Trustee shall then record a notice of sale in each county in which any part of the Premises is located and shall mail copies of the notice as prescribed by applicable law to us and to the other persons prescribed by applicable law. After the time required by applicable law and after any then required publication and posting of the notice of sale, the Trustee, without demand on us, shall sell the Premises at public auction to the highest bidder for cash or other form of payment satisfactory to the Trustee at the time and place designated in the notice of sale. The Trustee may postpone sale of the Premises by public declaration at the time and place of any previously scheduled sale, except as otherwise required by law. You or your designee may purchase the Premises at any sale and shall have the benefit of any law, to the extent applicable, permitting credit bids. The Trustee shall deliver to the purchaser a Trustee's deed conveying the Premises without any covenant or warranty, expressed or implied. The Trustee's deed shall be conclusive evidence in favor of purchasers and encumbrancers for value and without actual notice, that all requirements of this Deed of Trust and all requirements of law were met relating to the exercise of the power of sale and the Trustee's sale of the Premises conveyed by such deed. Knowledge of the Trustee shall not be imputed to you. The Trustee shall apply the proceeds of the sale in the following order: (i) to all expenses of the sale, including, but not limited to reasonable Trustee's and attorneys' fees; (ii) to all sums secured by this Deed of Trust; and (iii) any excess to the person or persons legally entitled to it or to the County Treasurer of the county in which the sale took place.

(c) OTHER REMEDIES: You may also judicially foreclose upon this Deed of Trust as if it was a mortgage. In addition, you may, in accordance with applicable law, (i) enter on and take possession of the Premises; (ii) collect the rental payments, including overdue rental payments, directly from tenants; (iii) manage the Premises; and (iv) sign, cancel and change leases. We agree that the interest rate set forth in the Note will continue before and after a default, until a Trustee's sale or entry of a judgment and foreclosure of the Premises. You shall be entitled to collect all reasonable fees and costs actually incurred by you in pursuing these remedies, including, but not limited to, reasonable attorneys' fees, and costs of documentary evidence, abstracts and title reports.

ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER: As additional security, we assign to you the rents of the Premises. You or a receiver appointed by the courts shall be entitled to enter upon, take possession of and manage the Premises and collect the rents of the Premises including those past due.

WAIVERS: To the extent permitted by applicable law, we waive and release any error or defects in proceedings to enforce this Deed of Trust and hereby waive the benefit of any present or future laws providing for state of execution, extension of time, exemption from attachment, levy and sale and homestead exemption.

BINDING EFFECT: Each of us shall be fully responsible for all of the promises and agreements in this Deed of Trust. Until the Note has been paid in full and your obligation to make further advances under the Note has been terminated, the provisions of this Deed of Trust will be binding on us, our legal representatives, our heirs and all future owners of the Premises. This Deed of Trust is for your benefit and for the benefit of anyone to whom you may assign it. Upon payment in full of all amounts owing to you under the Note and this Deed of Trust, and provided any obligation to make further advances under the Note has terminated, this Deed of Trust and your rights in the Premises shall end.

NOTICE: Except for any notice required under applicable law to be given in another manner, (a) any notice to us provided for in this Deed of Trust shall be given by delivering it or by mailing such notice by regular first class mail addressed to us at the mailing address set forth above or to the last address appearing in your records or at such other address as we may designate by notice to you as provided herein, and (b) any notice to you shall be given by certified mail, return receipt requested, to your mailing address set forth above or to such other address as you may designate by notice to us. Any notice provided for in this Deed of Trust shall be deemed to have been given to us or you when given in the manner designated herein.

RELEASE: Upon payment of all sums secured by this Deed of Trust and provided your obligation to make further advances under the Note has terminated, you shall satisfy this Deed of Trust without charge to us, except that we shall pay any fees for recording of a satisfaction of this Deed of Trust.

GENERAL: You can waive or delay enforcing any of your rights under this Deed of Trust without losing them. Any waiver by you of any provisions of this Deed of Trust will not be a waiver of that or any other provision on any other occasion.

Initials

THIS DEED OF TRUST has been signed by each of us under the seal on the date first above written.

_____
                  -Witness

_____
                  -Witness

_____(Seal)      _____(Seal)
IVAYLO DODEV          -Borrower                   -Borrower

_____(Seal)      _____(Seal)
                  -Borrower                   -Borrower

_____(Seal)      _____(Seal)
                  -Borrower                   -Borrower

_____(Seal)      _____(Seal)
                  -Borrower                   -Borrower

**STATE OF ARIZONA**        , Maricopa      County ss:

The foregoing instrument was acknowledged before me this 3rd January 2007 by IVAYLO DODEV

My Commission Expires: 08/31/10

_____
Notary Public

BONNIE F. POWELL
Notary Public - Arizona
Maricopa County
Expires 08/31/10

# EXHIBIT A

A PORTION OF LAND IN THE SOUTHWEST QUARTER OF SECTION 22, TOWNSHIP 2 SOUTH, RANGE 6 EAST, GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS;

COMMENCING AT THE SOUTHWEST CORNER OF SECTION 22;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 1284.85 FEET;

THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 415.04 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 193.02 FEET TO THE POINT OF BEGINNING;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 367.57 FEET;

THENCE NORTH 00 DEGREES 03 MINUTES 42 SECONDS EAST, A DISTANCE OF 9.56 FEET;

THENCE NORTH 18 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE OF 266.94 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 279.44 FEET;

THENCE SOUTH 00 DEGREES 25 MINUTES 50 SECONDS EAST, A DISTANCE OF 262.23 FEET TO THE POINT OF BEGINNING.

**EXHIBIT "G"**