**WRIGHT, FINLAY & ZAK, LLP**
Kim R. Lepore, Esq., Arizona Bar No. 019130
Bradford E. Klein, Esq., Arizona Bar No. 027720
18444 N. 25th Ave., Suite 420
Phoenix, AZ 85020
Telephone: 602-845-8898
Fax: 949-608-9142
klepore@wrightlegal.net

Attorneys for Defendants Select Portfolio Servicing, Inc. and The Bank of New York Mellon fka The Bank of New York as Trustee for the Certificateholders of CWALT, Inc., Alternative Loan Trust 2007-OA7, Mortgage Pass-Through Certificates, Series 2007-OA7

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ivaylo Tsvetanov Dodev, | ) Case No.: 2:13-cv-02155-DLR |
| | ) |
| Plaintiff, | ) **REQUEST FOR JUDICIAL NOTICE** |
| | ) **IN SUPPORT OF CERTAIN** |
| vs. | ) **DEFENDANTS' MOTION TO** |
| | ) **DISMISS PLAINTIFF'S SECOND** |
| Recontrust Company, N.A., Select Portfolio | ) **AMENDED COMPLAINT** |
| Servicing, Inc., The Bank Of New York | ) **PURSUANT TO FED. R. CIV. P.** |
| Mellon, Corporation, fka The Bank of New | ) **12(b)(6)** |
| York, Bank of America, N.A. successor of | ) |
| Countrywide Home Loans, Inc., Real Time | ) *[Filed concurrently with Motion to* |
| Resolutions, Inc., DOES 1-100, in his/her | ) *Dismiss]* |
| individual and official capacity, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE** that Defendants Select Portfolio Servicing, Inc.

("SPS")  and The Bank of New York Mellon fka The Bank of New York as Trustee for

the Certificateholders of CWALT, Inc., Alternative Loan Trust 2007-OA7, Mortgage

Pass-Through Certificates, Series 2007-OA7, *erroneously sued as* The Bank of New

York Mellon, Corporation, fka The Bank of New York request, pursuant to Federal Rules of Civil Evidence Rule 201, that the Court take judicial notice of the following documents in connection with their Motion to Dismiss filed concurrently herewith:

1.     A Deed of Trust recorded on December 18, 2006 in the Maricopa County Recorder's Office bearing instrument number 20061646998, a true and correct copy of which is attached hereto as Exhibit 1.

2.     A Corporation Assignment of Deed of Trust Arizona recorded on August 24, 2011 in the Maricopa County Recorder's Office, bearing instrument number 20110706279, a true and correct copy of which is attached hereto as Exhibit 2.

3.     A Substitution of Trustee Arizona recorded on August 24, 2011 in the Maricopa County Recorder's Office as instrument number 20110706280, a true and correct copy of which is attached hereto as Exhibit 3.

4.     A Notice of Trustee's Sale Arizona recorded on August 2, 2013 in the Maricopa County Recorder's Office as instrument number 20130709557, a true and correct copy of which is attached hereto as Exhibit 4.

5.     A Warranty Deed recorded on July 26, 2004 in the Maricopa County Recorder's Office as instrument number 20040852027, a true and correct copy of which is attached hereto as Exhibit 5.

6.     A Deed of Trust recorded on July 26, 2004 in the Maricopa County Recorder's Office as instrument number 20040852028, a true and correct copy of which is attached hereto as Exhibit 6.

7.     A Deed of Trust recorded on July 26, 2004 in the Maricopa County Recorder's Office as instrument number 20040852029, a true and correct copy of which is attached hereto as Exhibit 7.

8.     A Deed of Trust recorded on May 25, 2005 in the Maricopa County Recorder's Office as instrument number 20050698759, a true and correct copy of which is attached hereto as Exhibit 8.

9.    A Deed of Release recorded on July 5, 2005 in the Maricopa County Recorder's Office as instrument number 20050921124, a true and correct copy of which is attached hereto as Exhibit 9.

10.    A Deed of Release recorded on June 29, 2005 in the Maricopa County Recorder's Office as instrument number 20050891465, a true and correct copy of which is attached hereto as Exhibit 10.

11.    A Deed of Release and Reconveyance recorded on January 2, 2007 in the Maricopa County Recorder's Office as instrument number 2007-0004797, a true and correct copy of which is attached hereto as Exhibit 11.

**RESPECTFULLY SUBMITTED** this 20th day of November, 2014.

**WRIGHT, FINLAY & ZAK, LLP**

By: /s/ Kim R. Lepore
        Kim R. Lepore, Esq.
        Attorneys for Defendants Select Portfolio Servicing, Inc. and The Bank of New York Mellon fka The Bank of New York as Trustee for the Certificateholders of CWALT, Inc., Alternative Loan Trust 2007-OA7, Mortgage Pass-Through Certificates, Series 2007-OA7

ORIGINAL of the foregoing electronically
filed this 20th day of November, 2014.

COPIES of the foregoing mailed the
21th day of November, 2014, to:

Ivaylo Tsvetanov Dodev
6312 S/ 161st Way
Gilbert, AZ 85298
Plaintiff in pro se

Sean K. McElenney. Esq.
Coree E. Neumeyer, Esq.
Eric M. Moores, Esq.
Two N. Central Ave., Suite 2200
Phoenix, AZ 85004-4406
Attorneys for ReconTrust, Bank of America
and Brian T. Moynihan

/s/ Kim Lepore

# EXHIBIT "1"

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20061646998  12/18/2006  03:48
ELECTRONIC RECORDING

52354-22-2-2--
Esquivela

## Federal Title Agency, LLC

Recording Requested By:
FIRST MAGNUS FINANCIAL CORPORATION

Return To:
FIRST MAGNUS FINANCIAL CORPORATION

603 N. WILMOT
TUCSON, AZ 85711

Prepared By:

FIRST MAGNUS FINANCIAL CORPORATION
603 N. WILMOT
TUCSON, AZ 85711

————————————[Space Above This Line For Recording Data]————————————

# DEED OF TRUST

LOAN NO.:  6531180433
ESCROW NO.:  00052354001

MIN  100039265311804332
MERS Phone: 1-888-679-6377

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated DECEMBER 12, 2006 , together with all Riders to this document.

(B) "Borrower" is
IVAYLO T. DODEV, A MARRIED MAN, AS HIS SOLE AND SEPARATE PROPERTY

Borrower is the trustor under this Security Instrument. Borrower's mailing address is
23410 SOUTH 161ST WAY, GILBERT, AZ 85297

(C) "Lender" is
FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

Lender is a  CORPORATION
organized and existing under the laws of  ARIZONA

Initials

ARIZONA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS  Form 3003  1/01 (rev. 6/02)
VMP-6A(AZ) (0208)              Page 1 of 15    LENDER SUPPORT SYSTEMS INC. MERS6AAZ.NEW (05/04)

20061646998

Lender's mailing address is
603 North Wilmot Road, Tucson, AZ 85711
(D) "Trustee" is

Trustee's mailing address is

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated          DECEMBER 12, 2006        .
The Note states that Borrower owes Lender
SIX HUNDRED EIGHTY ONE THOUSAND SEVEN HUNDRED FIFTY AND NO/100 X X X X X X
                                                                                                                Dollars
(U.S. $ 681,750.00              ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than     JANUARY 01, 2037
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [XX] Adjustable Rate Rider | [ ] Condominium Rider | [ ] 1-4 Family Rider |
| [ ] Graduated Payment Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] Balloon Rider | [ ] Rate Improvement Rider | [ ] Second Home Rider |
| [ ] Other(s) [specify] | | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

Initials: _____

VMP-6A(AZ) (0206)                              Page 2 of 15                              Form 3003  1/01  (rev. 6/02)

20061646998

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                              of                              MARICOPA                              :
            [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
LEGAL DESCRIPTION ATTACHED HERETO AND MADE PART HEREOF ......AND BEING MORE PARTICULARLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 304-77-004                              which currently has the address of
                    23410 SOUTH 161ST WAY                              [Street]
            GILBERT                              [City] , Arizona        85297        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials:

VMP-6A(AZ) (0208)                    Page 3 of 15                    Form 3003  1/01 (rev. 6/02)

20061646998

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; .(b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

Initials:

VMP-6A(AZ) (0206)                    Page 4 of 15                    Form 3003  1/01 (rev. 8/02)

20061646998

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

20061646998

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials

VMP-6A(AZ) (0206)                    Page 6 of 15                    Form 3003  1/01  (rev. 6/02)

20061646998

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials: _____

VMP-6A(AZ) (0206)                    Page 7 of 15                    Form 3003  1/01  (rev. 6/02)

20061646998

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

Initials:

VMP-6A(AZ) (0206)                Page 8 of 15                Form 3003  1/01 (rev. 6/02)

20061646998

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials: _____

VMP-8A(AZ) (0206)                        Page 9 of 15                        Form 3003  1/01 (rev. 6/02)

20061646998

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

VMP-6A(AZ) (0206)                    Page 10 of 16                    Form 3003  1/01  (rev. 6/02)

20061646998

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

VMP-6A(AZ) (0206)                Page 11 of 15                Form 3003  1/01  (rev. 8/02)

20061646998

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

VMP-6A(AZ) (0208)                     Page 12 of 15                     Form 3003   1/01  (rev. 6/02)

20061646998

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Time of Essence.** Time is of the essence in each covenant of this Security Instrument.

VMP-6A(AZ) (0206)   Page 13 of 15   Form 3003  1/01 (rev. 6/02)

MARICOPA,AZ
Document: DOT 2006.1646998

Page 13 of 22

Printed on 11/5/2013 3:08:51 AM

20061646998

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____
                              -Witness

_____
                              -Witness

_____ (Seal)          _____ (Seal)
IVAYLO T DODEV            -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                         -Borrower                                    -Borrower

VMP-6A(AZ) (0206)              Page 14 of 15              Form 3003   1/01  (rev. 6/02)

20061646998

STATE OF ARIZONA                          ,    Maricopa        County ss:

   The foregoing instrument was acknowledged before me this 13th December 2006    by
IVAYLO T DODEV



**FAITH E. VILLA**
Notary Public - Arizona
Maricopa County
Expires 12/31/09

My Commission Expires: 12/31/09

                                                    —————————————————
                                                    Notary Public

VMP-6A(AZ) (0206)                    Page 15 of 15                    Form 3003  1/01  (rev. 6/02)    Initials _____

20061646998

# EXHIBIT A

A PORTION OF LAND IN THE SOUTHWEST QUARTER OF SECTION 22, TOWNSHIP 2 SOUTH, RANGE 6 EAST, GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS;

COMMENCING AT THE SOUTHWEST CORNER OF SECTION 22;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 1284.85 FEET;

THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 415.04 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 193.02 FEET TO THE POINT OF BEGINNING;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 367.57 FEET;

THENCE NORTH 00 DEGREES 03 MINUTES 42 SECONDS EAST, A DISTANCE OF 9.56 FEET;

THENCE NORTH 18 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE OF 266.94 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 279.44 FEET;

THENCE SOUTH 00 DEGREES 25 MINUTES 50 SECONDS EAST, A DISTANCE OF 262.23 FEET TO THE POINT OF BEGINNING.

ALTA Commitment – Exhibit A

20061646998

# ADJUSTABLE RATE RIDER
## (MTA-Twelve Month Average Index - Payment Caps)

LOAN NO.: 6531180433

MIN: 100039265311804332
MERS Phone: 1-888-679-6377

THIS ADJUSTABLE RATE RIDER is made this 12th day of    DECEMBER, 2006    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to FIRST MAGNUS FINANCIAL CORPORATION, AN ARIZONA CORPORATION

("Lender") of the same date and covering the property described in the Security Instrument and located at:

23410 SOUTH 161ST WAY, GILBERT, AZ 85297

[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agrees as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

2. INTEREST
(A) Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    1.750    %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

(B) Interest Rate Change Dates
The interest rate I will pay may change on the    1st    day of    FEBRUARY, 2007    , and on that day every month thereafter. Each date on which my interest rate could change is

PayOption MTA ARM Rider                                       Initials: _____
FE-5315  (0511)  Page 1 of 6    LENDER SUPPORT SYSTEMS, INC. COU-5315.COU (01/06)

20061646998

called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding       THREE AND 400/1000THS       percentage point(s)    3.400     % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than     9.950     %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the  1st  day of each month beginning on  FEBRUARY, 2007     . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   JANUARY 01, 2037    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at First Magnus Financial Corporation, An Arizona Corporation 603 North Wilmot Road, Tucson, AZ  85711 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $     2,435.51     unless adjusted under Section 3(F).

**PayOption MTA ARM Rider**
**FE-5315  (0511)**                    Page 2 of 6                    Initials:

20061646998

### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of FEBRUARY, 2008 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

### (E) Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**PayOption MTA ARM Rider**
**FE-5315 (0511)**          Page 3 of 6          Initials

20061646998

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN AND 000/1000THS percent ( 115.000 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date In substantially equal payments at the current interest rate.

### (G) Required Full Payment

On the    fifth    Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

### (H) Payment Options

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)    **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)    **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)    **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

### B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**PayOption MTA ARM Rider**
**FE-5316  (0511)**                    Page 4 of 6                    Initials:

20061646998

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**PayOption MTA ARM Rider**
**FE-5315 (0511)**                    Page 5 of 6                    Initials:

20061646998

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)       _____ (Seal)
IVAYLO T DODEV      -Borrower                  -Borrower

_____ (Seal)       _____ (Seal)
                  -Borrower                  -Borrower

_____ (Seal)       _____ (Seal)
                  -Borrower                  -Borrower

_____ (Seal)       _____ (Seal)
                  -Borrower                  -Borrower

**PayOption MTA ARM Rider**
**FE-5315  (0511)**           **Page 6 of 6**

**EXHIBIT "2"**

**OFFICIAL RECORDS OF**
**MARICOPA COUNTY RECORDER**
**HELEN PURCELL**
20110706279  08/24/2011  02:15
**ELECTRONIC RECORDING**

110407742nt-2-3-1--
sarabiam

RECORDING REQUESTED BY:
RECONTRUST COMPANY
**AND WHEN RECORDED MAIL DOCUMENT**
**AND TAX STATEMENTS TO:**
Bank of America, N.A.
400 National way
SIMI VALLEY, CA  93065

**TS No. 11-0075989**
**TITLE ORDER#: 110407742AZGTI**

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## CORPORATION ASSIGNMENT OF DEED OF TRUST ARIZONA

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND
TRANSFERS TO:

**THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK AS TRUSTEE**
**FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST**
**2007-OA7, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-OA7**

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 12/12/2006,
EXECUTED BY: IVAYLO T. DODEV, A MARRIED MAN, AS HIS SOLE AND SEPARATE
PROPERTY,TRUSTOR: TO NONE, TRUSTEE AND RECORDED AS INSTRUMENT NO.
20061646998 ON 12/18/2006, IN BOOK N/A, PAGE N/A, OF OFFICIAL RECORDS IN THE
COUNTY RECORDER'S OFFICE OF MARICOPA COUNTY, IN THE STATE OF ARIZONA.

**SEE ATTACHED LEGAL DESCRIPTION**

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE
MONEY DUE AND TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS
ACCRUED OR TO ACCRUE UNDER SAID DEED OF TRUST/MORTGAGE.

DATED: 8/23/11

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

BY: _Carmela Boone 8/23/11_

Carmelia Boone

_____, Assistant Secretary

State of: **Texas** )
County of: **Tarrant** )

On _8-23-11_ before me _Kanetta Denise Edwards_, personally
appeared **Carmelia Boone** Assistant Secretary , know to me (or proved to me on the
oath of _____ or through _TDL_ ) to be the person whose name is subscribed
to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes
and consideration therein expressed.
Witness my hand and official seal.

_Kanetta Denise Edwards_
Notary Public's Signature

KANETTA DENISE EDWARDS
Notary Public
State of Texas
My Comm. Expires 4-19-2014

_Form azasgn (01/02)_

20110706279

TS# 11-0075989
LEGAL DESCRIPTION

A PORTION OF LAND IN THE SOUTHWEST QUARTER OF SECTION 22, TOWNSHIP 2 SOUTH, RANGE 6 EAST, GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS; .

COMMENCING AT THE SOUTHWEST CORNER OF SECTION 22;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 1284.85 FEET;

THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 415.04 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 193.02 FEET TO THE POINT OF BEGINNING;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 367.57 FEET;

THENCE NORTH 00 DEGREES 03 MINUTES 42 SECONDS EAST, A DISTANCE OF 9.56 FEET;

THENCE NORTH 18 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE OF 266.94 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 270.44 FEET;

THENCE SOUTH 00 DEGREES 25 MINUTES 50 SECONDS EAST, A DISTANCE OF 262.23 FEET TO THE POINT OF BEGINNING.

# EXHIBIT "3"

¹ RECORDING REQUESTED BY:

RECORDING REQUESTED BY:
RECONTRUST COMPANY, N.A.
2380 Performance Dr, TX2-985-07-03
Richardson, TX 75082
WHEN RECORDED MAIL TO:
BANK OF AMERICA, N.A.
400 National way
SIMI VALLEY, CA 93065
Attn: FORECLOSURE DEPT
TS No. 11-0075989
Title Order No. 110407742AZGTI
APN No. 304-77-004W4

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20110706280  08/24/2011  02:15
ELECTRONIC RECORDING

110407742nt-2-3-2--
sarabiam

## SUBSTITUTION OF TRUSTEE ARIZONA

The undersigned beneficiary hereby appoints RECONTRUST COMPANY, N.A. 2380 Performance Dr, TX2-985-07-03 Richardson, TX 75082, SUCCESSOR TRUSTEE under the deed of trust executed by IVAYLO T. DODEV, A MARRIED MAN, AS HIS SOLE AND SEPARATE PROPERTY, as trustor(s), in which MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., is named beneficiary, and NONE, as original trustee, and Recorded on 12/18/2006, in Maricopa County; Arizona, as Instrument Number 20061646998, Book N/A, Page N/A, and legally describing the trust property as

SEE ATTACHED LEGAL DESCRIPTION

RECONTRUST COMPANY, N.A. HAS BEEN APPOINTED AS SUCCESSOR TRUSTEE.
RECONTRUST COMPANY, N.A. QUALIFIES AS A TRUSTEE OF THE TRUST DEED UNDER
ARIZONA REVISED STATUTES SECTION 33-803, SUBSECTION A. 5., BECAUSE IT IS A
NATIONAL ASSOCIATION REGULATED BY THE OFFICE OF THE COMPTROLLER OF THE
CURRENCY("OCC")

DATED: 08/23/2011

THE BANK OF NEW YORK MELLON FKA THE BANK
OF NEW YORK AS TRUSTEE FOR THE
CERTIFICATEHOLDERS OF CWALT, INC.,
ALTERNATIVE LOAN TRUST 2007-OA7, MORTGAGE
PASS-THROUGH CERTIFICATES, SERIES 2007-OA7BY
ITS AIF BANK OF AMERICA, N.A. SUCCESSOR BY
MERGER TO BAC HOME LOANS SERVICING, LP

State of: __Texas__ )
County of: __Tarrant__ )

David M Gregory   Assistant Vice President

On _8-23-11_ before me _Kanetta Denise Edwards_, personally appeared
__David M Gregory__, __Assistant Vice President__, know to me (or proved to me on the oath of
_____ or through __TX DL__ ) to be the person whose name is subscribed to the
foregoing instrument and acknowledged to me that he/she executed the same for the purposes and
consideration therein expressed.
Witness my hand and official seal.

_____
Notary Public

KANETTA DENISE EDWARDS
Notary Public
State of Texas
My Comm. Expires 4-19-2014

*Form azsub (08/06)*

20110706280

TS# 11-0075989
LEGAL DESCRIPTION

A PORTION OF LAND IN THE SOUTHWEST QUARTER OF SECTION 22, TOWNSHIP 2 SOUTH, RANGE 6 EAST, GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS;

COMMENCING AT THE SOUTHWEST CORNER OF SECTION 22;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 1284.85 FEET;

THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 415.04 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 193.02 FEET TO THE POINT OF BEGINNING;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 367.57 FEET;

THENCE NORTH 00 DEGREES 03 MINUTES 42 SECONDS EAST, A DISTANCE OF 9.56 FEET;

THENCE NORTH 18 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE OF 266.94 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 279.44 FEET;

THENCE SOUTH 00 DEGREES 25 MINUTES 50 SECONDS EAST, A DISTANCE OF 262.23 FEET TO THE POINT OF BEGINNING.

**EXHIBIT "4"**

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20130709557  08/02/2013  04:19
ELECTRONIC RECORDING

110407742nt2-3-1-1--
Esquivela

RECORDING REQUESTED BY:
RECONTRUST COMPANY, N.A.
2380 Performance Dr, TX2-984-04-07
Richardson, TX 75082
WHEN RECORDED MAIL TO:
SELECT PORTFOLIO SERVICING
3815 West Temple
Salt Lake City, UT 84115-4412
Attn: FORECLOSURE DEPT
TS No.: 11-0075989
Title Order No.: 110407742AZGTI
APN No.: 304-77-004W4

## NOTICE OF TRUSTEE'S SALE ARIZONA

The following legally described trust property will be sold, pursuant to the power of sale under that certain Deed of Trust Recorded on 12/18/2006, as Instrument Number 20061646998, Book N/A, Page N/A, in the records of Maricopa County, Arizona, at public auction to the highest bidder: In the Courtyard, by the main entrance of the Superior Court Building, 201 West Jefferson, Phoenix, AZ 85003 on 11/08/2013 at 10:00 AM of said day.

SEE ATTACHED LEGAL DESCRIPTION APN No. 304-77-004W4

The Deed of Trust and/or Beneficiary provide the following purported property location:
23410 SOUTH 161ST WAY, GILBERT, Maricopa County, AZ 85297

Said sale will be made for cash, but without covenant or warranty, express or implied, regarding title, possession or encumbrances, to pay the remaining principal sum of the note secured by said Deed of Trust, which includes interest thereon as provided in said note, advances, if any under the terms of said Deed of Trust, interest on advances, if any, fees, charges and expenses of the Trustee and of the trust created by said Deed of Trust. The original sum of the note is $681,750.00. Trustee will accept only cash or cashier's check for reinstatement or price bid payment. Reinstatement payment must be paid before five o'clock P.M on the last day other than a Saturday or legal holiday before the date of the sale. The Purchaser at the sale, other than the beneficiary to the extent of his credit bid, shall pay the price no later than five o'clock P.M. of the following day, other than a Saturday or legal holiday.

Name and Address of Original Trustor: IVAYLO T. DODEV, 23410 SOUTH 161ST WAY, GILBERT, AZ 85297
Name and Address of Current Trustee: RECONTRUST COMPANY, N.A., 2380 Performance Dr, TX2-984-04-07 Richardson, TX 75082 FOR INFORMATION/SALE INFORMATION CALL: (800) 281-8219
Name and Address of Current Beneficiary: BANK OF NEW YORK MELLON, F/K/A BANK OF NEW YORK, AS TRUSTEE, ON BEHALF OF THE REGISTERED HOLDERS OF ALTERNATIVE LOAN TRUST 2007-OA7, MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2007-OA7, 3815 West Temple, Salt Lake City, UT 84115-4412 PHONE: (888) 818-6032

RECONTRUST COMPANY, N.A. IS THE CURRENT TRUSTEE. RECONTRUST COMPANY, N.A. QUALIFIES AS A TRUSTEE OF THE TRUST DEED UNDER ARIZONA REVISED STATUTES SECTION 33-803, SUBSECTION A. 5., BECAUSE IT IS A NATIONAL ASSOCIATION REGULATED BY THE OFFICE OF THE COMPTROLLER OF THE CURRENCY("OCC").

Page 1 of 2                                            *AZNOS_2013.06.EP_06/2013*

20130709557

TS No.: 11-0075989
Title Order No.: 110407742AZGTI

DATED: __8|1|13__          RECONTRUST COMPANY, N.A.
                          As Trustee

State of: ___Texas___ )      BY:  8/1/13
                                  Margaret Pinto    Assistant Vice President

County of: ___Tarrant___ )

This instrument was acknowledged before me on __AUG 0 1 2013__ by _Margaret Pinto_,
__Assistant Vice President__ of RECONTRUST COMPANY, N.A., a national association, on behalf
of said national association.

Witness my hand and official seal.

_____
Notary Public's Signature

ROSEMARIE S. MARTINEZ
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-21-16

Page 2 of 2                    AZNOS_2013.06.EP_06/2013

MARICOPA,AZ              Page 2 of 3         Printed on 11/5/2013 3:09:03 AM
Document: DOT SLE 2013.709557

20130709557

TS# 11-0075989
LEGAL DESCRIPTION

A PORTION OF LAND IN THE SOUTHWEST QUARTER OF SECTION 22, TOWNSHIP 2 SOUTH, RANGE 6 EAST, GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS;

COMMENCING AT THE SOUTHWEST CORNER OF SECTION 22;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 1284.85 FEET;

THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 415.04 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 193.02 FEET TO THE POINT OF BEGINNING;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 367.57 FEET;

THENCE NORTH 00 DEGREES 03 MINUTES 42 SECONDS EAST, A DISTANCE OF 9.56 FEET;

THENCE NORTH 18 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE OF 266.94 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 279.44 FEET;

THENCE SOUTH 00 DEGREES 25 MINUTES 50 SECONDS EAST, A DISTANCE OF 262.23 FEET TO THE POINT OF BEGINNING.

# EXHIBIT "5"

Recorded at the request of *Capital Title Agency Inc.*
when recorded mail to

**IVAYLO T. DODEV**
23410 South 161st Way
Gilbert, AZ 85242

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20040852027  07/26/2004  10:56
ELECTRONIC RECORDING

22040541-3-4-1--
Fimbrezr

# Warranty Deed

Escrow No. 22040541

For the consideration of Ten Dollars, and other valuable considerations, I or we, **JUSTIN C. FRANKS, an unmarried man and DAIDRIA FRANKS, an unmarried woman**, do/does hereby convey to **IVAYLO T. DODEV and NIKOLINA T DODEVA**, husband and wife, the following real property situated in **Maricopa**, County, Arizona:

See Exhibit A attached hereto and made a part hereof.

*★ Who acquired title as Daidria Howe, an unmarried woman*

SUBJECT TO:  Current taxes and other assessments, reservations in patents and all easements, rights of way, encumbrances, liens, covenants, conditions, restrictions, obligations, and liabilities as may appear of record.

And I or we do warrant the title against all persons whomsoever, subject to the matters set forth above.

Dated **July 16, 2004.**

**JUSTIN C FRANKS**

**DAIDRIA FRANKS**

STATE OF ARIZONA
COUNTY OF **MARICOPA**    }ss:

This instrument was acknowledged before me this  16th  day of  July  , 2004  by:
JUSTIN C. FRANKS and DAIDRIA FRANKS.

My Commission Expires: 9/5/2006

Doris Burrell
Notary Public


OFFICIAL SEAL
DORIS BURRELL
Notary Public - State of Arizona
MARICOPA COUNTY
My Comm. Expires Sep. 5, 2006

20040852027

# ACCEPTANCE OF COMMUNITY PROPERTY

## (Grantee)

Escrow No.: **22040541**
Attachment to Warranty Deed Dated: July 16, 2004

KNOWN ALL MEN BY THESE PRESENTS:

THAT **IVAYLO T. DODEV AND NIKOLINA T DODEVA, HUSBAND AND WIFE**

each being first duly sworn upon oath each for himself or herself and jointly but not one for the other deposes and says:

THAT I am one of the Grantees named in that certain Deed which is dated July 16, 2004, and executed by **JUSTIN C. FRANKS**, an unmarried man and **DAIDRIA FRANKS**, an unmarried woman as Grantor, and **IVAYLO T. DODEV and NIKOLINA T DODEVA, husband and wife** as Grantee, and which instrument concerns the following described property:

**See Exhibit A attached hereto and made a part hereof.**

THAT the interests of the undersigned are being taken by them as Community Property with right of survivorship.

THAT each of us individually and jointly hereby assert and affirm that it is our intention to accept said interest as community property with right of survivorship and to acquire any interest in, or any proceeds arising out of said property, not as tenants in common and not as joint tenants, but as Community Property with right of survivorship.

**BUYERS:**

IVAYLO T. DODEV                NIKOLINA T DODEVA

STATE OF ARIZONA
COUNTY OF **MARICOPA**   } SS:

This instrument was acknowledged before me this _22nd_ day of _July_, 20 _04_ by:
IVAYLO T. DODEV and NICKOLINA T. DODEVEA.

My Commission Expires: _5-23-08_

Notary Public

OFFICIAL SEAL
**CHERYL WATSON**
Notary Public - State of Arizona
PINAL COUNTY
My Comm. Expires May 23, 2008

20040852027

Exhibit A

A PORTION OF LAND IN THE SOUTHWEST QUARTER OF SECTION 22, TOWNSHIP 2 SOUTH, RANGE 6 EAST, GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS;

COMMENCING AT THE SOUTHWEST CORNER OF SECTION 22;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 1284.85 FEET;

THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF  415.04 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF  193.02  FEET TO THE POINT OF BEGINNING;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 367.57 FEET;

THENCE NORTH 00 DEGREES 03 MINUTES 42 SECONDS EAST, A DISTANCE  OF 9.56 FEET;

THENCE NORTH 18 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE  OF 266.94 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE  OF 279.44 FEET;

THENCE SOUTH 00 DEGREES 25 MINUTES 50 SECONDS EAST, A DISTANCE  OF 262.23 FEET TO THE POINT OF BEGINNING.

# EXHIBIT "6"

| Home | About | Recorder | Elections | Media Events | Publications | Support |

## RECORDED DOCUMENT SEARCH DETAIL ☞ View Basket [New Search] CONTACT US

### RECORDING INFORMATION

| Name(s) | Document Code(s) |
|---------|------------------|
| AXIS MTG AND INVEST LLC<br>DODEV IVAYLO T<br>DODEV NIKOLINA T | DEED TRST |

| Recording Date/Time | Recording Number | Pages |
|---------------------|------------------|-------|
| 7/26/2004 10:56:32 AM | 20040852028 | 20 |
| | | View Unofficial Documents by clicking the number above. |

### VIEWING OPTIONS

○ PNG - Select to view one page at a time
◉ PDF - Select to view all the pages

◉ View Image

[Buy Document]

### MAIN SITE LINKS

- Home
- About
- Recorder
- Elections
- Media Events
- Publications
- Sitemap

### HOURS & LOCATIONS

**Recorder and Elections - Main Office (Downtown)**
111 S. Third Ave.
Phoenix AZ 85003
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-3535
T.D.D. 602-506-2348

**Recorder and Elections - Southeast Office (Mesa)**
222 E. Javelina
Mesa AZ 85210
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-3535
T.D.D. 602-506-2348

**Elections - MCTEC Office**
510 S. Third Ave.. Phoenix AZ 85003
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-1511
T.D.D. 602-506-2348

### CONTACT US

Sign up here to receive email notifications of any future website outages.

**Disclaimer**

The Maricopa County Recorder's Office presents the information on this web site as a service to the public. We have tried to ensure that the information contained in this electronic document is accurate.

The Recorder's Office makes no warranty or guarantee concerning the accuracy or reliability of the content at this site or at other sites to which we link. Assessing accuracy and reliability of information is the responsibility of the user.

The Recorder's Office shall not be liable for errors contained herein or for any damages in connection with the use of the information contained herein.

Recording Requested By:
AXIS MORTGAGE & INVESTMENTS, LLC

And After Recording Return To:
AXIS MORTGAGE & INVESTMENTS, LLC
1201 S. ALMA SCHOOL RD., SUITE 3700
MESA, ARIZONA 85210
Loan Number: 04-3495-12

22040541

2/3

[Space Above This Line For Recording Data]

# DEED OF TRUST

**MIN:** 1000439-0434951200-4

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)  "Security Instrument"** means this document, which is dated  JULY 21, 2004         , together with all Riders to this document.
**(B)  "Borrower"** is  IVAYLO T DODEV AND NIKOLINA T DODEVA, HUSBAND AND WIFE

Borrower is the trustor under this Security Instrument.  Borrower's mailing address is  13625 S 48TH ST #1088, PHOENIX, ARIZONA 85044

**(C)  "Lender"** is  AXIS MORTGAGE & INVESTMENTS, LLC

Lender is a  LIMITED LIABILITY CORPORATION                                 organized and existing under the laws of  ARIZONA
Lender's mailing address is  1201 S. ALMA SCHOOL RD., SUITE 3700, MESA, ARIZONA 85210

**(D)  "Trustee"** is  CAPITAL TITLE AGENCY INC., AN ARIZONA CORP
Trustee's mailing address is  2901 E CAMELBACK ROAD, PHOENIX, ARIZONA 85016

**(E)  "MERS"** is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  **MERS is the beneficiary under this Security Instrument.**  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F)  "Note"** means the promissory note signed by Borrower and dated  JULY 21, 2004         .
The Note states that Borrower owes Lender  THREE HUNDRED EIGHT THOUSAND AND 00/100
                                   Dollars (U.S. $ 308,000.00         ) plus interest.

---

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3003 1/01 (rev. 6/02)                    Page 1 of 13

DocMagic *eFarms* 800-649-1362
www.docmagic.com

Az3003.mzd.1.tem

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **AUGUST 1, 2034**       .

**(G)  "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)  "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)  "Riders"** means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider     ☐ Condominium Rider     ☐ Second Home Rider

☐ Balloon Rider     ☐ Planned Unit Development Rider     ☐ Other(s) [specify]

☐ 1-4 Family Rider     ☐ Biweekly Payment Rider

**(J)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)  "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)  "Escrow Items"** means those items that are described in Section 3.

**(N)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)  "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)  "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)  "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)  "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS.  This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **COUNTY** of **MARICOPA** :

    [Type of Recording Jurisdiction]                     [Name of Recording Jurisdiction]

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3003 1/01 (rev. 6/02)               Page 2 of 13                     *DocMagic eForms* 800-649-1362
www.docmagic.com

Az3003.mzd.2.tem

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N. #: 304-77-004-W

which currently has the address of  23410 S. 161ST WAY

[Street]

GILBERT            , Arizona        85297            ("Property Address"):

[City]                                [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3003 1/01 (rev. 6/02)                Page 3 of 13                DocMagic eForms 800-649-1362
www.docmagic.com

Az3003.mzd.3.tem

**2.    Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.    Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to

Az3003.mzd.4.tem

Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such

DocMagic *eFerms* 800-649-1362
www.docmagic.com

Az3003.mzd.5.tem

inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

   **6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

   **7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

   Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

   **8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

   **9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to, (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not

have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security

Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests

transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer;** Unofficial Document **. Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3003 1/01 (rev. 6/02)                    Page 10 of 13                    DocMagic *eForms* 800-649-1362
www.docmagic.com

Az3003.mzd.10.tem

of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security

Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Time of Essence.** Time is of the essence in each covenant of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
IVAYLO T DODEV                -Borrower

_____ (Seal)
NIKOLINA T DODEVA            -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

Unofficial Document

Witness:                                Witness:

_____         _____

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3003 1/01 (rev. 6/02)          Page 12 of 13          DocMagic *eForms* 800-649-1362
                                                           *www.docmagic.com*

Az3003.mzd.12.tem

State of Arizona
County of  MARICOPA

The foregoing instrument was acknowledged before me this *22nd day of July, 2004*
by  IVAYLO  T  DODEV,  NIKOLINA  T  DODEVA



_____
Signature of Person Taking Acknowledgment

_____
Title

_____
Serial Number, if any

(Seal)                          My commission expires: _____

Unofficial Document

OFFICIAL SEAL
CHERYL WATSON
Notary Public - State of Arizona
PINAL COUNTY
My Comm. Expires May 23, 2008

---

MIN: 1000439-0434951200-4                Loan Number: 04-3495-12

# ADJUSTABLE RATE RIDER
## (LIBOR Six-Month Index (As Published in *The Wall Street Journal*) - Rate Caps)
## (Interest Only ARM)

THIS ADJUSTABLE RATE RIDER is made this 21st day of JULY, 2004                      ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed or Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to AXIS MORTGAGE & INVESTMENTS,
LLC, LIMITED LIABILITY CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and located at:

23410 S. 161ST WAY, GILBERT, ARIZONA 85297
[Property Address]

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND
THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of        3.625 %. The Note also provides for
changes in the interest rate and the monthly payments, as follows:

## 3.  PAYMENTS
### (A) Time and Place of Payments
I will pay interest by making payments every month for the first 120           payments (the
"Interest-Only Period") in the amount sufficient to pay interest as it accrues. Every month thereafter I will
pay principal and interest by making payments in an amount sufficient to fully amortize the outstanding
principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note.
The principal and interest payment I pay may change as the interest rate I pay changes pursuant to Section
4 of this Note.
I will make my monthly payments on the     1st        day of each month beginning on
SEPTEMBER 1, 2004      . I will make these payments every month until I have paid all of the
principal and interest and any other charges described below that I may owe under this Note. Each monthly
payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on
AUGUST 1, 2034          , I still owe amounts under this Note, I will pay those amounts in full
on that date, which is called the "Maturity Date."

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
DLJMC 6 MONTH IO ARM RIDER  05/01/04       Page 1 of 4                    *DocMagic eFarms* 800-649-1362
www.docmagic.com

I will make my monthly payments at 1201 S. ALMA SCHOOL RD., SUITE 3700, MESA, ARIZONA 85210

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $930.42 This amount may change.

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the 1st day of FEBRUARY, 2005 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 375/1000 percentage points ( 2.375 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

Except as provided in Section 3(A) above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

My interest rate will never be greater than 12.000%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
DLJMC 6 MONTH IO ARM RIDER  05/01/04        Page 2 of 4

DocMagic *eForms* 800-649-1362
www.docmagic.com

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption.  Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
DLJMC 6 MONTH IO ARM RIDER  05/01/04        Page 3 of 4

*DocMagic eFarms* 800-649-1362
www.docmagic.com

Usr6lm.dlj.3.tem

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
IVAYLO T DODEV                      -Borrower

_____ (Seal)
NIKOLINA T DODEVA                   -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

Unofficial Document

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
DLJMC 6 MONTH IO ARM RIDER  05/01/04        Page 4 of 4

DocMagic *eForms* 800-649-1362
www.docmagic.com

UsrRm.dlj.4.tem

Loan Number: 04-3495-12

Date: JULY 21, 2004

Property Address: 23410 S. 161ST WAY, GILBERT, ARIZONA 85297

## EXHIBIT "A"

## LEGAL DESCRIPTION

A PORTION OF LAND IN THE SOUTHWEST QUARTER OF SECTION 22, TOWNSHIP 2 SOUTH, RANGE 6 EAST, GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS;

COMMENCING AT THE SOUTHWEST CORNER OF SECTION 22;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 1284.85 FEET;

THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 415.04 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 193.02 FEET TO THE POINT OF BEGINNING;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 367.57 FEET;

THENCE NORTH 00 DEGREES 03 MINUTES 42 SECONDS EAST, A DISTANCE OF 9.56 FEET;

THENCE NORTH 18 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE OF 266.94 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 279.44 FEET;

THENCE SOUTH 00 DEGREES 25 MINUTES 50 SECONDS EAST, A DISTANCE OF 262.23 FEET TO THE POINT OF BEGINNING.

A.P.N. # : 304-77-004-W

DocMagic eForms 800-649-1362
www.docmagic.com

Legal.msc

Loan Number: 04-3495-12

# SIX-MONTH LIBOR ADJUSTABLE-RATE
# LOAN PROGRAM DISCLOSURE
## INTEREST-ONLY
### Important Mortgage Loan Information
*Please Read Carefully*

This disclosure describes the features of the Adjustable-Rate Mortgage (ARM) program you are considering. Information on other ARM programs available from your Lender will be provided upon request. This disclosure does not constitute a commitment to make a loan to you. If you eventually obtain a loan, the Note, Security Instrument and related documents will establish your legal rights and obligations regarding the loan.

## HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED

- Your initial interest rate is not based on the index plus the margin. However, the initial interest rate may be equal to the index plus the margin or may include a discount or may include a premium. If your initial interest rate includes a discount, the initial rate will be lower than the sum of the index plus the margin. If your initial interest rate includes a premium, the initial rate will be higher than the sum of the index plus the margin. Please ask your Lender for the initial interest rate, discount or premium.
- Your interest rate will be periodically adjusted based on the index rate plus the margin. Please ask your Lender for the current index rate and margin.
- The index rate is the average of interbank offered rates for six month U.S. Dollar-denominated deposits in the London market, commonly referred to as the "LIBOR" index, as published in *The Wall Street Journal*. If this index is no longer available a comparable index will be substituted.
- The effective date of a change in the interest rate is a "Change Date."
- Except for your initial interest rate, which may be lower than, equal to or higher than the rate that is based on the index plus the margin, the interest rate will equal the index rate plus the margin, rounded to the nearest one-eighth of one percentage point (.125%), unless your interest rate "caps" limit the amount of change in the interest rate on a Change Date.
- Please note that if your initial interest rate is lower than the rate that is based on the index plus the margin, the interest rate may increase on the first Change Date even if the index decreases.
- Payments made during the first one-hundred-twenty (120) regularly scheduled monthly payments will be applied towards interest only. This means that the regular monthly payments will not reduce the principal balance during the interest-only period.
- Beginning with the one-hundred-twenty-first (121) regularly scheduled monthly payment, your payments will be applied towards principal and interest.
- During the period that you make payments of interest only, your payment will be based on the interest rate and loan balance. After that period, your payment will be based on the interest rate, loan balance and remaining loan term.

## HOW YOUR INTEREST RATE CAN CHANGE

Your interest rate can change every six (6) months to the index rate plus the margin, subject to the following limits:
- Your interest rate will be rounded to the nearest one-eighth of one percentage point (.125%).
- Regardless of the value of the index rate, the interest rate on your loan will never be more than the maximum interest rate set in your loan documents. Your Lender will set the maximum interest rate at the time of loan commitment/lock. Please ask your Lender for the maximum interest rate on your loan.
- Your interest rate cannot decrease to be less than the margin over the term of the loan.

SIX-MONTH LIBOR ARM DISCLOSURE - 10 YEAR INTEREST-ONLY
NO PERIODIC CAP- NON-CONVERTIBLE
FORM 620-IO 10/02/03                    Page 1 of 2

DocMagic *eFarms* 800-649-1362
www.docmagic.com

620io.als.1.tem

## HOW YOUR PAYMENT CAN CHANGE

- Your payment can change each time your interest rate changes.
- You will be notified in writing at least twenty-five (25) days before the due date of each adjustment. This notice will contain information about your interest rate, payment amount and loan balance.
- Your payment may increase or decrease substantially depending on changes in the interest rate.

## INITIAL AND MAXIMUM INTEREST RATE

For example, on a $10,000 thirty-year loan with an initial interest rate of 3.875% (index[1] plus the margin[2] rounded to the nearest .125%), the interest rate could rise to 12.00% (maximum interest rate in effect on October 2, 2003). The monthly payment can rise from a first year payment of $32.29 to a maximum of $110.11 in the 11th Year.

1. *An index in effect on October 2, 2003 is 1.160. The index in effect at the time the initial interest rate is established for your loan may be different. The initial interest rate on your loan may be lower than, equal to or higher than the rate that is based on the index plus the margin.*
2. *Margin of 2.75 percentage points. This is a margin we have used recently. Your margin may be different.*

## CALCULATING YOUR INITIAL PAYMENT

To see what your payments (excluding escrow payments) would be, divide your mortgage amount by $10,000; then multiply the loan payment by that amount. (For example, the monthly payment for a mortgage amount of $60,000 would be $60,000 ÷ $10,000 = 6; 6 x $32.29 = $193.74).

| | | | |
|---|---|---|---|
| Borrower  IVAYLO T DODEV | Date 07/22/04 | Borrower NIKOLINA T DODEVA  07-22-04 | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

SIX-MONTH LIBOR ARM DISCLOSURE - 10 YEAR INTEREST-ONLY
NO PERIODIC CAP- NON-CONVERTIBLE
FORM 620-IO 10/02/03                    Page 2 of 2

DocMagic eForms   800-649-1362
www.docmagic.com

620io.als.2.tem

# EXHIBIT "7"

Home    About    Recorder    Elections    Media Events    Publications    Support



# RECORDED DOCUMENT SEARCH DETAIL ⇌View Basket  New Search  CONTACT US

## RECORDING INFORMATION

| Name(s) | Document Code(s) |
|---|---|
| AXIS MTG AND INVEST LLC<br>DODEV IVAYLO T<br>DODEV NIKOLINA T | DEED TRST |

| Recording Date/Time | Recording Number | Pages |
|---|---|---|
| 7/26/2004 10:56:32 AM | 20040852029 | 7 |
| | | View Unofficial Documents by clicking the number above. |

## VIEWING OPTIONS

○ PNG - Select to view one page at a time          ◉ View Image
◉ PDF - Select to view all the pages

Buy Document

## MAIN SITE LINKS     HOURS & LOCATIONS          CONTACT US

- Home
- About
- Recorder
- Elections
- Media Events
- Publications
- Sitemap

**Recorder and Elections - Main Office (Downtown)**
111 S. Third Ave.
Phoenix AZ 85003
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-3535
T.D.D. 602-506-2348

**Recorder and Elections - Southeast Office (Mesa)**
222 E. Javelina
Mesa AZ 85210
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-3535
T.D.D. 602-506-2348

**Elections - MCTEC Office**
510 S. Third Ave., Phoenix AZ 85003
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-1511
T.D.D. 602-506-2348

Sign up here to receive email notifications of any future website outages.

**Disclaimer**

The Maricopa County Recorder's Office presents the information on this web site as a service to the public. We have tried to ensure that the information contained in this electronic document is accurate.

The Recorder's Office makes no warranty or guarantee concerning the accuracy or reliability of the content at this site or at other sites to which we link. Assessing accuracy and reliability of information is the responsibility of the user.

The Recorder's Office shall not be liable for errors contained herein or for any damages in connection with the use of the information contained herein.

Recording Requested By:

**Unofficial Document**

And After Recording Return To:
AXIS MORTGAGE & INVESTMENTS, LLC
1201 S. ALMA SCHOOL RD., SUITE 3700
MESA, ARIZONA 85210
Loan Number: 04-3496-12

# DEED OF TRUST

MIN: 1000439-0434961200-2

THIS DEED OF TRUST is made this 21st day of JULY, 2004 among the Trustor, IVAYLO T DODEV AND NIKOLINA T DODEVA, HUSBAND AND WIFE (herein "Borrower"),

CAPITAL TITLE AGENCY INC., AN ARIZONA CORP, 2901 E CAMELBACK ROAD, PHOENIX, ARIZONA 85016 (herein "Trustee"), and the Beneficiary, Mortgage Electronic Registration Systems, Inc. ("MERS"), (solely as nominee for Lender, as hereinafter defined, and Lender's successors and assigns). MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. AXIS MORTGAGE & INVESTMENTS, LLC, LIMITED LIABILITY CORPORATION is organized and existing under the laws of ARIZONA and has an address of 1201 S. ALMA SCHOOL RD., SUITE 3700, MESA, ARIZONA 85210

(herein "Lender").

BORROWER, in consideration of the indebtedness herein recited and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of MARICOPA , State of Arizona:
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N. #: 304-77-004-W

THIS SECURITY INSTRUMENT IS SUBORDINATE TO AN EXISTING FIRST LIEN(S) OF RECORD.
which has the address of 23410 S. 161ST WAY
[Street]
GILBERT , Arizona 85297 (herein "Property Address");
[City] [Zip Code]

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents (subject however to the rights and authorities given herein to Lender to collect and apply such rents), all of which shall be deemed to be and remain a part of the property covered by this Deed of Trust; and all of the foregoing, together with said property (or the leasehold estate if this Deed of Trust is on a leasehold) are hereinafter referred to as the "Property." Borrower understands and agrees that MERS holds only legal title to the

ARIZONA–SECOND MORTGAGE–1/80–FNMA/FHLMC UNIFORM INSTRUMENT
Form 3803 – AS AMENDED FOR MERS          Page 1 of 6

DocMagic eForms 800-649-1362
www.docmagic.com

Az38031.mzd

interests granted by Borrower in this Deed of Trust; but, if necessary to comply with law or custom, MERS, (as nominee for Lender and Lender's successors and assigns), has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing or cancelling this Deed of Trust.

TO SECURE to Lender the repayment of the indebtedness evidenced by Borrower's note dated JULY 21, 2004 and extensions and renewals thereof (herein "Note"), in the principal sum of U.S. $ 57,700.00 , with interest thereon, providing for monthly installments of principal and interest, with the balance of the indebtedness, if not sooner paid, due and payable on AUGUST 1, 2019 the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Deed of Trust; and the performance of the covenants and agreements of Borrower herein contained.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest.** Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments (including condominium and planned unit development assessments, if any) which may attain priority over this Deed of Trust and ground rents on the Property, if any, plus one-twelfth of yearly premium installments for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender.

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a Federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Deed of Trust that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Deed of Trust.

If the amount of the Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as Lender may require.

Upon payment in full of all sums secured by this Deed of Trust, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 17 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Deed of Trust.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.

Az38032.mzd

**4. Prior Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Deed of Trust, and leasehold payments or ground rents, if any.

**5. Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require and in such amounts and for such periods as Lender may require.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Deed of Trust.

**6. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Deed of Trust is on a leasehold. If this Deed of Trust is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

**7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Deed of Trust, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Deed of Trust, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Deed of Trust. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

**8. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust.

**10. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Deed of Trust granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Deed of Trust by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Deed of Trust, but does not execute the Note, (a) is co-signing this Deed of Trust only to grant and convey that Borrower's interest in the Property to Trustee under the terms of this Deed of Trust, (b) is not personally liable on the Note or under this Deed of Trust, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Deed of Trust or the Note without that Borrower's consent and without releasing that Borrower or modifying this Deed of Trust as to that Borrower's interest in the Property.

**12. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Deed of Trust shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Deed of Trust shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**13. Governing Law; Severability.** The state and local laws applicable to this Deed of Trust shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of Federal law to this Deed of Trust. In the event that any provision or clause of this Deed of Trust or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Deed of Trust or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Deed of Trust and the Note are declared to be severable. As used herein, "costs", "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

**14. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note and of this Deed of Trust at the time of execution or after recordation hereof.

**15. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair, or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

**16. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Deed of Trust. However, this option shall not be exercised by Lender if exercise is prohibited by Federal law as of the date of this Deed of Trust.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Deed of Trust. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Deed of Trust without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**17. Acceleration; Remedies.** Except as provided in paragraph 16 hereof, upon Borrower's breach of any covenant or agreement of Borrower in this Deed of Trust, including the covenants to pay when due any sums secured by this Deed of Trust, Lender prior to acceleration shall give notice to Borrower as provided in paragraph 12 hereof specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 10 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Deed of Trust and sale of Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the nonexistence of a default or any other defense of Borrower to acceleration and sale. If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option, may declare all of the sums secured by this Deed of Trust to be immediately due and payable without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all reasonable costs and expenses incurred in pursuing the remedies provided in this paragraph 17, including, but not limited to, reasonable attorneys' fees.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which the Property or some part thereof is located and shall mail copies of such notice in the manner prescribed by applicable law to Borrower and to the other persons prescribed by applicable law. After the lapse of such time as may be required by applicable law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or Lender's designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property so sold without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all reasonable costs and expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees and costs of title evidence; (b) to all sums secured by this Deed of Trust; and (c) the excess, if any, to the person or persons legally entitled thereto, or to the clerk of the superior court of the county in which the sale took place.

**18. Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Deed of Trust due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Deed of Trust discontinued at any time prior to the earlier to occur of (i) sale of the Property pursuant to the power of sale contained in this Deed of Trust or (ii) entry of a judgment enforcing this Deed of Trust if: (a) Borrower pays Lender all sums which would be then due under this Deed of Trust and the Note had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Deed of Trust; (c) Borrower pays all reasonable expenses incurred by Lender and Trustee in enforcing the covenants and agreements of Borrower contained in this Deed of Trust, and in enforcing Lender's and Trustee's remedies as provided in paragraph 17 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Deed of Trust, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Deed of Trust shall continue unimpaired. Upon such payment and cure by Borrower, this Deed of Trust and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

**19. Assignment of Rents; Appointment of Receiver; Lender in Possession.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 17 hereof or abandonment of the Property, Lender, in person, by agent or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collections of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Deed of Trust. Lender and the receiver shall be liable to account only for those rents actually received.

**20. Release.** Upon payment of all sums secured by this Deed of Trust, Lender shall release this Deed of Trust without charge to Borrower. Borrower shall pay all costs of recordation, if any.

**21. Substitute Trustee.** Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon the Trustee herein and by applicable law.

**22. Time of Essence.** Time is of the essence of each covenant of this Deed of Trust.

**23. Mailing Address.** Borrower's mailing address is the Property Address. Trustee's mailing address is
```
2901 3 CAMELBACK ROAD, PHOENIX, ARIZONA 85016
```

ARIZONA–SECOND MORTGAGE–1/80–FNMA/FHLMC UNIFORM INSTRUMENT
Form 3803 – AS AMENDED FOR MERS                Page 5 of 6                DocMagic eFormn  800-649-1362
                                                                          www.docmagic.com

## REQUEST FOR NOTICE OF DEFAULT
## AND FORECLOSURE UNDER SUPERIOR
## MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Deed of Trust to give Notice to Lender, at Lender's address set forth on page one of this Deed of Trust, of any default under the superior encumbrance and of any sale or other foreclosure action.

IN WITNESS WHEREOF, Borrower has executed and acknowledges receipt of pages 1 through 6 of this Deed of Trust.

_____ (Seal)          _____ (Seal)
IVAYLO T DODEV            -Borrower         NIKOLINA T DODEVA         -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

Witness: _____    Unofficial Document   Witness: _____

_____                 _____

STATE OF ARIZONA,              County ss: MARICOPA

This foregoing instrument was acknowledged before me this *22nd dy of July, 2004*
                                                                              [date]

by IVAYLO T DODEV, NIKOLINA T DODEVA
                    [person acknowledging]

My Commission Expires:



OFFICIAL SEAL
CHERYL WATSON
Notary Public - State of Arizona
PINAL COUNTY
My Comm. Expires May 23, 2008

_____
                  Notary Public

ARIZONA–SECOND MORTGAGE–1/80–FNMA/FHLMC UNIFORM INSTRUMENT
Form 3803 – AS AMENDED FOR MERS                Page 6 of 6          DocMagic *eForms* 800-649-1362
                                                                   www.docmagic.com

Az38036.mzd

Loan Number:  04-3496-12

Date: JULY 21, 2004

Property Address:  23410 S. 161ST WAY, GILBERT, ARIZONA 85297

## EXHIBIT "A"

## LEGAL DESCRIPTION

A PORTION OF LAND IN THE SOUTHWEST QUARTER OF SECTION 22, TOWNSHIP 2 SOUTH, RANGE 6 EAST, GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS;

COMMENCING AT THE SOUTHWEST CORNER OF SECTION 22;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 1284.85 FEET;

THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF  415.04 FEET;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF  193.02 FEET TO THE POINT OF BEGINNING;

THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, A DISTANCE OF 367.57 FEET;

THENCE NORTH 00 DEGREES 03 MINUTES 42 SECONDS EAST, A DISTANCE OF 9.56 FEET;

THENCE NORTH 18 DEGREES 49 MINUTES 40 SECONDS EAST, A DISTANCE OF 266.94 FEET;

THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, A DISTANCE OF 279.44 FEET;

THENCE SOUTH 00 DEGREES 25 MINUTES 50 SECONDS EAST, A DISTANCE OF 262.23 FEET TO THE POINT OF BEGINNING.

A.P.N. # : 304-77-004-W

**DocMagic** *eForms* 800-649-1362
www.docmagic.com

Legal.msc

# EXHIBIT "8"

| Home | About | Recorder | Elections | Media Events | Publications | Support |



## RECORDED DOCUMENT SEARCH DETAIL ⚲View Basket [New Search] CONTACT US

RECORDING INFORMATION

| Name(s) | Document Code(s) |
|---|---|
| DODEV IVAYLO T<br>DODEVA NIKOLINA T<br>FIRST MAGNUS FINANCIAL CORPORATION | DEED TRST |

| Recording Date/Time | Recording Number | Pages |
|---|---|---|
| 5/25/2005 4:50:38 PM | 20050698759 | 22 |
| | | View Unofficial Documents by clicking the number above. |

VIEWING OPTIONS

○ PNG - Select to view one page at a time
● PDF - Select to view all the pages

● View Image


[Buy Document]

MAIN SITE LINKS     HOURS & LOCATIONS     CONTACT US

- Home
- About
- Recorder
- Elections
- Media Events
- Publications
- Sitemap

**Recorder and Elections - Main Office (Downtown)**
111 S. Third Ave.
Phoenix AZ 85003
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-3535
T.D.D. 602-506-2348

**Recorder and Elections - Southeast Office (Mesa)**
222 E. Javelina
Mesa AZ 85210
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-3535
T.D.D. 602-506-2348

**Elections - MCTEC Office**
510 S. Third Ave., Phoenix AZ 85003
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-1511
T.D.D. 602-506-2348

Sign up here to receive email notifications of any future website outages.

**Disclaimer**

The Maricopa County Recorder's Office presents the information on this web site as a service to the public. We have tried to ensure that the information contained in this electronic document is accurate.

The Recorder's Office makes no warranty or guarantee concerning the accuracy or reliability of the content at this site or at other sites to which we link. Assessing accuracy and reliability of information is the responsibility of the user.

The Recorder's Office shall not be liable for errors contained herein or for any damages in connection with the use of the information contained herein.

Unofficial Document

20

25

Fo

**CHICAGO TITLE INSURANCE COMPANY**

Recording Requested By:
FIRST MAGNUS FINANCIAL CORPORATION

Return To:
FIRST MAGNUS FINANCIAL CORPORATION

603 N. WILMOT
TUCSON, AZ 85711

Prepared By:

FIRST MAGNUS FINANCIAL CORPORATION
603 N. WILMOT                           **REFINANCE**
TUCSON, AZ 85711

———————————[Space Above This Line For Recording Data]———————————

# DEED OF TRUST

LOAN NO.:  9845001050                        MIN   100039298450010502
ESCROW NO.:  2509478                         MERS Phone: 1-888-679-6377

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated                MAY 19, 2005                ,
together with all Riders to this document.

(B) "Borrower" is
IVAYLO T. DODEV AND NIKOLINA T. DODEVA, HUSBAND AND WIFE

Borrower is the trustor under this Security Instrument. Borrower's mailing address is
23410 SOUTH 161ST WAY, GILBERT, AZ 85297
(C) "Lender" is
FIRST MAGNUS FINANCIAL CORPORATION                , AN ARIZONA CORPORATION

Lender is a  CORPORATION
organized and existing under the laws of   ARIZONA

ARIZONA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS   Form 3003  1/01 (rev. 6/02)

Lender's mailing address is
603 North Wilmot Road, TUCSON, AZ 85711
(D) "Trustee" is                                                                                                                      .
CHICAGO TITLE INSURANCE CO.
Trustee's mailing address is                                                                                                     .
15615 NORTH 71ST STREET 207, SCOTTSDALE, AZ 85254                                              .
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated            MAY 19, 2005
The Note states that Borrower owes Lender
FIVE HUNDRED EIGHT THOUSAND AND NO/100 X X X X X X X X X X X X X X X X X
                                                                                                                      Dollars
(U.S. $ 508,000.00                      ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than     JUNE 01, 2035                      .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [XX] Adjustable Rate Rider | [ ] Condominium Rider | [ ] 1-4 Family Rider |
| [ ] Graduated Payment Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] Balloon Rider | [ ] Rate Improvement Rider | [ ] Second Home Rider |
| [ ] Other(s) [specify] | | |

Unofficial Document

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY of MARICOPA :

    [Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

LEGAL DESCRIPTION ATTACHED HERETO AND MADE PART HEREOF ......AND BEING MORE PARTICULARLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Unofficial Document

Parcel ID Number: 304-77-004          which currently has the address of

        23410 SOUTH 161ST WAY        [Street]

        GILBERT        [City] , Arizona    85297    [Zip Code]

("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.    <small>Unofficial Document</small>

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22.   Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold.  Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law.  After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale.  Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale.  Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. Unofficial Document  ils in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein.  Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

23. Release.  Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.  Borrower shall pay any recordation costs.  Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee.  Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder.  Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Time of Essence.  Time is of the essence in each covenant of this Security Instrument.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____  -Witness

_____  -Witness

_____ (Seal)
IVAYLO T. DODEV                    -Borrower

N. T. Dodeva _____ (Seal)
NIKOLINA T. DODEVA                 -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

Unofficial Document

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

STATE OF ARIZONA                    ,    *MARICOPA*                    County ss:

    The foregoing instrument was acknowledged before me this *MAY 20, 2005*    by
IVAYLO T. DODEV AND NIKOLINA T. DODEVA

My Commission Expires: *11-5-06*

                                                       _____
Notary Public

**PAMELA J. MARKMAN**
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
NOVEMBER 5, 2006

Unofficial Document

# ADJUSTABLE RATE RIDER
## (MTA-Twelve Month Average Index - Payment Caps)

LOAN NO.:  9845001050

MIN: 100039298450010502
MERS Phone: 1-888-679-6377

THIS ADJUSTABLE RATE RIDER is made this 19th day of        MAY, 2005        , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to FIRST MAGNUS FINANCIAL CORPORATION                      , AN ARIZONA CORPORATION ("Lender") of the same date and covering the property described in the Security Instrument and located at:

23410 SOUTH 161ST WAY, GILBERT, AZ  85297

[Property Address]

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agrees as follows:

## A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

## 2.  INTEREST
### (A) Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of            1.000            %.  The interest rate I will pay may change.

PayOption MTA ARM Rider
FE-5315  (0412)                    Page 1 of 6          LENDER SUPPORT SYSTEMS, INC. COU-5315.COU (02/05)

10/04

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the          1st          day of          JULY, 2005          , and on that day every month thereafter.  Each date on which my interest rate could change is called an "Interest Rate Change Date."  The new rate of interest will become effective on each Interest Rate Change Date.  The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

### (C) Index

Begining with the first Rate Change Date, my adjustable interest rate will be based on an index.  The "Index"  "Twelve Month Average"  of the annual yields on actively traded United States Treasurey Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields").  The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.  The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index". Unofficial Document

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding          TWO AND 800/1000THS          percentage point(s)          2.800          % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date.  My interest will never be greater than          9.950          %.  Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

PayOption MTA ARM Rider
FE-5315  (0412)                    Page 2 of 6                                                          10/04

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the  1st  day of each month beginning on JULY, 2005      .

I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on       JUNE 01, 2035      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at FIRST MAGNUS FINANCIAL CORPORATION       , AN ARIZONA CORP 603 North Wilmot Road, TUCSON, AZ  85711

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $       1,633.93      unless adjusted under Section 3(F).

### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the first day of       JULY, 2006 Unofficial Document       , and on that day every 12th month thereafter.  Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.  The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date.  The result of this calculation is called the "Full Payment."  Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment.

PayOption MTA ARM Rider
FE-5315  (0412)                               Page 3 of 6                                        10/04

Initials:

This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

(E) Additions to My Unpaid Principal
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

Unofficial Document

(F) Limit on My Unpaid Principal; Increased Monthly Payment
My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN AND 000/1000THS percent ( 115.000 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

(G) Required Full Payment
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

PayOption MTA ARM Rider
FE-5315 (0412)                          Page 4 of 6                          10/04

**(H) Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)    **Interest Only Payment**: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)    **Fully Amortized Payment**: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)    **15 Year Amortized Payment**: the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that

obligates the transferee to keep all the promises and agreements made in the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____(Seal)
IVAYLO T. DODEV                  -Borrower

_____(Seal)
NIKOLINA T. DODEVA                  -Borrower

_____(Seal)
                  -Borrower

_____(Seal)
                  -Borrower

Unofficial Document

_____(Seal)
                  -Borrower

_____(Seal)
                  -Borrower

_____(Seal)
                  -Borrower

_____(Seal)
                  -Borrower

PayOption MTA ARM Rider
FE-5315 (0412)                    Page 6 of 6                    10/04

# CHICAGO TITLE INSURANCE COMPANY

Page    1

## LEGAL DESCRIPTION

Escrow/Title No. 2509478      48

A portion of land in the Southwest quarter of Section 22, Township 2 South, Range 6 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

COMMENCING at the Southwest corner of Section 22;

thence North 90 degrees 00 minutes 00 seconds East, a distance of 1284.85 feet;

thence North 00 degrees 00 minutes 00 seconds East, a distance of 415.04 feet;

thence South 90 degrees 00 minutes 00 seconds West, a distance of 193.02 feet to the POINT OF BEGINNING;

thence South 90 degrees 00 minutes 00 seconds West, a distance of 367.57 feet;

thence North 00 degrees 03 minutes 42 seconds East, a distance of 9.56 feet;

thence North 18 degrees 49 minutes 40 seconds East, a distance of 266.94 feet;

thence North 90 degrees 00 minutes 00 seconds East, a distance of 279.44 feet;

thence South 00 degrees 25 minutes 50 seconds East, a distance of 262.23 feet to the POINT OF BEGINNING.

Unofficial Document

COMML-7/2/93-MAB

# EXHIBIT "9"

Home   About   Recorder   Elections   Media Events   Publications   Support

RECORDED DOCUMENT SEARCH DETAIL  ☞ View Basket   New Search   CONTACT US

RECORDING INFORMATION

| Name(s) | Document Code(s) |
|---|---|
| DODEV IVAYLO T<br>MERS INC<br>ODEVA NIKOLINA T | REL D/T |

| Recording Date/Time | Recording Number | Pages |
|---|---|---|
| 7/5/2005 11:29:41 AM | 20050921124 | 1 |
|  |  | View Unofficial Documents by clicking the number above. |

VIEWING OPTIONS

○ PNG - Select to view one page at a time      ● View Image
● PDF - Select to view all the pages

Buy Document

MAIN SITE LINKS          HOURS & LOCATIONS                    CONTACT US

- Home
- About
- Recorder
- Elections
- Media Events
- Publications
- Sitemap

**Recorder and Elections - Main Office (Downtown)**
111 S. Third Ave.
Phoenix AZ 85003
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-3535
T.D.D. 602-506-2348

**Recorder and Elections - Southeast Office (Mesa)**
222 E. Javelina
Mesa AZ 85210
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-3535
T.D.D. 602-506-2348

**Elections - MCTEC Office**
510 S. Third Ave., Phoenix AZ 85003
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-1511
T.D.D. 602-506-2348

Sign up here to receive email notifications of any future website outages.

Disclaimer

The Maricopa County Recorder's Office presents the information on this web site as a service to the public. We have tried to ensure that the information contained in this electronic document is accurate.

The Recorder's Office makes no warranty or guarantee concerning the accuracy or reliability of the content at this site or at other sites to which we link. Assessing accuracy and reliability of information is the responsibility of the user.

The Recorder's Office shall not be liable for errors contained herein or for any damages in connection with the use of the information contained herein.



Recording Requested By:
AMERICA'S SERVICING COMPANY

When Recorded Return To:
IVAYLO DODEV
23410 S 161ST WY
GILBERT, AZ 85297

O F
MARI
2005-

6 OF 22
FRAUSTOJ

## Deed of Release

America's Servicing Company #:1205086915 "DODEV"  Lender ID:319001/500247773  Maricopa, Arizona
MERS #: 1000439-0434951200-4  VRU #: 1-888-679-6377

WHEREAS, the undersigned MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. is the present beneficiary of that certain Deed of Trust further described as :

Trustor : IVAYLO T DODEV AND NIKOLINA T ODEVA, HUSBAND AND WIFE
Original Beneficiary : MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS) AS NOMINEE FOR AXIS MORTGAGE & INVESTMENTS, LLC
Dated: 07/21/2004 Recorded:  07/26/2004  in Book/Reel/Liber: N/A Page/Folio: N/A as Instrument No.: 20040852028
In the County of Maricopa State of Arizona

AND WHEREAS, the indebtedness secured by said Deed of Trust has been paid in full; NOW THEREFORE, the undersigned DOES HEREBY RECONVEY, without warranty, to the person or persons legally entitled thereto, the estate, title, and interest now held by it under said Deed of Trust in the said County, describing the land therein as more fully described in the said Deed of Trust.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
On June 23rd, 2005

By:_____
ERIC OCAMPO, Assistant Secretary

STATE OF California
COUNTY OF San Bernardino

On June 23rd, 2005, before me, NORI E. MCVEY, a Notary Public in and for San Bernardino in the State of California, personally appeared ERIC OCAMPO, Assistant Secretary, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

NORI E. MCVEY
Notary Expires: 12/26/2007 #1456782



(This area for notarial seal)

# EXHIBIT "10"

Home    About    Recorder    Elections    Media Events    Publications    Support



# RECORDED DOCUMENT SEARCH DETAIL ⇌ View Basket  New Search  CONTACT US

## RECORDING INFORMATION

| Name(s) | Document Code(s) |
|---|---|
| DODEV IVAYLO T<br>DODEVA NIKOLINA T<br>MERS INC | REL D/T |

| Recording Date/Time | Recording Number | Pages |
|---|---|---|
| 6/29/2005 9:35:40 AM | 20050891465 | 1 |
| | | View Unofficial Documents by clicking the number above. |

## VIEWING OPTIONS

○ PNG - Select to view one page at a time    ● View Image
● PDF - Select to view all the pages

**Buy Document**

## MAIN SITE LINKS

- Home
- About
- Recorder
- Elections
- Media Events
- Publications
- Sitemap

## HOURS & LOCATIONS

**Recorder and Elections - Main Office (Downtown)**
111 S. Third Ave.
Phoenix AZ 85003
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-3535
T.D.D. 602-506-2348

**Recorder and Elections - Southeast Office (Mesa)**
222 E. Javelina
Mesa AZ 85210
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-3535
T.D.D. 602-506-2348

**Elections - MCTEC Office**
510 S. Third Ave., Phoenix AZ 85003
Hours: 8:00 A.M. - 5:00 P.M. Monday - Friday
Phone: 602-506-1511
T.D.D. 602-506-2348

## CONTACT US

Sign up here to receive email notifications of any future website outages.

**Disclaimer**

The Maricopa County Recorder's Office presents the information on this web site as a service to the public. We have tried to ensure that the information contained in this electronic document is accurate.

The Recorder's Office makes no warranty or guarantee concerning the accuracy or reliability of the content at this site or at other sites to which we link. Assessing accuracy and reliability of information is the responsibility of the user.

The Recorder's Office shall not be liable for errors contained herein or for any damages in connection with the use of the information contained herein.



Recording Requested By:
Wilshire Credit Corporation

When Recorded Return To:

Ivavlo Dodeva
23410 S 161st Way
Gilbert, AZ  85297

MA

2005-0891405 06/29/05 07:55
16 OF 25
IBARRAS

---

### DEED OF RELEASE

Wilshire Credit Corp #:374818 "Dodeva" ID:/  Maricopa, AZ

WHEREAS, the undersigned MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC., A DELAWARE CORPORATION is the present beneficiary of that certain Deed of Trust further described as:

Trustor: IVAYLO T DODEV AND NIKOLINA T DODEVA, HUSBAND AND WIFE
Original Beneficiary: MERS
Dated: 07/21/2004
Recorded: 07/26/2004 as Instrument No. 20040852029
In the County of MARICOPA, State of ARIZONA

AND WHEREAS, the indebtedness secured by said Deed of Trust has been paid in full;

NOW THEREFORE, the undersigned DOES HEREBY RECONVEY, without warranty, to the person or persons legally entitled thereto, the estate, title, and interest now held by it under said Deed of Trust in said County, describing the land therein as more fully described in said Deed of Trust.

Mortgage Electronic Registration Systems Inc., a Delaware Corporation
On   June 16, 2005

By:_____

SUE JONES ASSISTANT SECRETARY


STATE OF Oregon
COUNTY OF Washington

ON June 16, 2005, before me, JEANNETTE L. KRAMER, a Notary Public in and for the County of Washington County, State of Oregon, personally appeared Sue Jones Assistant Secretary, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

_____
JEANNETTE L. KRAMER
Notary Expires: 09/04/2007  #372244

OFFICIAL SEAL
JEANNETTE L KRAMER
NOTARY PUBLIC-OREGON
COMMISSION NO. 372244
MY COMMISSION EXPIRES SEPTEMBER 4, 2007

(This area for notarial seal)
Wilshire Credit Corporation, P.O. BOX 8517, Portland, OR 97207-8517
JLK-20050616-0038 AZMARIC MARICOPA AZ BAT: 6877/374818 KXAZDOR1

**EXHIBIT "11"**

Unofficial
Document

Recording Requested By:
ReconTrust Company, N.A.
1330 W. Southern Ave.
MS: TPSA-88
Tempe, AZ 85282-4545
(800) 540-2684

When recorded, mail to:
IVAYLO T. DODEV, NIKOLINA T. DODEVA
23410 S 161st Way
Gilbert, AZ 85297

2007-0004797 01/02/07 01:34 PM
65 OF 121
ACUNAR

Above space for Recorder's use
DOCID#000935213542005N

## DEED OF RELEASE AND RECONVEYANCE

The undersigned is the legal owner and holder of the Note or Notes for the total original sum of $508,000.00 and of all other indebtedness secured by Deed of Trust dated 05/19/2005 made by
IVAYLO T. DODEV, NIKOLINA T. DODEVA
Trustor, and recorded on 05/25/2005, as Instrument No. 20050698759, in Docket N/A, Page N/A, of Official Records, in the office of the County Recorder of MARICOPA, Arizona

Said Note or Notes, together with all other indebtedness secured by said Deed of Trust, have been fully paid and satisfied. Therefore pursuant to Arizona Revised Statutes 33-707, the undersigned Beneficiary does hereby release and reconvey to the person or persons legally entitled thereto without warranty, all right, title and interest in and to the property described in said Deed of Trust.

Dated: 12/19/2006

Mortgage Electronic Registration Systems, Inc.

By: _____

Kimberly Robertson,
Assistant Secretary

### CORPORATE ACKNOWLEDGMENT

STATE OF ARIZONA                    )
COUNTY OF MARICOPA                  )

On 12/19/2006, before me, R. Higgins, Notary Public, personally appeared Kimberly Robertson personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

R. Higgins
Notary Public for said County and State
My commission expires:10/12/2009



OFFICIAL SEAL
R. HIGGINS
NOTARY PUBLIC - ARIZONA
MARICOPA COUNTY
My Comm. Expires Oct. 12, 2009